ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| MARITZA LÓPEZ DE MODESTTI; ÁNGEL F. MODESTTI LÓPEZ; NATHALIE MODESTTI LÓPEZ Y LA SUCESIÓN DE ÁNGEL F. MODESTTI-TORRES<br><br>Apelados<br><br>v.<br><br>BAYAMÓN MEDICAL CENTER H/N/C HOSPITAL HERMANOS MELÉNDEZ, et als.<br><br>Apelante | KLAN202400089 | *Apelación*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Sobre: Daños y Perjuicios; Impericia Médicas<br><br>Caso Núm.: BY2020CV01474 (402) |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Salgado Schwarz y el Juez Ronda Del Toro.

Rodríguez Casillas, juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 20 de mayo de 2025.

Comparece ante nos el Dr. Ariel E. Bermúdez Vera (en adelante: "Dr. Bermúdez Vera" o "apelante") mediante el presente recurso de apelación y nos solicita que revoquemos la *Sentencia* dictada el 17 de noviembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante: "TPI").[1] Allí se declaró Ha Lugar una acción civil en daños y perjuicios por impericia médica instada en contra del apelante.

Considerados los escritos de las partes, la transcripción de la prueba oral, la evidencia documental, testimonial y pericial admitida en el juicio en su fondo, resolvemos **revocar** la Sentencia apelada por los siguientes fundamentos.

---
[1] Notificada el 27 de noviembre de 2023.

**-I-**

La causa de acción en el presente caso surge el **12 de mayo de 2019** como resultado del fallecimiento del Sr. Ángel Filipo Modestti Torres -Q.D.P.- (en adelante: "señor Modestti Torres" o "paciente"). Obra del expediente que el señor Modestti Torres era un paciente de 65 años, con una condición de salud muy comprometida debido a una serie de enfermedades crónicas. En resumen, sufría de diabetes tipo II en estadio final de enfermedad renal crónica (ESRD),[2] por lo cual recibía tratamiento de hemodiálisis a través de una fístula arterio-venosa, tres veces en semana por más de un año antes de su fallecimiento.

Además, el señor Modestti Torres tenía una condición cardiovascular severa (operado de corazón abierto con la creación de tres puentes aorto-coronarios y complicación de cardiomiopatía), hipertensión, asma, periferovascular (mala circulación), úlceras necróticas, entre otras condiciones. [3] Precisamente, es el padecimiento de úlceras en las extremidades inferiores que origina los hechos que se relatan a continuación.

**A.**

**Antes de la hospitalización del 12 de marzo de 2019**, el señor Modestti Torres fue admitido en el Bayamón Medical Center (en adelante: "Hospital" o "BMC") el **13 de febrero de 2019** con un diagnóstico de —**úlcera en el dedo 3ro del pie derecho y necrosis del dedo 4to**—. En las áreas ulcerosas, el cultivo realizado mostró

---

[2] *End -stage renal disease.*
[3] Véanse, *Determinaciones de Hechos de la Sentencia apelada*, págs. 114 – 116 del Apéndice del recurso de apelación; *Informe Pericial del Dr. Pablo Rodríguez Ortíz* (Parte Co-Ddo./apelante Dr. Bermúdez Vera), págs. 1-2 de la Entrada Núm. 125 de SUMAC, págs. 1-2 de 12; *Informe Pericial del Dr. Gilberto Rodríguez Morales* (Parte Co-Ddo. Hospital Bayamón Medical Center), págs. 1-2 de la Entrada Núm. 129 de SUMAC, págs. 1-2 de 4; e *Informe Pericial del Dr. Danniel S. Timmerman* (Parte Dte./apelados), pág. 8 de la Entrada Núm. 123 de SUMAC, pág. 8 de 10.

la presencia de dos tipos de bacterias *(Morganella Morganii)*[4] y *(Estafilococos áureos)*.[5]

Ante ese resultado, se le realizó una evaluación con ultrasonido (dúplex) de las arterias de ambas piernas. La evaluación demostró que padecía de arterioesclerótica difusa con estenosis de la arteria superficial femoral de la pierna derecha.

También, se realizó una placa de pecho que demostró efusiones pleurales bilaterales grandes (acumulación excesiva de líquido), sugestivas de fallo cardiaco congestivo.

Al día siguiente, **14 de febrero de 2019**, se le realizó al paciente un estudio de arteriograma que demostró que padecía de una estrechez de 50% de la arteria poplítea, con 90% de estenosis (estrechez) de la arteria tibial anterior derecha. De igual modo, el estudio reportó que todas las arterias distales que van a los pies estaban sumamente calcificadas. Como parte del tratamiento, se recomendó endovascular de ambas piernas.

El **16 de febrero de 2019** al paciente se le hizo un ecocardiograma que demostró una función ventricular izquierda de su **corazón** severamente afectada con apenas una fracción de eyección de un **25 – 30%**. Tanto el nefrólogo como el cardiólogo estuvieron de acuerdo con que se realizara la angioplastia (procedimiento para mejorar el flujo sanguíneo) en las arterias de las piernas de forma ambulatoria en el Hospital del Auxilio Mutuo, por lo que ya había obtenido una cita. Ambos especialistas entendían que la enfermedad era bien severa, tanto la disfunción (mal funcionamiento) ventricular del corazón como la enfermedad perifero-vascular (trastorno de circulación sanguínea) en las piernas.

---

[4] Resistentes a la mayoría de los antibióticos. *Informe Pericial del Dr. Gilberto Rodríguez Morales*, pág. 2 de la Entrada Núm. 129 de SUMAC, pág. 2 de 4.
[5] Resistente a *meticilina. Ídem.*

El paciente fue estabilizado y dado de alta el **21 de febrero de 2019** del hospital. En esa ocasión, el demandado/apelante, Dr. Bermúdez Vera no intervino.[6]

**B.**

**El 12 de marzo de 2019**, —a poco más de tres semanas de haber sido dado de alta del Hospital— el señor Modestti Torres **volvió ingresar a la Sala de Emergencias del BMC**. En esta ocasión, la hospitalización ocurrió a petición del **radiólogo intervencional**, Dr. Salvador Mercado Oliveras, luego de que en el Hospital Auxilio Mutuo (en adelante: "HAM") intentara —sin existo— revascularizar (angioplastia) la circulación del flujo sanguíneo de las piernas del paciente.  Por lo cual, fue hospitalizado bajo el mismo diagnóstico de —**celulitis** en el dedo 3ro del pie derecho y **necrosis** del dedo 4to— por falta de circulación sanguínea en las piernas.[7]

El **internista y médico primario** Dr. Jesús Amparo Flores (en adelante: "Dr. Amparo Flores" o "internista y médico primario") realizó la admisión del paciente Modestti Torres **bajo su supervisión**. Luego de evaluarlo y consultar con subespecialistas (infectólogo, cardiólogo, nefrólogo y gastroenterólogo) procedió a recetarle antibióticos, medicamentos para la presión, la diabetes, antiplaquetarios y antiácidos.

De igual modo, durante la hospitalización del paciente, estuvo bajo el cuidado de su **médico primario y nefrólogo**, el Dr. Eddie Rodríguez Castro (en adelante: "Dr. Rodríguez Castro" o "médico primario y/o nefrólogo").

---

[6] Para el tratamiento recibido por el señor Modestti Torres en las **fechas del 13 al 21 de febrero de 2019**, véanse, el *Informe Pericial del Dr. Daniel S. Timmerman*, pág, 3 de la Entrada Núm. 123 de SUMAC, pág. 3 de 10; el *Informe Pericial del Dr. Pablo Rodríguez Ortíz*, pág. 1 de la Entrada Núm. 125 de SUMAC, pág. 1 de 12; y el *Informe Pericial del Dr. Gilberto Rodríguez Morales*, págs. 1–2 de la Entrada Núm. 129 de SUMAC, págs. 1-2 de 4.

[7] Véanse, el *Informe Pericial del Dr. Daniel S. Timmerman*, pág, 3 de la Entrada Núm. 123 de SUMAC, pág. 3 de 10; el *Informe Pericial del Dr. Pablo Rodríguez Ortíz*, pág. 1 de la Entrada Núm. 125 de SUMAC, pág. 1 de 12; y, el *Informe Pericial del Dr. Gilberto Rodríguez Morales*, pág. 1 de la Entrada Núm. 129 de SUMAC, pág. 1 de 4.

Precisamente, es el Dr. Rodríguez Castro quien hace la primera consulta al **cirujano**, Dr. Bermúdez Vera para que evaluara la condición de úlceras en los dedos del pie derecho que sufría el señor Modestti Torres por falta de circulación. La consulta surge porque el paciente tenía gangrena y podía propagarse, si no se trataba la infección.[8]

Ante ese cuadro médico, el **13 de marzo de 2019** el Dr. Bermúdez Vera evaluó por primera vez al señor Modestti Torres de 65 años y, además del historial de diabetes mellitus, encontró que tenía **úlceras en los dedos 3, 4 y 5 del pie derecho, al igual que en los dedos 1 y 3 del pie izquierdo**.[9] A la luz de estos hallazgos, el Dr. Bermúdez Vera le informó al paciente sobre su condición y las alternativas de tratamiento. El señor Modestti Torres aceptó la recomendación de someterse a un procedimiento quirúrgico de desbridamiento y limpieza del tejido necrótico de ambos pies.[10] Por otra parte, ese mismo día el paciente fue sometido a una placa de pecho que reveló efusiones pleurales bilaterales de sus pulmones, consistente con un edema pulmonar cardiogénico (acumulación anormal de líquido entre el pulmón y el tórax debido a la afección cardiaca del paciente).[11]

Al día siguiente, **14 de marzo de 2019**, el anestesiólogo encargado examinó al paciente —antes de someterlo a la cirugía— y encontró que estaba apto para el procedimiento quirúrgico. [12]

---

[8] Véanse, las *Determinaciones de Hechos* número 8 al núm. 33 de la Sentencia apelada, en el Apéndice V del recurso de apelación, págs. 114-116.

[9] Véase, *Reporte de Consulta,* Apéndice IX del recurso de apelación, pág. 195; (véase el mismo documento, pág. 10 de la Entrada Núm. 128 de SUMAC, pág. 10 de 200).

[10] Véase, *Autorización y Consentimiento para Procedimiento Quirúrgico y/o Tratamiento*, págs. 2215-2216 de la Entrada Núm. 128 de SUMAC, págs. 15-16 de 52.

[11] Véanse, *Informe Pericial del Dr. Daniel S. Timmerman,* pág, 3 de la Entrada Núm. 123 de SUMAC, pág. 3 de 10; e, *Informe Pericial del Dr. Pablo Rodríguez Ortíz*, pág. 2 de la Entrada Núm. 125 de SUMAC, pág. 2 de 12.

[12] Véase, *Evaluación Preoperatoria del Departamento de Anestesiología* (*Department of Anesthesiology Pre-Operative/Pain/Anesthesiology Consultation*), Apéndice X del recurso de apelación, pág. 196; (véase el mismo documento, pág. 529 de la Entrada Núm. 128 de SUMAC, pág. 130 de 200).

Específicamente, el anestesiólogo catalogó el estado físico del señor Modestti Torres como número 3, conforme al sistema de clasificación de la Sociedad Estadounidense de Anestesiólogos (ASA Status). Por lo tanto, con el consentimiento del paciente,[13] el procedimiento se realizó bajo **sedación** (no anestesia), lo cual permitió que el señor Modestti Torres estuviera consiente y fuese capaz de mantener su propia respiración sin la asistencia de máquinas.

Así, el Dr. Bermúdez Vera procedió a realizar el desbridamiento y limpieza **en los dedos 3, 4 y 5 del pie derecho, al igual que en los dedos 1 y 3 del pie izquierdo**. Además, ambos pies presentaban ulceraciones con descargas [secreciones]. Procedió a aplicar antibiótico *Silvadene* en las heridas y vendar los dedos. El proceso operatorio fue sencillo y duró unos diez (10) minutos: 11:50am a 12:00pm. El paciente estaba estable y consiente. Los fragmentos necróticos de piel removida durante la cirugía fueron enviados a patología para ser examinados. También, el Dr. Bermúdez Vera ordenó que se trasladara al señor Modestti Torres al *"general ward"*, para el cuidado del paciente.

El señor Modestti Torres continuó **bajos los cuidados del internista y médico primario**, Dr. Amparo Flores, y los subespecialistas del hospital. Entre ellos, el **nefrólogo y médico primario**, Dr. Rodríguez Castro, quien continuaba con el monitoreo del paciente y su tratamiento de hemodiálisis.

Como parte del tratamiento recibido en el BMC, **desde el 16 de marzo de 2019 hasta el 20 de marzo de 2019**, el señor Modestti Torres fue sometido a una serie de terapias respiratorias y medicamentos pulmonares.[14] El **17 de marzo de 2019** se reveló el

---

[13] Véase, *Consentimiento para la Anestesia*, pág. 530 de la Entrada Núm. 128 de SUMAC, págs. 131 de 200.

[14] Véase, *Informe Pericial del Dr. Danniel S. Timmerman*, pág. 4 de la Entrada Núm. 123 de SUMAC, pág. 4 de 10.

resultado de una radiografía del área del pecho del paciente que demostró que tenía un derrame pleural bilateral (acumulación excesiva de líquido entre los pulmones y el tórax) más grande en el lado derecho, al igual que una atelectasia bilateral.[15]

El **18 de marzo de 2019** el laboratorio de patología reveló que el material desbridado durante la operación del 14 de marzo de 2019 contenía **fragmentos de tejido de piel necrótica con infección focal y úlceras clínicamente necróticas** en los dedos 3, 4 y 5 del pie derecho, al igual que en los dedos 1 y 3 del pie izquierdo.[16]

El **19 de marzo de 2019**, el Dr. Bermúdez Vera ordenó, telefónicamente, que se le aplicara en las úlceras del paciente crema *Silvadene* y normal salina, ya que no estaba recibiendo el cuidado en las áreas afectadas.[17]

También, el **19 de marzo de 2019** el nefrólogo y médico primario, Dr. Rodríguez Castro, anotó en el expediente que en el cuarto dedo del pie derecho del paciente tenía úlceras isquémicas y gangrena. De ese modo, el nefrólogo y médico primario hizo constar que la gangrena seguía empeorando y solicitó una segunda consulta al cirujano Dr. Bermúdez Vera para que evaluara la posibilidad de una amputación, ya que en sus propias palabras, *"se ve peor"*.[18]

El **20 de marzo de 2019**, el Dr. Bermúdez Vera evaluó por segunda vez al señor Modestti Torres y encontró que el paciente tenía el 4to. dedo del pie derecho con gangrena seca, infección y

---

[15] Véase, *Estudio de pecho del Departamento de Radiología del BMC*, pág, 404 de la Entrada Núm. 128 de SUMAC, pág. 4 de 200.

[16] Véase, *Reporte de Examen de Tejidos (Tissue Examination Report),* pág. 535 de la Entrada Núm. 128 de SUMAC, pág. 136 de 200.

[17] Véanse, *Orden Médica vía teléfono*, a la pág. 1,484 de la Entrada Núm. 128 de SUMAC, pág. 84 de 100. Y la Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 55-56.

[18] Véanse, *Evaluación y Consulta del Dr. Rodríguez Castro,* Apéndice XI del recurso de apelación, pág. 197; (véase el mismo documento, pág, 590 de la Entrada Núm. 128 de SUMAC, pág. 192 de 200); *Determinación de Hechos núm. 81 de la Sentencia apelada*, Apéndice V del recurso de apelación, pág. 118; y, la Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 245-249.

secreciones.[19] **En esa misma fecha** del 20 de marzo de 2019, el Dr. Bermúdez Vera solicitó una consulta con el "*wound care team*",[20] que es una facilidad para curaciones de heridas con enfermeras entrenadas en el manejo de úlceras y heridas, para que el paciente recibiera ese cuidado y se evitara las complicaciones de amputaciones futuras.[21]

En consecuencia, el Dr. Bermúdez Vera procedió a explicarle al señor Modestti Torres que era necesario amputar el cuarto dedo del pie derecho ya que, de no hacerlo, su condición empeoraría, e inclusive, existía el riesgo de perder su pie. El paciente aceptó la recomendación del cirujano, por lo que se acordó llevar a cabo la cirugía en la mañana del día siguiente.[22]

Efectivamente, el **21 de marzo de 2019** el anestesiólogo volvió a evaluar al señor Modestti Torres y autorizó el procedimiento quirúrgico bajo sedación (no anestesia). Nuevamente, catalogó el estado físico del paciente con el número 3 en el sistema de clasificación de la Sociedad Estadounidense de Anestesiólogos (ASA Status),[23] y le tomó por escrito su consentimiento.[24]

Con la aprobación del anestesiólogo, el **21 de marzo de 2019** el Dr. Bermúdez Vera realizó el procedimiento quirúrgico y amputó el cuarto dedo del pie derecho (gangrena seca). Del récord se desprende que la intervención comenzó a las 12:20 p.m. y finalizó a

---

[19] Véase, *Evaluación del Dr. Bermúdez Vera*, Apéndice XII del recurso de apelación, pág. 198; (véase el mismo documento, pág, 591 de la Entrada Núm. 128 de SUMAC, pág. 193 de 200).

[20] Véase, *Órdenes Médicas (Physician's Orders)*, pág. 1,486 de la Entrada Núm. 128 de SUMAC, pág. 86 de 100.

[21] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 69.

[22] Véase, *Autorización y Consentimiento para Procedimiento Quirúrgico y/o Tratamiento*, págs, 2217-2218 de la Entrada Núm. 128 de SUMAC, págs. 17-18 de 92.

[23] Véase, *Consulta del Anestesiólogo (Department of Anesthesiology Pre-Operative/Pain/Anesthesiology)*, Apéndice XIII del recurso de apelación, pág. 199.

[24] Véase, *Consentimiento para la Anestesia*, pág. 545 de la Entrada Núm. 128 de SUMAC, págs. 146 de 200.

las 12:30 p.m. También, surge que en la operación el paciente estuvo estable y consciente. El dedo amputado fue enviado a patología. [25]

**Una vez finalizada la operación**, el Dr. Bermúdez Vera se retiró de la sala de operaciones para escribir sus **notas post operatoria**.[26] Surge de las notas, que a las **12:35 p.m.** —cinco minutos **después** de finalizada la cirugía— y bajo el cuidado del *Departamento de Anestesia*, el señor Modestti Torres confrontó problemas respiratorios acompañados de una bradicardia, por lo que el anestesista y el anestesiólogo tuvieron que colocarlo en un ventilador mecánico para estabilizarlo.

Esa misma tarde, el Dr. Bermúdez Vera emitió una serie de órdenes para que el paciente fuese trasladado a la **Unidad de Cuidado Intensivo** para mantenerlo bajo observación; además, emitió unas indicaciones, en especial, al nefrólogo, Dr. Rodríguez Castro, y, al cardiólogo.[27]

El **22 de marzo de 2019**, se le tomó una radiografía al señor Modestti Torres del área del pecho que reflejó un derrame pleural en el lado derecho.[28] Ante este hallazgo, el neumólogo intensivista, Dr. Javier Ramos Rossi consultó con el cirujano, Dr. Bermúdez Vera para la colocación de un tubo torácico en el lado derecho del pecho. Por lo que ese mismo día el cirujano le colocó un tubo de pecho al paciente para drenar el fluido y expandir el pulmón.[29]

En horas de la mañana del **23 de marzo de 2019**, se le tomó una radiografía del área del pecho al paciente. La lectura de la placa

---

[25] Véase, *Reporte Operatorio*, Apéndice XII del recurso de apelación, pág. 200; (véase el mismo documento, pág, 549 de la Entrada Núm. 128 de SUMAC, pág. 150 de 200).

[26] Véase, *Reporte Post Operatorio*, Apéndice XV del recurso de apelación, pág. 201; (véase el mismo documento, pág, 599 de la Entrada Núm. 128 de SUMAC, pág. 200 de 200).

[27] Véase, *Órdenes Médicas (Physician's Orders),* Apéndice XVI del recurso de apelación, pág. 202; (véase el mismo documento, pág, 1,492 de la Entrada Núm. 128 de SUMAC, pág. 92 de 100).

[28] Es una ocupación del espacio pleural (entre los pulmones y el tórax) por un exceso anormal de líquido.

[29] Véase, *Reporte de Consulta del neumólogo (Report of Consultation)*, Apéndice XVIII del recurso de apelación, pág. 204; (véase el mismo documento, pág, 14 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200).

que hizo el Departamento de Radiología interpretó que el tubo torácico en el lado derecho con el primer hueco se salía de la pared torácica y por ello, se recomendaba que el cirujano lo evaluara para que considerase su reposicionamiento. Además, se hizo constar, entre otras condiciones, que el paciente tenía el corazón agrandado, sufría una de edema pulmonar con efusiones pleurales bilaterales, mayor en el lado derecho que en el izquierdo.[30] Esa misma recomendación se hizo en la tarde del mismo 23, 24, 25 y 27 de marzo de 2019.[31] No obstante, el Dr. Bermudez Vera indicó que revisó el tubo de pecho y comprobó que estaba drenando correctamente. Eventualmente, el tubo de pecho fue retirado.[32]

En cuanto al dedo amputado, el **27 de marzo de 2019** la Dra. Luz M. Rodríguez del laboratorio de patología, reportó los hallazgos de los estudios realizados. El resultado arrojó que el dedo amputado tenía **clínicamente una gangrena y osteomielitis focal de la falange distal del cuarto dedo del pie derecho** *(gangrene and focal osteomyelitis clinically from right foot, fourth toe distal phalange).[33]*

Ese mismo **27 de marzo de 2019**, el internista y médico primario, Dr. Amparo Flores consultó al Dr. Bermúdez Vera para que realizara un procedimiento de catéter de vena subclavia derecha, debido a la deshidratación que sufría el paciente.[34]

El **6 de abril de 2019** se realizó al señor Modestti Torres (quien se encontraba en la unidad de cuido intensivo) un cultivo de

---

[30] Véase, *Hallazgos/Impresión de placa de pecho del Departamento de Radiología (Findings/Impression, chest view, Radiology Department),* pág. 409 de la Entrada Núm. 128 de SUMAC, pág. 9 de 200.

[31] Véase, *Hallazgos/Impresión de placa de pecho del Departamento de Radiología (Findings/Impression, chest view, Radiology Department),* págs, 410-412, 417 de la Entrada Núm. 128 de SUMAC, págs. 10-12, 17 de 200.

[32] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 121-123.

[33] Véase, *Reporte de Examen de Tejidos del Laboratorio de Patología (Tissue Examination Report),* Apéndice XVII del recurso de apelación, pág. 203; (véase el mismo documento, pág, 550 de la Entrada Núm. 128 de SUMAC, pág. 151 de 200).

[34] Véase, *Reporte de Consulta (Consultant Report),* pág, 16 de la Entrada Núm. 128 de SUMAC, pág. 16 de 200.

esputo que resultó positivo a las bacterias: ***Acinetobacter baumannii*** y ***E. coli***.[35]

El **20 de abril de 2019**, el neumólogo intensivista, Dr. Javier Ramos Rossi consultó por segunda vez con el Dr. Bermúdez Vera para que realizara una cirugía de traqueotomía al señor Modestti Torres con el fin de promover el destete de la ventilación mecánica. Ante diagnóstico de fallo respiratorio crónico del paciente, el Dr. Bermudez Vera no procedió con la traqueotomía, y entre otras cosas, escribió en la hoja de consulta: *"On call to tracheostomy on monday." "Start on vitamin K therapy."*[36]

El **21 de abril de 2019**, el Dr. Bermudez Vera volvió a evaluar al señor Modestti Torres y recomendó no llevar a cabo la traqueotomía, dado que el cuadro médico del peciente no mejoraba.[37]

Tras evaluar al paciente, el **23 de abril de 2019** el Dr. Bermúdez Vera anotó que el problema respiratorio del señor Modestti Torres era crónico y continuaba con niveles elevados de PT, por lo tanto, recomendó una transfusión de *"fresh frozen plasma"* y vitamina K para mejorar los niveles de coagulación en la sangre.[38]

El **30 de abril de 2019**, el neumólogo intensivista, Dr. Javier Ramos Rossi consultó por tercera vez con el Dr. Bermúdez Vera para una posible colecistectomía (extirpar la vesícula biliar por causa de piedras). No obstante, al evaluar al señor Modestti Torres el Dr. Bermudez Vera no recomendó remover la vesícula en ese momento,

---

[35] Véase, resultado de cultivo del expediente médico del BMC, la pág. 182 de la Entrada Núm. 128 de SUMAC, págs. 182 de 200.

[36] Véase, *Reporte de Consulta (Consultant Report)*, pág, 21 de la Entrada Núm. 128 de SUMAC, pág. 21 de 200.

[37] Véanse, *Notas del Cirujano, Dr. Bermúdez Vera*, pág. 1,139 de la Entrada Núm. 128 de SUMAC, págs. 140 de 201; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 128-129.

[38] Véanse, *Notas del Cirujano, Dr. Bermúdez Vera*, pág. 1,170 de la Entrada Núm. 128 de SUMAC, págs. 171 de 201; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 129-130.

debido a la condición inestable de *colecistitis aguda* y la *coagulopatía* que aquejaban al paciente.[39]

Pese a los intentos de los médicos y especialistas, las condiciones comórbidas que afectaban al señor Modestti Torres fueron deteriorándose a tal extremo que el **12 de mayo de 2019** el paciente falleció de **sepsis** secundaria a neumonía.[40]

### C.

**Tras la muerte del señor Modestti Torres**, su viuda, la señora María López Cruz (en adelante: "señora López Cruz") y sus hijos, Nathalie Modestti López y Ángel F. Modestti López (en conjunto: "los apelados"), el **10 de abril de 2020** presentaron una demanda por daños y perjuicios contra el Dr. Bermúdez Vera y el hospital BMC.[41]

Según se desprende de la demanda, los apelados le imputaron negligencia al Dr. Bermúdez Vera por no proveer un tratamiento postoperatorio adecuado al paciente.[42] Alegaron que la muerte del señor Modestti Torres pudo evitarse si el Dr. Bermúdez Vera no lo hubiese sometido al proceso de desbridación y limpieza, debido a la insuficiencia arterial que padecía el paciente y porque el tipo de gangrena que le aquejaba no requería de amputación alguna, sino de un tratamiento local avanzado. Añadieron que el Dr. Bermúdez Vera fue negligente al no seguir el estándar de cuidado corriente que se le exige al cirujano luego de una cirugía. En específico, señalaron que tanto el Dr. Bermúdez Vera como el personal del Hospital

---

[39] Véanse, *Notas del Cirujano, Dr. Bermúdez Vera*, pág, 1,258 de la Entrada Núm. 128 de SUMAC, pág. 59 de 101; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 130-133.

[40] Véase, *Certificado de Defunción*, págs, 2,208-2,209 de la Entrada Núm. 128 de SUMAC, págs. 8-9 de 52.

[41] Se incluyó como codemandado al Hospital Bayamón Medical Center h/n/c Hospital Hermanos Meléndez. Sin embargo, el 6 de mayo de 2023 el TPI dictó Sentencia Parcial acogiendo el desistimiento con perjuicio de la causa de acción contra el Hospital. En consecuencia, se decretó el archivo, con perjuicio, solo en lo que respecta a la causa de acción por responsabilidad directa. No obstante, se mantuvo la reclamación por responsabilidad vicaria contra el BMC. Véase, *Sentencia Parcial*, Apéndice IV del recurso de apelación, pág. 99.

[42] Véase, *Demanda*, Apéndice I del recurso de apelación, págs. 1-7.

incurrieron en negligencia al no considerar las condiciones pulmonares del señor Modestti Torres en la primera intervención, que a su vez, se complicaron con la segunda intervención quirúrgica, a tal grado que fue la **causa próxima** de su fallecimiento. Por estos hechos, los demandantes y aquí apelados reclamaron una compensación monetaria por sus sufrimientos y angustias mentales.

El **8 de julio de 2020**, el Dr. Bermúdez Vera contestó la demanda negando las imputaciones de negligencia en su contra.[43] Arguyó que su intervención con el señor Modestti Torres fue como consultor para únicamente atender el desbridamiento y limpieza, eventual amputación del cuarto dedo del pie derecho y la colocación de línea central. De modo que, cualquier otra condición que aquejara al señor Modestti Torres quedó en manos y cuidado de su internista y médico primario, su nefrólogo, cardiólogo, infectólogo y neumólogo. Referente a la condición pulmonar preoperatoria del señor Modestti Torre, añadió que para las cirugías del 14 y 21 de marzo, el anestesiólogo examinó al paciente <u>antes</u> de los procedimientos y lo encontró estable, con pulmones claros. Por lo que contó con la autorización del anestesiólogo para realizar las dos (2) operaciones.

Tras varios trámites procesales y estipulación de la prueba, el juicio en su fondo se celebró los días 2, 3, 4, 5, 8, 10, 11 y 12 de mayo de 2023.

La parte demandante/aquí apelada compareció representada por el Lcdo. Juan R. Dávila Díaz (en adelante: "Lcdo. Dávila Díaz").

Por su parte, el Dr. Bermúdez Vera compareció representado por la Lcda. Sigrid López González (en adelante: "Lcda. López González"). Mientras que el Hospital BMC compareció representado

---

[43] Véase, *Contestación a la Demanda,* Apéndice II del recurso de apelación, págs. 8-27.

por el Lcdo. Eduardo Ortiz Rivera (en adelante: "Lcdo. Ortiz Rivera") y por el Lcdo. Kermit Ortiz Morales (en adelante: "Lcdo. Ortiz Morales").

En cuanto a los testigos, por la parte demandante/aquí apelada testificó la **señora Maritza López Cruz y sus dos hijos**; así como los peritos: **Dr. Daniel S. Timmerman** (en adelante: "Dr. Timmerman") y el psiquiatra **Dr. Víctor Lladó**.

Mientras que por la parte demandada/aquí apelante, declaró el propio **Dr. Bermúdez Vera** y los peritos: el **Dr. Pablo Rodríguez Ortiz** (en adelante: "Dr. Rodríguez Ortiz") y el psiquiatra **Dr. Raúl López Menéndez**.

Por último, el Hospital BMC presentó como testigos al **Dr. Amparo Flores** (internista y médico primario) y el **Dr. Rodríguez Castro** (nefrólogo y médico primario), mientras que el **Dr. Gilberto Rodríguez Morales** (en adelante: "Dr. Rodríguez Morales") testificó como el perito del Hospital.

**1.**

**Examinemos la prueba de negligencia médica presentada por la parte demandante y aquí apelada**.

El **Dr. Timmerman** fue el primer perito en testificar el 2 y 3 de mayo de 2023. En resumen, el Dr. Timmerman es un cirujano general y doctor en medicina osteopática con más de 15 años de experiencia. Practica la medicina en el estado de Nueva Jersey y cuenta con una certificación en *"Wound Management"*.[44]

Como perito de los demandantes/apelados, el Dr. Timmerman revisó el expediente médico del señor Modestti Torres del Hospital de los días 13 de febrero al 21 de febrero de 2019 y las notas de Sala de Emergencia del BMC del día 12 de marzo de 2019. Además, examinó el expediente médico del 12 de marzo hasta el 11 de mayo

---

[44] Véase, *Curriculum Vitae* del Dr. Danniel S. Timmerman, Entrada Núm. 123 de SUMAC, págs. 1-3 de 3.

de 2019 del Hospital. Con esa información, rendió su Informe Pericial.

Basado en su Informe Pericial y a preguntas del abogado de los demandantes/apelados, el Dr. Timmerman opinó que la **primera intervención** de desbridación y limpieza que realizó el Dr. Bermúdez Vera al paciente **no estaba indicado**:

> **PERITO/DR. TIMMERMAN**
> El paciente tenía unas **úlceras arteriales** y estaba estable. Y la decisión de llevar a cabo un desbridamiento en la suite de Sala de Operaciones **no era indicada**. Y, de hecho, el desbridamiento está contraindicado cuando el sanamiento (sic) de esa úlcera se dificulta debido a **insuficiencia arterial severa**. [...]
> De hecho, el paciente, el señor Modestti tenía una enfermedad arterial considerable, según se mostraba en el angiograma que se... en el angiograma que se le tomó el 14 de febrero de 2019, el cual indicaba había un 90 por ciento de estenosis en la arteria tibial anterior derecha. [...]
> Como resultado, **mi opinión es que ese desbridamiento que se llevó a cabo el 14 de marzo de 2019 no estaba indicado**.[45]

Acto seguido, el Dr. Timmerman explicó cuál era —según su opinión— el procedimiento correcto para tratar el tipo de úlcera que el señor Modestti Torres padecía:

> **PERITO/DR. TIMMERMAN**
> [E]n una úlcera, **úlcera arterial colonizada con bacteria**, <u>sería suficiente brindar cuidado a la herida de forma local</u>, específicamente aplicando *Betadina* **para secarla y mejorar la carga biológica**.
>
> **LCDO. DÁVILA DÍAZ**
> Yo le pregunto, doctor, en el *"issue"* número 2 que usted marca en su... en el número... página número 7 de su, de su Informe, descríbale al tribunal qué era lo que tenía el señor en su pie, **qué tipo de úlcera o gangrena**.
>
> **PERITO/DR. TIMMERMAN**
> <u>Tenía una **úlcera arterial**</u> que el doctor Bermúdez **describió como gangrena seca**.
>
> **LCDO. DÁVILA DÍAZ**
> <u>¿Cómo es el desarrollo de una **gangrena seca?** ¿Cómo se desarrolla?</u>
>
> **PERITO/DR. TIMMERMAN**
> <u>Gangrena seca es eso mismo, como se escucha, **es seca**. Y cuando hay un paciente que tiene una úlcera arterial, lo que se hace es que se deja que ese proceso de, de gangrena continúe su curso y se le aplica solución *Betadina* o algún</u>

---

[45] Véase, Transcripción de la Prueba Oral Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 169-171. Énfasis nuestro.

otro tipo de solución para **mantenerla seca y libre de bacterias.**

**LCDO. DÁVILA DÍAZ**
¿Cuál es su opinión de la orden telefónica que dio el doctor Bermúdez **posterior** a la primera intervención?

**PERITO/DR. TIMMERMAN**
La orden telefónica del doctor Bermúdez indicó que se le colocara en la herida *Silvadine* (sic) o *Silvadene.* El *Silvadene* es un... **contribuye a la humedad, que puede empeorar una úlcera arterial**.

**LCDO. DÁVILA DÍAZ**
Le pregunto, doctor, **¿qué usted opina, opina del tratamiento preoperativo, si alguno, que llevó a cabo el doctor Bermúdez?**

**PERITO/DR. TIMMERMAN**
No se ordenó ningún tipo de tratamiento **preoperativo**.

**LCDO. DÁVILA DÍAZ**
**¿Qué usted opina hubiese sido necesario, si algo, antes de, de llevar a cabo la primera intervención?**

**PERITO/DR. TIMMERMAN**
Yo creo que **se pudo haber evitado si se utilizaba una solución que secara la herida y que ayudara con la carga biológica**.

**LCDO. DÁVILA DÍAZ**
Ahorita, usted testificó que los días siguientes a la primera intervención del doctor, el doctor no dio seguimiento o visitó al paciente sino hasta el seis días después. Yo le pregunto, **¿qué usted opina de ese proceder?**

**PERITO/DR. TIMMERMAN**
Mi opinión es que si uno opera a una persona, pues se tiene que seguir viendo cómo va el, el paciente. Como un cirujano, es la persona que está en la mejor posición de determinar qué es lo que necesita el paciente. Usualmente, debería hacer... dar seguimiento cada veinticuatro horas.[46]

**En cuanto a la segunda intervención del 21 de marzo de 2023**, el Dr. Timmerman opinó que no estaba indicada. Primeramente, porque el Dr. Bermúdez Vera catalogó la gangrena del cuarto dedo como seca. Según el perito, una opción de tratamiento para la gangrena seca es la auto amputación. Esto es, dejar que el propio dedo se ampute. En segundo lugar, el Dr. Timmerman declaró que esta cirugía fue un estresor para el señor Modestti Torres. Además, expresó que el señor Modestti Torres tenía

---

[46] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 171-174. Énfasis y subrayado nuestro.

complicaciones pulmonares que no lo hacían un candidato idóneo para esa intervención.

A la pregunta de cuál fue la consecuencia directa de la segunda intervención, el Dr. Timmerman opinó:

**PERITO/DR. TIMMERMAN**
**Es mi opinión que la causa más cercana a la muerte del paciente comenzó en la segunda cirugía**. Y esto **empeoró** debido a la **colocación inadecuada** del **tubo torácico** del lado derecho **y que no haya corregido en los seis días posteriores**.[47]

Finalmente, el Dr. Timmerman concluyó que el Dr. Bermúdez Vera se **desvió del estándar de cuidado** de las siguientes maneras:

[A]l no diagnosticar la etiología de las heridas del señor Modestti o básicamente úlceras arteriales. Y al hacerlo llevó a cabo un procedimiento quirúrgico que no estaba indicado el 14 de marzo de 2019.

Al llevar a cabo una amputación innecesaria del cuar... del, del cuarto dedo del pie derecho del señor Modestti, el cual tenía, según indica el doctor Bermúdez, gangrena seca, cuando existían otras opciones disponibles.

Al no proveer un cuidado postoperatorio adecuado, ya que el doctor Bermúdez no ordenó ningún tratamiento de cuidado de la herida luego de la cirugía del 14 de marzo de dos mil diecinue... diecinueve hasta el quinto día luego de la operación. El doctor Bermúdez tampoco llevó a cabo algún examen físico que yo pudiera identificar en el período postoperatorio hasta el día número 6.

Al no reconocer que el tubo torácico que se había colo... que el doctor Bermúdez había colocado en la cavidad torácica derecha del señor Modestti, estaba colocado de forma inadecuada, y no se atendió, se dejó de esa manera hasta diez... por un período de diez días.

Que se evidencia en el sin número de -perdón- de estudios de imagen durante ese período de tiempo, lo cual resultó en un drenaje inefectivo. Y, por lo tanto, fuera exitosa la recuperación postoperatoria del señor Modestti.

Al no apreciar las condiciones comórbidas del paciente antes de la cirugía inicial y luego no reconocer la decaída en la salud del señor Modestti como resultado de la primera cirugía. Al no apreciar el estado desmejorado del señor Modestti luego de la primera cirugía, el doctor Bermúdez **ordenó una segunda operación innecesaria, la cual fue la causa más cercana de su muerte**.[48]

---

[47] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, pág. 181.
[48] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 183-185. Énfasis nuestro. Además, véase las conclusiones del *Informe Pericial del Dr. Daniel S. Timmerman*, a la pág. 10 de la Entrada Núm. 123 de SUMAC, pág. 10 de 10:
*Conclusion*
**Dr. Bermudez deviated from the standard of care:**
- *By failing to diagnose the wound etiology of Mr. Modestii, (sic) namely arterial ulcers and in so doing performed a contraindicated surgical intervention on 3/14/2019.*

En cuanto al Informe Pericial del Dr. Pablo Rodríguez Ortiz,

perito del Dr. Bermúdez Vera/apelante, el Dr. Timmerman opinó:

**LCDO. DÁVILA DÍAZ**
Le pregunto, doctor, el perito de la parte codemandada, doctor Bermúdez, se llama doctor Rodríguez, es el perito del doctor Bermúdez, **concluye que la muerte del paciente se debió a un cuadro séptico causado por una pulmonía que en nada tiene que ver con la extremidad del paciente**.

[...]

Le pregunto, **¿cuál es su opinión en cuanto a esa conclusión?**

**PERITO/DR. TIMMERMAN**
Ciertamente, el paciente tenía un proceso pulmonar que estaba sucediendo antes de que se diera la segunda cirugía. **Ese proceso se empeoró por el hecho de que llevaron al paciente a Sala de Operaciones**. Y ese... y esa situación de empeoramiento no se trató en el momento que se le colocó el tubo torácico en el lado derecho. **Y si al paciente no lo hubiesen llevado a Sala de Operaciones, no se hubiese empeorado**.[49]

**Finalizado el interrogatorio directo**, se inició el

**contrainterrogatorio** por la representación legal del Dr. Bermúdez

Vera/apelante, la Lcda. López González.

---

- *By performing an unnecessary amputation of the 4th right toe of Mr. Modestii (sic) as the patient had dry gangrene as stated by Dr. Bermudez in his operative note for which other treatment options were available.*
- *By failing to provide appropriate post-operative care to Mr. Modestii (sic) in that Dr. Bermudez did not provide wound care orders until post-operative day #5 nor did Dr. Bermudez physically examine Mr. Modestii (sic) during his post-operative course until postoperative day #6;*
- *By failing to recognize the chest tube inserted by Dr. Bermudez into the right thoracic cavity of Mr. Modestii (sic) was improperly placed and left unattended as such for 10 days evidenced on multiple imaging studies over that time resulting in ineffective drainage and thereby contributing to the failed post-operative recovery of Mr. Modestii (sic);*
- *By failing to appreciate the comorbid conditions of Mr. Modestii (sic) prior to the initial surgery and then failing to recognize the declining health of Mr. Modestii (sic) resulting from said initial surgery. Further, in so failing to appreciate the deconditioned state of Mr. Modestii (sic) and evolving pneumonia following the initial surgery, Dr. Bermudez performed a second unnecessary operation on Mr. Modestii (sic) which was the proximate cause of his death.*

*My opinions are based on my review of the full medical records, on my education and training, on my knowledge of the relevant medical literature, my understanding of the facts of this particular case, and on my experience and expertise in the field of general surgery, with a special interest in the field of wound care.*
*Daniel S. Timmerman.* Véase, pág. 10 de la Entrada Núm. 123 de SUMAC, pág. 10 de 10.

[49] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, pág. 186. Énfasis nuestro.

El Dr. Timmerman comenzó reconociendo que el papel del Dr. Bermudez Vera **no era de médico primario** del señor Modestti Torres, y sí, **su rol fue de consultor**.[50] También, indicó que la revascularización practicada por el **radiólogo intervencional**, Dr. Salvador Mercado Oliveras, no fue exitosa;[51] así lo expresó:

> **PERITO/DR. TIMMERMAN**
> Así que, específicamente dice que no fue exitosa la canulación (fonética) de la arteria tibial anterior, que es la arteria que le suple a esa angiosoma donde está el dedo del pie isquémico.
> El paciente tiene cambios hiperémicos en el pie izquierdo con enfermedad arteriosclerótica significativa de la circulación infrapoplítea. **Es posible que se necesite intervención terapéutica en este lado**. El paciente va a reanudar terapia antiplaquetas. Se recomienda una evaluación de seguimiento en dos a tres semanas **luego de la evaluación quirúrgica**.[52]

También, el Dr. Timmerman reconoció que el paciente dependía de la hemodiálisis debido a su estado de ***"end stage renal disease."*** Además, reconoció que tanto en la primera como en la segunda hospitalización del paciente en el BMC, estuvo atendido por el médico internista, Dr. Amparo Flores, y por los siguientes especialistas: infectólogo, radiólogo invasivo, urólogo, nefrólogo, cirujano, hematólogo oncólogo, neumólogo, cardiólogo y anestesiólogo. Por lo cual, opinó que el señor Modestti Torres fue atendido por múltiples especialistas para sus variadas enfermedades de salud comórbidas.[53]

El Dr. Timmerman fue confrontado con el **certificado de defunción** del señor Modestti Torres (D.E.P.) y la causa de muerte:

> **LCDA. LÓPEZ GONZÁLEZ**
> En la parte inferior, dígame **cuál es la primera causa de la muerte certificada por su médico**.
>
> **PERITO/DR. TIMMERMAN**
> Fallo respira… **fallo respiratorio**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> ¿Y qué más dice al lado?

---

[50] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, pág. 188.
[51] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 194-195.
[52] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 196-197. Énfasis nuestro.
[53] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 203-209.

**PERITO/DR. TIMMERMAN**
No lo sé.

**LCDA. LÓPEZ GONZÁLEZ**
**¿La segunda condición de la causa de la muerte?**

**PERITO/DR. TIMMERMAN**
**Sepsis**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y lo que dice al lado?

**PERITO/DR. TIMMERMAN**
No lo sé.

**LCDA. LÓPEZ GONZÁLEZ**
**¿La tercera causa de la muerte?**
[...]
No, yo no estoy pidiendo que me lea las letras (ininteligible) manuscrito, que es lo que hemos estado discutiendo hasta ahora.

**PERITO/DR. TIMMERMAN**
Bueno, para la **A** lo que dice es **fallo respiratorio** y no entiendo el resto. Para la **B**, veo **sepsis**, pero no entiendo el resto. Para la **C**, veo cuarto, tal vez **gangrena del dedo del pie**. Y para la **D**, dice **enfermedad renal en *stage* en hemodiálisis**. Y entonces, lo que dice parte 2, el 25...

**LCDA. LÓPEZ GONZÁLEZ**
El 25.

**PERITO/DR. TIMMERMAN**
...**hipertenso y diabetes tipo 2**. Y no entiendo lo demás.
[...]
**LCDA. LÓPEZ GONZÁLEZ**
La pregunta es... Aquí dice **"Indique otras condiciones significativas que contri... contribuyeron a la muerte, pero que no están relacionadas a la causa básica indicada en la parte 1. El número 25. "**

**PERITO/DR. TIMMERMAN**
Okey.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y cuál usted... Lo que él dijo, de nuevo, que...

**PERITO/DR. TIMMERMAN**
**Hipertenso y diabético**.

**LCDA. LÓPEZ GONZÁLEZ**
**Gracias**. **Doctor, así que, no estamos ante un paciente muy saludable, ¿correcto? Okey**.

**PERITO/DR. TIMMERMAN**
**No**.
**LCDA. LÓPEZ GONZÁLEZ**
Y el doctor Ariel Bermúdez **era un consultor de siete u ocho consultores** que trataban a este paciente, ¿correcto?

**DR. TIMMERMAN**
**Sí**.[54]

---

[54] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 211-214. Énfasis nuestro.

Ante la **Evaluación Preoperatoria del Departamento de Anestesiología** que hizo el anestesiólogo al paciente **antes** de ser operado el 21 de marzo de 2019,[55] el Dr. Timmerman expresó que **no se encontró ningún problema pulmonar**:

**LCDA. LÓPEZ GONZÁLEZ**
... **¿Cuál es el día de la cirugía? Doctor, arriba a la mano izquierda, a la mano izquierda superior, dice** *"date of surgery"*. **¿Cuál es el día de la cirugía?**

[...]
**PERITO/DR. TIMMERMAN**
**21 de marzo de 2019**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuál es el diagnóstico preoperatorio**?

**PERITO/DR. TIMMERMAN**
**Gangrena el pie derecho, cuarto metatarso**.

**LCDA. LÓPEZ GONZÁLEZ**
Y este documento, según surge de la parte superior de la página, también es de la... del **anestesiólogo**, **¿correcto?**

**PERITO/DR. TIMMERMAN**
**Sí**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y cuando nos vamos al **número 2** de la revisión del sistema, bajo *"pulmonary"*, qué dice?

**PERITO/DR. TIMMERMAN**
Está circulado...

**LCDA. LÓPEZ GONZÁLEZ**
¿No?

**PERITO/DR. TIMMERMAN**
...el no.

**LCDA. LÓPEZ GONZÁLEZ**
**No significa que este doctor no encontró ningún problema pulmonar, ¿correcto?**

**PERITO/DR. TIMMERMAN**
(No verbalizó la respuesta)

**LCDA. LÓPEZ GONZÁLEZ**
**¿Usted tiene... ¿Si o no?**

**PERITO/DR. TIMMERMAN**
**El no encontró ningún problema pulmonar en su evaluación de los sistemas.**

**LCDA. LÓPEZ GONZÁLEZ**
El **número 3** bajo "**cardiac**" tiene las mismas condiciones que usted leyó ahorita para la intervención de marzo 14, **¿correcto?**

---

[55] Véase, la *Evaluación Preoperatoria del Departamento de Anestesiología* (*Department of Anesthesiology Pre-Operative/Pain/Anesthesiology Consultation*) que hizo el anestesiólogo al señor Modestti Torres el 21 de marzo de 2019, que obra en el Apéndice del recurso de apelación, pág. 199.

**PERITO/DR. TIMMERMAN**
"<u>Yes, maˈam</u>".

**LCDA. LÓPEZ GONZÁLEZ**
¿<u>Y cuáles</u>...

**PERITO/DR. TIMMERMAN**
<u>Sí</u>, señora.

**LCDA. LÓPEZ GONZÁLEZ**
...<u>eran</u>?

**PERITO/DR. TIMMERMAN**
<u>Presión alta y fallo cardíaco congestivo</u>.

**LCDA. LÓPEZ GONZÁLEZ**
¿<u>Perdón</u>?

**PERITO/DR. TIMMERMAN**
<u>Fallo cardíaco congestivo</u>.

**LCDA. LÓPEZ GONZÁLEZ**
**Congestivo**. ¿<u>Y bajo el **número 5** en "**endocrine**"</u>?

**PERITO/DR. TIMMERMAN**
<u>Es la misma</u>.

**LCDA. LÓPEZ GONZÁLEZ**
Y qué dice, <u>que sí, que tiene problemas</u>, ¿<u>correcto</u>?

**PERITO/DR. TIMMERMAN**
"<u>Circle yes</u>".

**LCDA. LÓPEZ GONZÁLEZ**
¿<u>Y si</u>...

**PERITO/DR. TIMMERMAN**
<u>Circulado el sí. Diabetes mellitus, Dependiente de insulina</u>.

**LCDA. LÓPEZ GONZÁLEZ**
¿<u>Y en el **número 6** bajo **renal**</u>?

**PERITO/DR. TIMMERMAN**
<u>Es la misma</u>.

**LCDA. LÓPEZ GONZÁLEZ**
¿<u>Y qué es *"the same"*? ¿Qué quiere decir *"the same"*?</u>

**PERITO/DR. TIMMERMAN**
<u>Se circuló el sí, enfermedad renal terminal, hemodiálisis por un año</u>.

**LCDA. LÓPEZ GONZÁLEZ**
Okey. ¿A la mano... En la columna de la mano derecha hay un acápite que dice "**physical exam**". Léanos qué escribió el anestesiólogo para ese "physical exam". ¿<u>H.R., qué significa</u>?

**PERITO/DR. TIMMERMAN**
(Ininteligible) contestó en inglés.

**LCDA. LÓPEZ GONZÁLEZ**
¿<u>Cuánto tiene</u>?

**PERITO/DR. TIMMERMAN**
97.

**LCDA. LÓPEZ GONZÁLEZ**
¿Eso es bueno o eso es malo?

**PERITO/DR. TIMMERMAN**
Es normal alto.

**LCDA. LÓPEZ GONZÁLEZ**
¿B. P., qué significa?

**PERITO/DR. TIMMERMAN**
"130 over 60".

**LCDA. LÓPEZ GONZÁLEZ**
No. ¿Qué significa B. P.?

**PERITO/DR. TIMMERMAN**
130 sobre 60. Presión arterial.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y qué tiene el paciente?

**PERITO/DR. TIMMERMAN**
130...

**LCDA. LÓPEZ GONZÁLEZ**
¿Y eso es bueno...

**PERITO/DR. TIMMERMAN**
...sobre 60.

**LCDA. LÓPEZ GONZÁLEZ**
...es bueno o malo?

**PERITO/DR. TIMMERMAN**
Es un poquito alto.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y la temperatura?

**PERITO/DR. TIMMERMAN**
37 grados centígrados.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y.R.R.?

**PERITO/DR. TIMMERMAN**
Es...

**LCDA. LÓPEZ GONZÁLEZ**
¿Cuánto?

**PERITO/DR. TIMMERMAN**
...ritmo respiratorio. 17 por minuto.

**LCDA. LÓPEZ GONZÁLEZ**
¿Bueno o malo?

**PERITO/DR. TIMMERMAN**
Es alto.

**LCDA. LÓPEZ GONZÁLEZ**
**¿El anestesiólogo canceló esta operación por este "physical exam" que hizo, que usted dice que todo es alto?**

**PERITO/DR. TIMMERMAN**
No.

**LCDA. LÓPEZ GONZÁLEZ**
¿Usted ha estado en alguna intervención quirúrgica que el anestesiólogo puede detener una intervención quirúrgica, porque no lo encuentra apto para estar en una intervención como tal?

**PERITO/DR. TIMMERMAN**
Sí.
[…]
**LCDA. LÓPEZ GONZÁLEZ**
¿Qué si usted ha estado envuelto en una cirugía en la cual el anestesiólogo haya denegado entrar al paciente a un procedimiento quirúrgico?

**PERITO/DR. TIMMERMAN**
Sí.

**LCDA. LÓPEZ GONZÁLEZ**
Y en este caso no ocurrió esa decisión del anestesiólogo, sino que dio el visto bueno y se continuó, ¿correcto?

**PERITO/DR. TIMMERMAN**
Correcto.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y en el ASA Status lo mantuvo en 3, igual que la primera ocasión, ¿correcto?

**PERITO/DR. TIMMERMAN**
Sí.

**LCDA. LÓPEZ GONZÁLEZ**
Y no me acuerdo qué fue lo que usted dijo que 3 significaba.

**PERITO/DR. TIMMERMAN**
Medio o moderado, riesgo.

**LCDA. LÓPEZ GONZÁLEZ**
Y se volvió hacer un plan de anestesia con sedación, ¿correcto?

**PERITO/DR. TIMMERMAN**
Correcto.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y bajo "family", se, se marca que la familia estuvo de acuerdo?

**PERITO/DR. TIMMERMAN**
Correcto.

**LCDA. LÓPEZ GONZÁLEZ**
En la página 545, que es la próxima, se mantuvo la recomendación de sedación, ¿correcto?

**PERITO/DR. TIMMERMAN**
Sí.[56]

---

[56] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 261-265. Énfasis nuestro.

Asimismo, en el contrainterrogatorio el Dr. Timmerman fue confrontado con las con las anotaciones que hizo el anestesiólogo y la enfermera **luego** de la intervención quirúrgica del señor Modestti Torres el 21 de marzo de 2019.[57] En específico, reconoció que la intervención quirúrgica realizada por el Dr. Bermúdez Vera fluyó bien y cinco minutos más tarde —bajo el cuido de la unidad de anestesia— es que se observa que el señor Modestti Torres sufre una bradicardia. Por lo que luego de suministrarle atropina al paciente y continuar con los procedimientos para estabilizarlo, incluso intubarlo, se mantuvo con los signos vitales estables y fue trasladado a la Unidad de Cuido Intensivo de Cardiología. En ese sentido, el Dr. Timmerman opinó que, conforme al expediente médico, **el manejo del paciente fue adecuado**.[58]

De igual modo, el Dr. Timmerman fue confrontado con los resultados del laboratorio de patología.[59] En específico, opinó que **no hay ninguna relación entre la osteomielitis y el fallo respiratorio** sufridos el señor Modestti Torres:

> **LCDA. LÓPEZ GONZÁLEZ**
> **Doctor, este es el <u>reporte patológico</u>.**
> [...]
> **¿Y el resultado del diagnóstico de este reporte <u>opera... operatorio fue cuál?</u>**
>
> **PERITO/DR. TIMMERMAN**
> **Gangrena y una osteomielitis focal clínica <u>en el pie derecho</u>, en el <u>dedo número 4</u> de la dis...de la <u>falange distal</u>.**
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **<u>¿Qué es osteomielitis?</u>**
>
> **PERITO/DR. TIMMERMAN**
> **<u>Puede ser una inflamación aguda del hueso</u>.**
> [...]
> **<u>O crónica...</u>**
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **<u>¿Y en qué, si algo, esta condición provoca un fallo respiratorio, si alguno?</u>**
>
> **PERITO/DR. TIMMERMAN**
> **<u>No lo...</u>**

---

[57] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 9-17.
[58] *Ídem.*
[59] Véase, el Reporte de Patología en el Apéndice del recurso de apelación, pág. 203.

**LCDA. LÓPEZ GONZÁLEZ**
**¿No?**
**PERITO/DR. TIMMERMAN**
**…no lo hace.**[60]

También, el Dr. Timmerman reconoció que en su Informe Pericial <u>no</u> utilizó el término **"distress" respiratorio** como una condición que el señor Modestti Torres padecía **antes** de la amputación del dedo el 21 de marzo de 2019:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué página de récord usted se refiere para decirnos que este paciente, antes de la amputación del dedo, tenía un "distress" respiratorio?**

**PERITO/DR. TIMMERMAN**
"<u>The patient was treated by respir</u>….

**LCDA. LÓPEZ GONZÁLEZ**
**No**, **doctor**. **Escuche la pregunta**.

**Interprete del DR. TIMMERMAN habla en primera persona**

*"Where in the report?"*

**LCDA. LÓPEZ GONZÁLEZ**
**¿En, en qué parte de su reporte dice que el paciente tenía un "distress" respiratorio? ¿Página 4?**

**PERITO/DR. TIMMERMAN**
*"It's here".*

**LCDA. LÓPEZ GONZÁLEZ**
**¿En qué párrafo?**

**PERITO/DR. TIMMERMAN**
**En la página 4.**

**LCDA. LÓPEZ GONZÁLEZ**
**Esto en la página 4. ¿En cuál de las entradas que usted hace de su página 4 surge que usted menciona que el paciente, antes de esta amputación, tenía "distress" respiratorio?**

**Interprete del DR. TIMMERMAN habla en segunda persona**
**Él no usó esas palabras exactas.**[61]

En esa misma línea del contrainterrogatorio el Dr. Timmerman se contradice a preguntas de la licenciada López González, al contestar que una efusión bilateral pleural no es lo

---

[60] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 18-19.
[61] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 19-20. Énfasis nuestro.

mismo que una pulmonía, para luego decir que, bajo su opinión pueden ser lo mismo:

[...]

**LCDA. LÓPEZ GONZÁLEZ**
…míreme. ¿Si yo me hago un *"chest x ray"*… un *"chest x ray"* con un radiólogo, verdad que ahí sale una imagen si yo tengo un problema pulmonar? **¿Sí o no?**

**PERITO/DR. TIMMERMAN**
**"Yes"**.

**LCDA. LÓPEZ GONZÁLEZ**
**Sí**. ¿En las imágenes que usted leyó de las… resultados… Usted no vio en las imágenes. **¿Usted encontró alguna de ellas de antes del día de la amputación del dedo el 21 de marzo, hay alguna… comentario del radiólogo diciendo que había un problema pulmonar?**

**PERITO/DR. TIMMERMAN**
¿*"Pulmonary distress"*?

**LCDA. LÓPEZ GONZÁLEZ**
**¿Algún problema pulmonar?**

**PERITO/DR. TIMMERMAN**
*"Yes"*.

**LCDA. LÓPEZ GONZÁLEZ**
¿Sí?

**PERITO/DR. TIMMERMAN**
*"Yes"*.
**LCDA. LÓPEZ GONZÁLEZ**
Dígame cuál y cuándo.

**PERITO/DR. TIMMERMAN**
[...]

**Página 4. Marzo 17, 2019… [...] Una… un derrame pleural bilateral**.
[...]

**LCDA. LÓPEZ GONZÁLEZ**
Es el segundo *"bullet"*. Okey. **¿Y ahí donde usted nos refiere que sí tenía un *"bilateral pleural effusion"*? ¿Y qué es eso?**

**PERITO/DR. TIMMERMAN**
**Fluido en la cavidad del, del tórax**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Es lo mismo que pulmonía?**

**PERITO/DR. TIMMERMAN**
**No**.

**LCDA. LÓPEZ GONZÁLEZ**
**No.** Pues mi pregunta ha sido en todo momento **si usted había encontrado en algunas de las imágenes que este paciente tuviera pulmonía**. Mi pregunta no fue si tenía fluido. **Era si tenía pulmonía**.
[...]
**Doctor, ¿me puede contestar?**

> **PERITO/DR. TIMMERMAN**
> El 17 de marzo de 2017 hubo una… derrame **pleural bilateral**, igual… y también tenía una **atelectasia bilateral**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **¿Usted acaba de decirnos que bilateral *"pleural effusion"* es liquido en el… la cavidad de… del *chest*?**
>
> **PERITO/DR. TIMMERMAN**
> **Correcto**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **Y mi pregunta ha sido sobre pulmonía. ¿Tener agua en el… líquido (sic) de los pulmones es lo mismo que pulmonía?**
>
> **PERITO/DR. TIMMERMAN**
> **Puede ser**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **¿Puede ser? ¿Es esa su opinión?**
>
> **PERITO/DR. TIMMERMAN**
> **Sí**.[62]

Finalmente, en el contrainterrogatorio el Dr. Timmerman reconoció que en su Informe Pericial no consideró todas las condiciones comórbidas del señor Modestti Torres:

> **LCDA. LÓPEZ GONZÁLEZ**
> Este es de marzo 21 de 2019, que lo discutimos ayer en la tarde y fuimos uno por uno y bajo "pul…**pulmonary**" se marcó **"No"**, por el **anestesiólogo y dio el visto bueno para el procedimiento de la amputación**. **¿Correcto?**
>
> **PERITO/DR. TIMMERMAN**
> Como se discutió ayer, **sí**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **Okey**. …**¿Usted está de acuerdo en que luego que el paciente está en Intensivo, el paciente desarrolló un cuadro de un *"shock"* séptico?**
>
> **PERITO/DR. TIMMERMAN**
> **Ese fue uno de los diagnósticos que dio el médico de cuido crítico**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> ¿Así que está de acuerdo que eso es uno de los diagnósticos? **Gracias**. **¿Y que hubo una disfunción cardíaca que por tener ese evento che… séptico, el paciente no lo toleró y fallece?**
>
> **PERITO/DR. TIMMERMAN**
> ¿Puede repetir la pregunta?
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **¿Uno de los diagnósticos de… que dio el médico de *"critical care"* era que tenía un *"shock"* séptico? ¿Correcto? ¿Sí?**

---

[62] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 21-26. Énfasis nuestro.

**PERITO/DR. TIMMERMAN**
"**Yes**".

**LCDA. LÓPEZ GONZÁLEZ**
**¿Y el paciente, con una disfunción cardíaca, él no toleró ese *"shock"* séptico y eso lo conduce a un … a fallecer? ¿Usted está de acuerdo?**

**PERITO/DR. TIMMERMAN**
**En parte, sí**.

**LCDA. LÓPEZ GONZÁLEZ**
Ayer, doctor… Un momento, un momento. **Yo le mencioné las condiciones de este paciente, que eran diabetes mellitus, *"in stage renal disease"*, por la cual él recibía diálisis tres veces a la semana por los últimos años**. **Él tenía un *"hipersensi… sensitive disorder"* y de los procedimientos que él tuvo, procedimientos quirúrgicos, él tuvo un *"arteriovenous fistula"***, ¿Correcto?
Tuvo un *"cavat"* por 3 y un *"inguinal repair"*, tuvo un *"percutaneous angioplasty"* y tuvo un *"right subclavean catheter unknown"* **y ninguna de estas condiciones que usted ayer me aceptó qué si tenía el paciente, usted lo mencionó en su informe. ¿Por qué no lo mencionó?**

**Interprete del DR. TIMMERMAN habla en segunda persona**
Él aceptó que tenía, que tenía hipertensión y que tenía diabetes, que era dependiente de insulina, tenía un *"PTA run-off"*, un angiograma, aunque no sabía si era la mano dere… el brazo derecho o el brazo izquierdo.
[…]

**LCDA. LÓPEZ GONZÁLEZ**
**No. Mi pregunta es por qué usted no mencionó en su reporte las condiciones que tenía este paciente y todos los procedimientos por los cuales él pasó en los últimos años**.

**PERITO/DR. TIMMERMAN**
En la Página 8 de su reporte…
[…]
…el primer *"bullet point"* en la página abajo, en la parte de abajo de la página.

**LCDA. LÓPEZ GONZÁLEZ**
Okey.

**PERITO/DR. TIMMERMAN**
…dice diabetes mellitus…

**LCDA. LÓPEZ GONZÁLEZ**
Okey.

**PERITO/DR. TIMMERMAN**
*"severe peripheral arterial disease"*…

**LCDA. LÓPEZ GONZÁLEZ**
Okey.

**PERITO/DR. TIMMERMAN**
…(ininteligible) *"angiogram"*, una función sistólica severa. En el ventrículo izquierdo había una disfunción sistólica severa con una fracción de eyección de 25 a 30

porciento, como lo anotó el cardiólogo el 16 de febrero de 2019.

**LCDA. LÓPEZ GONZÁLEZ**

No mencionó en su informe algo bien importante, que este paciente era un **"end stage renal disease"** por lo cual él estaba recibiendo diálisis tres veces a la semana por los últimos años. **¿Por qué no lo mencionó? ¿Para usted eso no es importante?**

**PERITO/DR. TIMMERMAN**

Pienso que todas sus comorbi… comorbilidades son importantes, **pero no todas estaban… eran relevantes para este reporte en específico**.[63]

**Finalizado el contrainterrogatorio de la Lcda. López González, dio inicio el re-interrogatorio directo del Dr. Timmerman.** En resumen, reiteró que para la segunda intervención el paciente padecía de derrame pleural bilateral y atelectasia, que a su opinión, podría ser era una predisposición a la pulmonía, por lo cual, relega a un plano secundario el *shock* séptico como primera causa de muerte y concluye que fue la pulmonía, que aparece en segundo lugar, como causa primaria de muerte.[64]

**El segundo contrainterrogatorio estuvo a cargo del Lcdo. Eduardo Rivera en representación legal del co-demandado BMC**. Luego de aceptar las enfermedades comórbidas del señor Modestti, el Dr. Timmerman confirmó que el estándar de cuidado ("standard care") para tratar una úlcera de pie diabético es el desbridamiento.[65] De igual modo, reconoció que en una úlcera arterial la sangre fluye limitadamente.[66] Conforme al primer issue (*Debridement of arterial ulcers*) a la página 7 de su Informe Pericial, el Dr. Timmerman señala que como meta principal se intentó medicamente aumentar la circulación sanguínea del paciente, y reconoció, que aumentó en ciertas partes de las extremidades bajas. En específico, reconoció que el procedimiento que se hizo el 8 de marzo de 2019 al paciente

---

[63] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 26-29. Énfasis nuestro.
[64] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 40-50.
[65] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 51-52.
[66] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 52-53.

aumentó parcialmente la circulación, pero no en el área de las úlceras.[67]

**En lo referente a la segunda intervención del 21 de marzo de 2019,** el Dr. Timmerman fue confrontado con el **Informe de Patología**: *"Gangrena y osteomielitis focal clínicamente del pie derecho, cuarto dedo distal de la falange o falange distal."* Reconoció que es una inflamación del hueso que podría ser una infección causada por bacterias y hongos.[68]

**En cuanto al juicio clínico utilizado por el Dr. Bermúdez Vera con el señor Modestti**, el Dr. Timmerman indicó que el doctor Bermúdez utilizó su juicio clínico, pero en su opinión, estuvo debajo del estándar de cuido.[69] En ese sentido, el Lcdo. Ortíz Rivera preguntó:

**LCDO. ORTÍZ RIVERA**
¿A preguntas de los compañeros, usted **admitió** que este paciente tenía una plétora de, de condiciones como la **diabetes**…

**PERITO/DR. TIMMERMAN**
**"Yes"**.

**LCDO. ORTÍZ RIVERA**
…*stage renal disease*, etcétera? **¿Correcto?**

**PERITO/DR. TIMMERMAN**
**Sí**.

**LCDO. ORTÍZ RIVERA**
¿Y también **admitió** a preguntas de los compañeros **que todas las condiciones estaban siendo tratadas por diferentes especialistas dentro de la hospitalización en el Bayamón Medical Center?**

**PERITO/DR. TIMMERMAN**
**"Yes"**.

**LCDO. ORTÍZ RIVERA**
**¿Y que todos los días iba algún médico, de alguna de algunas de las condiciones a tratarlo, a tratarlo?**

**PERITO/DR. TIMMERMAN**
**Algún doctor, sí.**

**LCDO. ORTÍZ RIVERA**
**¿El doctor Bermúdez no era un médico primario?**

---

[67] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 53-54.
[68] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 74-75.
[69] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, pág. 84.

**PERITO/DR. TIMMERMAN**
"<u>**Correct**</u>".

**LCDO. ORTÍZ RIVERA**
<u>¿Habían otros, otros doctores y el "nursing staff"
bregando con ese paciente?</u>

**PERITO/DR. TIMMERMAN**
"<u>**Yes**</u>".[70]

También, el Dr. Timmerman admitió que en el récord médico no hay ninguna anotación de que el pulmón no estaba expandiéndose correctamente. Asimismo admitió que el tubo de pecho podría moverse por algún movimiento del paciente o durante el baño realizado por alguna enfermera.[71]

**Finalizado el segundo contrainterrogatorio**, **dio inicio el re-interrogatorio directo**. En resumen, el Dr. Timmerman reiteró que aun cuando hubo un mejoramiento después del angiograma del 8 de marzo de 2019, a la arteria poplitial, no hubo mejoramiento en el dedo del pie que estaba con gangrena.[72] Conforme al issue núm. 2 (*Treatment options for dry gangrene in consideration of the whole patient*) a la página 7 de su Informe Pericial, reconoce que una gangrena seca se desarrolla lentamente y típicamente no se infecta, **a menos que no sea colonizada o críticamente infectada**.[73] Reiteró que la amputación del dedo era contraindica ya que se trataba de un gangrena seca y el tratamiento indicado para la úlcera arterial era aplicando *Betadine* porque seca la herida y erradica la bacteria local.[74]

Aunque en el re-interrogatorio directo el Dr. Timmerman concluyó que una bradicardia podría ser causada por problemas respiratorios,[75] a preguntas en el **re-contrainterrogatorio** admitió que el líquido pleural puede ser causado por problemas de bombeo del corazón y los pulmones en conjunto:

---

[70] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 85-86.
[71] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 87-88.
[72] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, pág. 92.
[73] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 93-94.
[74] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, pág. 95.
[75] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 98-99.

**LCDO. ORTÍZ RIVERA**
**¿Por lo tanto, si no tiene el tubo y el corazón sigue sin funcionar, se le va, se le va a seguir... el, el líquido va a seguir produciéndose?**

**PERITO/DR. TIMMERMAN**
**Puede contribuir a eso**.

**LCDO. ORTÍZ RIVERA**
**Gracias**.[76]

La prueba de la parte demandante/apelada continuó con los testimonios de la señora Maritza López Vda. de Modestti,[77] su hija Nathalie Christine Modestti López,[78] su hijo Ángel F. Modestti López,[79] en cuanto a las angustias metales sufridas. Finalmente, concluyó con el testimonio del perito Víctor Lladó Díaz,[80] sobre el mismo tema. Por lo que el caso quedó sometido.

**2.**

**En segundo orden, examinemos la prueba presentada por la parte codemandada/apelante, Dr. Bermúdez Vera**.

El **5 de mayo de 2023**, el Dr. Bermúdez Vera inició su testimonio sobre su intervención con el señor Modestti Torres los días 14 y 21 de marzo de 2019. También, declaró sobre la colocación del tubo de pecho al paciente. Luego de estipular el historial académico y profesional del Dr. Bermúdez Vera;[81] y además, de testificar de su más de 26 años de experiencia como cirujano de pacientes de cáncer, sistema gastrointestinal, **pie diabético**, **enfermedades periferovascular**, hernias ventrales, baso, tiroides, paratiroides e **isquemia a nivel de extremidades**, indicó que tiene privilegio en el BMC, por lo que allí ubica su oficina, y práctica profesional.[82] En cuanto a los pacientes con problemas de pie diabético que atiende en su práctica señaló:

---

[76] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 101-102.
[77] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 110-138.
[78] Véase, Transcripción de la Prueba Oral del 3 de mayo de 2023, págs. 144-157.
[79] Véase, Transcripción de la Prueba Oral del 4 de mayo de 2023, págs. 7-18.
[80] Véase, Transcripción de la Prueba Oral del 4 de mayo de 2023, págs. 25-173.
[81] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 16-21; y el Curriculum Vitae del Dr. Bermúdez Vera Véase, a la pág. 1 de la Entrada Núm. 125 de SUMAC, págs. 1 de 4.
[82] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 21-25.

**DR. BERMÚDEZ VERA**

Pues por eso. Eso, dentro de los números de casos que se hacen aparte de eso, <u>el ochenta por ciento de los casos que yo hago en una semana son relacionados con laparoscopía, porque esa es mi pasión, eso es lo que me gusta más</u>.

Aún así, por ejemplo, para mí, en estos días, que, y lo digo, estos días y en aquellos días también, porque mi práctica siempre ha sido grande, la, yo puedo, <u>de un número de diez pacientes que tengo, que yo tengo hospitalizados, mínimo cuatro son problemas de pie diabético y eso ocurre básicamente todo el tiempo durante el año</u>, porque ya le digo, **<u>la cantidad de pacientes con problemas de diabetes y úlceras y gangrenas es una cosa increíble y eso sale uno y llegan dos, todo el tiempo es así</u>**.[83]

**Sobre la primera intervención el 14 de marzo de 2019**, el Dr. Bermúdez Vera declaró que conoció por primera vez al señor Modestti Torres el 13 de marzo de 2019, a raíz de una consulta que le solicitó el **nefrólogo y médico primario**, Dr. Rodríguez Castro,[84] quien le indicó sobre un *"paciente que tiene el cuarto debo infectado, gangrenado"*.[85] El Dr. Bermúdez Vera evaluó al paciente de 65 años y encontró que tenía un historial de diabetes mellitus, insuficiencia periferovascular con múltiples dedos con úlceras, razón por la cual fue admitido al hospital para evaluación y manejo.[86] En específico, en el pie derecho tenía úlceras en los dedos tres, cuatro y cinco; y en el pie izquierdo, tenía úlceras en el primer dedo y en el tercer dedo que además tenía tejido necrótico con una descarga leve. Por lo cual, luego de consultarlo con los familiares y el señor Modestti Torres,[87] recomendó hacer un desbridamiento *(debriding)* al próximo día.[88]

El **14 de marzo de 2019** el Dr. Bermúdez Vera realizó el desbridamiento y limpieza y señaló que había bastante tejido

---

[83] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 30-31. Énfasis nuestro.
[84] Véase, *Reporte de Consulta*, pág. 10 de la Entrada Núm. 128 de SUMAC, págs. 10 de 200.
[85] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 31-33.
[86] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 33-35.
[87] Véase, *Autorización y Consentimiento para Procedimiento Quirúrgico y/o Tratamiento*, pág. 2,215 de la Entrada Núm. 128 de SUMAC, págs. 15 de 52.
[88] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 35-42; y, el Reporte de Consulta, a la pág. 10 de la Entrada Núm. 128 de SUMAC, págs. 10 de 200.

**necrótico** o "*debris*".[89] Declaró además, que luego de la cirugía, ordenó la transferencia del señor Modestti Torres a la sala general con la aprobación del departamento de anestesia. También, ordenó que el tejido necrótico fuese enviado a patología. De igual modo, ordenó observar el sangrado *("watch for bleeding")* y la aplicación de medicamentos contra el dolor:

> **DR. BERMÚDEZ VERA**
> Esa es una, son órdenes de *"transfer"* después de una cirugía. Yo, en la, el 3-14 a las 2:15 de la tarde pues yo escribo esas órdenes donde dice *"Transfer to the general ward after anesthesia clearance"*. Pongo *"Restart preop orders"*.
> Y pongo, *"Watch for bleeding"*. Pongo, medicamentos, pongo Demerol 25, Phenergan 25 intramuscular cada cuatro horas para el manejo del dolor, *"PRN for pain"*. *"Patient referred request nurse"*, eso es lo que significa *"PRN for pain"* y está mi firma ahí.[90]

El **19 de marzo de 2019**, el Dr. Bermúdez Vera ordenó telefónicamente que se le aplicara al paciente antibiótico en crema *Silvadene* y agua normal salina en las áreas afectadas:

> **LCDA. LÓPEZ GONZÁLEZ**
> Doctor, ... <u>¿Nos puede leer qué fue, si algo, lo que escribió a la enfermera</u>?
>
> **DR. BERMÚDEZ VERA**
> <u>Sí, Esto es una orden telefónica mía del 19, 3-19-19 a las 5:00 de la tarde, donde dice que se le aplique crema *Silvadene* en las áreas afectadas del pie derecho izquierdo, las úlceras del pie derecho izquierdo y se aplique normal salina en esas áreas también diariamente.</u>
>
> **LCDA. LÓPEZ GONZÁLEZ**
> <u>¿Por qué usted hizo esa orden telefónica, qué justificaba</u>?
>
> **DR. BERMÚDEZ VERA**
> <u>Pues a mí se me llamó que el paciente no tenía, no estaba recibiendo cuidado en las úlceras.</u>
>
> **LCDA. LÓPEZ GONZÁLEZ**
> <u>¿Quién lo llamó</u>?
>
> **DR. BERMÚDEZ VERA**
> <u>Yo entiendo que la enfermera.</u>[91]

---

[89] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 47-48; y, *Reporte Operatorio*, pág. 584 de la Entrada Núm. 128 de SUMAC, págs. 135 de 200. Énfasis nuestro.

[90] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 53-54; y, *Órdenes Médicas (Physician's Orders)*, pág. 1,479 de la Entrada Núm. 128 de SUMAC, pág. 79 de 100.

[91] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 55-56; y, *Orden Médica vía teléfono*, pág. 1,484 de la Entrada Núm. 128 de SUMAC, pág. 84 de 100.

Continuó declarando que ese mismo día, **19 de marzo de 2019**, recibió una llamada del **nefrólogo y médico primario**, Dr. Rodríguez Castro, expresando: *"que le preocupaba un dedo en el pie del paciente que estaba avanzando la gangrena"*. Y quería que el Dr. Bermúdez Vera lo viera.[92]

También, surge del récord médico que ese **19 de marzo de 2019**, a las 10:30 pm, el **nefrólogo y médico primario** le solicitó por escrito al Dr. Bermúdez Vera que evaluara el cuarto dedo del pie derecho del paciente, con la posibilidad de amputarlo ya que la gangrena había empeorado: *"se ve peor".[93]*

El **20 de marzo de 2019** el Dr. Bermúdez Vera evaluó al paciente y concluyó que tenía una "gangrena seca" en el 4to. dedo del pie derecho, y programó una amputación para el próximo día.[94] A preguntas de la Lcda. López González, el Dr. Bermúdez Vera explicó lo que significa tener "gangrena seca" y sus ramificaciones:

**DR. BERMÚDEZ VERA**
…para los efectos de un *"dry gangrene"* yo tengo que tener una parte del cuerpo que está seca junto a una parte que está viva. **O sea, tengo una parte negra, muerta, adyacente a una parte viva, es la única forma que yo puedo decir que tiene un "dry gangrene"**, ¿okey?

**LCDA. LÓPEZ GONZÁLEZ**
¿Y cómo se trata ese tipo de condición?

**DR. BERMÚDEZ VERA**
**En estos pacientes, la, en pacientes de pie diabático, el 'dry gangrene' es un arma de doble filo**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Por qué?

**DR. BERMÚDEZ VERA**
**Porque un paciente puede tener infección en la unión de ese tejido necrótico y ese es el problema en realidad. Pacientes que están con secreciones pueden tener infección activa en esa parte del, ya sea dedo, mano, pie, pueden tener infección ahí activa**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Qué más?

---

[92] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 56-58.
[93] Véase, *Consulta del Nefrólogo*, pág. 590 de la Entrada Núm. 128 de SUMAC, pág. 191 de 200.
[94] Véanse, la Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 59-60; y, *Notas del Cirujano,* pág. 591 de la Entrada Núm. 128 de SUMAC, págs. 192 de 200.

**DR. BERMÚDEZ VERA**
**Por lo tanto, <u>si uno ve secreciones, pues entonces,
uno debe hacer un *"debridement"* o hacer una
amputación parcial</u>**.

[...]

**LCDA. LÓPEZ GONZÁLEZ**
<u>**¿Qué pasaba si usted no amputaba el dedo?**</u>

**DR. BERMÚDEZ VERA**
<u>Si hay un foco infeccioso activo en este o cualquier
paciente, y dejamos eso ahí, eso es un foco de infección que</u>
**puede terminar en una septicemia en el paciente**. **Y si
nos vamos a referir al caso, este paciente tenía, como yo
dije inicialmente, tenía una enfermedad,** <u>**tenía
insuficiencia periferovascular y eso hace más propicio la
promoción de infecciones**</u>. <u>Por lo tanto, si yo tengo un
margen de error corto o pequeño y yo me equivoco,</u> **el
problema que va a asumir el paciente es peor**.

**LCDA. LÓPEZ GONZÁLEZ**
<u>**¿Cómo qué?**</u>

[...]

<u>**¿Cuál es el "peor", como qué?**</u>

**DR. BERMÚDEZ VERA**
<u>Bueno, pues como le acabo de decir,</u> **le puede dar una
infección generalizada y puede hasta morir**.

[...].[95]

**LCDA. LÓPEZ GONZÁLEZ**
<u>Doctor, lo que estábamos preguntándole es</u> **qué
pasaba si usted no le amputaba ese dedo**.

**DR. BERMÚDEZ VERA**
<u>**Yo entendía que el paciente iba a entrar en
problemas de infección, por lo menos a nivel del pie, iba
a ser una, iba a desarrollarse una gangrena mayor**</u>.

**LCDA. LÓPEZ GONZÁLEZ**
<u>**¿Y qué consecuencias tenía?**</u>

**DR. BERMÚDEZ VERA**
<u>Pues en un paciente como él,</u> **desastrosas**.

**LCDA. LÓPEZ GONZÁLEZ**
<u>**¿Cómo qué?**</u>

**DR. BERMÚDEZ VERA**
<u>**Hasta la muerte le puede ocasionar**</u>.[96]

El Dr. Bermúdez Vera, continuó su testimonio explicando que

contó con el consentimiento del paciente, señor Modestti Torres para

la amputación del cuarto dedo del pie derecho.[97]

---

[95] Objeción denegada.
[96] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 61-66.
Énfasis nuestro.
[97] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 66-67.

También, explicó el contenido de las órdenes médicas del **20 de marzo de 2019**, en la que solicitó una consulta con el "*wound care team*", [98] que según el apelante, es una facilidad para curaciones de heridas con enfermeras entrenadas en el manejo de úlceras y heridas.[99] Sobre el propósito de esta consulta, explicó lo siguiente:

> **DR. BERMÚDEZ VERA**
> Bueno, pues como le acabo de decir, **le puede dar una infección generalizada y puede hasta morir**.
>
> **DR. BERMÚDEZ VERA**
> **El paciente no solamente tenía una gangrena en un dedo**, sino tenía problemas en múltiples dedos en los dos pies y uno, pues hay que cuidar esos pies tam… esos dedos también, **porque no queremos que siga perdiendo dedos**.
>
> **LCDA. LÓPEZ GONZÁLEZ**
> **¿Y cuál era el propósito entonces de que usted solicitara esa consulta?**
>
> **DR. BERMÚDEZ VERA**
> **Porque con ese cuidado podíamos entonces evitar nuevas amputaciones y esa es la idea de que el *team*** entre, para dar cuidado, mejor cuidado al paciente, para que eso no, evitar esos problemas.[100]

El Dr. Bermúdez Vera continuó su testimonio con el relato de la **segunda intervención del 21 de marzo de 2019**, sobre los procesos aplicados durante la intervención quirúrgica en el cual se le amputó el cuarto dedo del pie derecho al paciente Modestti Torres.

Conforme al reporte operatorio, narró que inició la intervención a las **12:20 pm** y finalizó la misma a las **12:30 pm**. También, declaró que ordenó el envío del tejido extraído de la amputación al laboratorio de patología. Además, incluyó el diagnóstico preoperatorio y postoperatorio en el que coincidió con una gangrena en el cuarto dedo amputado del pie derecho; y en los hallazgos (*"gross finding"),* escribió gangrena "seca" en el cuarto dedo —*4th toe gangrene "Dry"*. Luego de leer el procedimiento

---

[98] Véase, *Órdenes Médicas (Physician's Orders),* pág. 1,486 de la Entrada Núm. 128 de SUMAC, pág. 86 de 100.

[99] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 69.

[100] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 70. Énfasis nuestro.

seguido en la intervención, indicó que la sección de inmediata condición post operatoria *("immediate post-op conditions")* escribió que el paciente estaba estable y tolera bien el procedimiento *("stable and tolerated well the procedure").* [101]

Tras culminar la operación, el Dr. Bermúdez Vera se retiró de la sala de operaciones para escribir la **nota post operatoria**, en la que describe el proceso operatorio. [102] Sin embargo, cinco (5) minutos después finalizar la cirugía, el personal del Hospital le notificó que el señor Modestti Torres *"se puso malo".*[103] Acto seguido, volvió a la sala de operaciones y encontró que tanto el anestesista y anestesiólogo —servicio de anestesia— estaban intubando al paciente. Junto a una enfermera graduada le explicó a la esposa del señor Modestti Torres que hubo que entubarlo a causa de un arresto cardiorrespiratorio. Luego, el anestesiólogo le explicó al Dr. Bermúdez Vera que el paciente tuvo una bradicardia y que se fue en hipotensión, por lo que hubo que intubarlo. Relató que, ante este cuadro clínico, ordenó a la 1:40 de la tarde el traslado del señor Modestti Torres a la **Unidad de Cuidados Intensivos** junto con una serie de órdenes médicas para el equipo médico que lo atendería allí.[104] Hizo hincapié en que en esas órdenes médicas le solicitó a dos (2) doctores: el **nefrólogo y médico primario**, Dr. Rodríguez Castro y al cardiólogo de igual apellidos, que evaluaran al paciente; además, entre otras órdenes, solicitó una placa de pecho ante el hecho de que el paciente fue intubado. Indicó, que el internista, Dr. Amparo Flores fungía como médico de cabecera o primario.[105]

---

[101] Véanse, *Reporte de Operación (Operation Report)*, pág. 549 de la Entrada Núm. 128 de SUMAC, pág. 150 de la 200; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 70-73.

[102] Véanse, *Notas post Operatoria (Post Op. Note) del Dr. Bermúdez Vera*, pág. 599 de la Entrada Núm. 128 de SUMAC, pág. 200 de 200; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 73-77.

[103] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 78-79.

[104] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 79-81; y, *Órdenes Médicas (Physician's Orders),* pág. 1,492 de la Entrada Núm. 128 de SUMAC, pág. 92 de 100.

[105] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 82-85.

**En cuanto a la colocación del tubo de pecho**, el Dr. Bermúdez Vera declaró que el **22 de marzo de 2019**, el hijo del señor Modestti Torres autorizó que al paciente se le colocara un tubo de pecho en el lado derecho debido a una efusión pleural.[106] Esta autorización se originó luego de que el **neumólogo intensivista**, Dr. Javier Ramos Rossi, se lo solicitara por escrito.[107] En lo pertinente, el Dr. Bermúdez Vera explicó:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Y cuál era la función de ese tubo?**

**DR. BERMÚDEZ VERA**
El tubo de pecho, **cuando hay una efusión pleural** que causa desviación o que **el paciente tiene, por el líquido que tiene dentro de la cavidad toráxica**, **tiene problemas respiratorio**, **se utiliza para drenar ese líquido que está en esa área**, **para librar la tensión de ese líquido**, **por lo cual mejora la perfusión y la ventilación del paciente**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y cuándo usted colocó ese tubo?

**DR. BERMÚDEZ VERA**
**Ese mismo día**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Tuvo algún problema en la entubación?

**DR. BERMÚDEZ VERA**
**Ningún problema**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Estuvo drenando?

**DR. BERMÚDEZ VERA**
**Drenó**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuándo usted lo removió?**

**DR. BERMÚDEZ VERA**
**Yo lo removí varios días, varios días después de eso, aproximadamente como 10 días después**.[108]

En específico, el Dr. Bermúdez Vera declaró que luego de la solicitud que le hizo el neumólogo, Dr. Javier Ramos Rossi, procedió a colocar el tubo de pecho al paciente. Describió en qué consiste el

---

[106] Véase, *Notas del Cirujano Dr. Bermúdez Vera*, pág. 613 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200.
[107] Véanse, *Reporte de Consulta de Consulta del neumólogo, Dr. Javier Ramos Rossi al Dr. Bermúdez Vera (Report to Consultation)*, pág. 14 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200.
[108] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 85-86. Énfasis nuestro.

proceso de colocar un tubo de pecho. Narró que luego de esterilizar

el área y aplicar un anestésico:

**DR. BERMÚDEZ VERA**

Se hace una incisión hasta el tejido subcutáneo donde se crea un túnel. Nosotros hacemos una incisión más o menos, a nivel del quinto espacio intercostal, no es lo que dice ahí, pero eso es lo que hacemos. Entramos al tejido subcutáneo y hacemos un túnel que vamos por el lado de la pared torácica y luego más arriba, al nivel del quinto espacio intercostal, entramos a la cavidad.

Abrimos ese espacio y se le coloca entonces, eso se hace con disección roja, o sea, no es cortante, no va abriendo con un, lo que se llama un Kelly, que es básicamente, como un alicate bien largo, vamos a ponerlo así para que ustedes puedan entender lo que es, finito, pero es bien largo y con eso nosotros podemos disecar a través del tejido.

Llegamos al espacio donde queremos colocar el tubo y haciendo lo mismo de forma roma presionando y abriendo, presionando y abriendo, entramos a la cavidad y entonces, creamos el espacio para entonces colocar el tubo a través de ese tracto que va a la cavidad torácica. Y luego que se le coloca el tubo, se amarra la piel para que no se mueva, no pueda moverse ni para arriba ni para abajo ni... se queda prácticamente fijo completamente a la pared del paciente. Y por eso es que se le dice que fue fijado del, con sutura 2-0 y se le aplicaron, se le pone un vendaje encima para sellar el espacio.[109]

Continuó narrando que el resultado de ese procedimiento fue

que la fusión del paciente drenó. Así, finalizado el procedimiento a

las 4:40 de la tarde del día 22 de marzo de 2019, recomendó que se

le hiciera una placa de pecho al paciente y se tuviera cuidado con el

área de entrada del tubo.[110]

Surge del expediente médico que en horas de la madrugada

del **23 de marzo de 2019**, se le tomó una radiografía del área del

pecho al paciente. La lectura de la placa que hizo el Departamento

de Radiología interpretó que el tubo torácico en el lado derecho con

el hueco centinela se salía de la pared torácica y recomendó al

cirujano evaluarlo para considerar su reposicionamiento. Además,

se hizo constar, entre otras condiciones, que el paciente tenía el

---

[109] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 88-90. Énfasis nuestro.

[110] Véanse, *Órdenes Médicas del Dr. Bermúdez Vera para placa de pecho del 3/22/19, 4:30pm, (Physician's Orders)*, pág. 1,497 de la Entrada Núm. 128 de SUMAC, pág. 92 de 100; *Reporte de Consulta de Consulta del neumólogo, Dr. Javier Ramos Rossi al Dr. Bermúdez Vera y orden de placa de pecho del 3/22/19, 4:40pm (Report to Consultation)*, pág. 14 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 90.

corazón agrandado, sufría una de edema pulmonar con efusiones pleurales, mayores en el lado derecho que en el izquierdo.[111] También, surge del récord médico que la recomendación para que el cirujano evaluara el reposicionamiento del tubo de pecho, se hizo en la tarde del mismo día 23 y en los días 24, 25 y 27 de marzo de 2019.[112]

Ese mismo **27 de marzo de 2019**, el **internista y médico primario**, Dr. Amparo Flores consultó al Dr. Bermúdez Vera para que realizara un procedimiento de catéter de vena subclavia derecha, debido a la deshidratación que sufría el paciente. El Dr. Bermúdez Vera colocó el catéter.[113] El cirujano declaró que luego de una placa se encontró que el catéter se proyectaba hacia la yugular del mismo lado derecho, por lo que se intentó colocar otro, lo cual fue infructuoso.[114]

**En cuanto a los resultados de las placas de pecho de los días 23, 24, 25 y 27 de marzo de 2019,** que recomendaban al cirujano evaluar el reposicionamiento del tubo de pecho, el **1 de abril de 2019** a la 1:25 de la tarde, el Dr. Bermúdez Vera escribió una nota de cirugía indicando que el tubo de pecho no tenía liqueo de aire, y sería removido al próximo día.[115] En lo pertinente, explicó:

> **DR. BERMÚDEZ VERA**
> El problema es que en la, **en la nota del 1 de abril yo estoy escribiendo que el tubo no tiene liqueo y le estoy, le quiero explicar por qué es que yo digo eso y que lo, porque se me está solicitando que se remueva el tubo**. Y por eso es que yo escribo que el tubo, **el tubo de pecho no**

---

[111] Véase, *Hallazgos/Impresión de placa de pecho del Departamento de Radiología (Findings/Impression, chest view, Radiology Department),* pág. 409 de la Entrada Núm. 128 de SUMAC, pág. 9 de 200.

[112] Véase, *Hallazgos/Impresión de placa de pecho del Departamento de Radiología (Findings/Impression, chest view, Radiology Department),* págs, 410-412, 417 de la Entrada Núm. 128 de SUMAC, págs. 10-12, 17 de 200.

[113] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 96-100; y, *Reporte de Consulta (Report of Consultation) del internista Dr. Amparo Flores al cirujano Dr. Bermúdez Vera*, pág, 16 de la Entrada Núm. 128 de SUMAC, pág. 16 de 200.

[114] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 105-106.

[115] Véase, *Notas del Cirujano Dr. Bermúdez Vera del 1 de abril de 2019, para remoción de tubo de pecho,* pág. 781 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200.

**tiene liqueo**, **que está en buena posición, pero se va a retirar al otro día**, próximo día. [...].[116]

Tras una interrupción de la juez para impartirle al apelante unas instrucciones sobre el contenido de su testimonio de la intervención sobre el tubo de pecho,[117] la abogada del Dr. Bermúdez Vera abordó detalladamente el contenido de la anotación del **1 de abril de 2019**:

#### LCDA. LÓPEZ GONZÁLEZ
[...]
... Léanos su nota de la que aparece en esa página, por favor.

#### DR. BERMÚDEZ VERA
La fecha es el 1 de abril de 2019 a la 1:25 de la tarde. Es una nota de cirugía. Dice que el problema es, estamos hablando del tubo, del *"Right close thoracostomy"* y dice ***"Chest tub without air leak or output Will be DC tomorrow a.m."***

#### LCDA. LÓPEZ GONZÁLEZ
¿Puede decírnoslo en español?

#### DR. BERMÚDEZ VERA
Nota de cirugía en relación al problema es el tubo de pecho del lado derecho. Dice, **"El tubo de pecho no tiene líquido de aire o descarga y por razón, se va a remo... ser removido al día siguiente"**, eso es lo que dice, **la mañana siguiente**. **Y yo firmo esa nota**.

[...]
#### LCDA. LÓPEZ GONZÁLEZ
**¿Cómo usted llega a esta conclusión de esa nota, doctor?**

#### DR. BERMÚDEZ VERA
**Porque yo reviso el tubo, yo voy a revisar el tubo y el sistema cerrado que tiene**.

[...]
#### LCDA. LÓPEZ GONZÁLEZ
**¿...usted hizo para poder llegar a esa conclusión doctor?**

#### DR. BERMÚDEZ VERA
Cuando uno tiene un tubo de pecho, uno tiene una succ... **eso es una caja que se conecta al sistema del hospital, que es de succión**. **Cuando uno quiere verificar si hay liqueo o no**, **o lo desconecta de ese sistema y deja el sistema solo**, el, **la caja pegada al tubo que va al pecho del paciente y uno revisa ahí si el paciente tiene o no tiene liqueo**, **porque hay una columna de agua y eso es lo que nos dice a nosotros si bota aire o no bota aire**, si tiene algún problema con el tubo o no tiene ningún problema el tubo, si bota líquido o no bota líquido, **y es desconectándolo del sistema de succión del hospital**.

---

[116] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 118. Énfasis nuestro.
[117] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 118-121.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Luego de lo que usted hizo con ese procedimiento, la conclusión es la nota que nos acaba de leer?**

**DR. BERMÚDEZ VERA**
**Eso es así**.[118]

El interrogatorio continuó con el tema de la orden médica del **3 de abril de 2019**,[119] referente a la solicitud telefónica que hizo el Dr. Bermúdez Vera al **radiólogo invasivo**, Dr. Salvador Mercado para que por medio de los métodos radiológicos le colocara al señor Modestti Torres una línea central de acceso venoso (cánula) para que continuara con el suministro de medicamentos y hemodiálisis, ya que se trataba de un paciente renal que había recibido múltiples procedimientos.[120]

El Dr. Bermúdez Vera continuó declarando sobre una consulta que el **neumólogo intensivista**, Dr. Javier Ramos Rossi le hizo el **20 abril de 2019** a las 10:00 a.m., para que evaluara la posibilidad de intervenir al señor Modestti Torres para hacerle una **traqueotomía**:

**LCDA. LÓPEZ GONZÁLEZ**
¿Y usted la contesta?

**DR. BERMÚDEZ VERA**
. . . Ese mismo día, a las 11:30, no sé si es a.m. o p.m., pero, pero es a las 11:30 a.m., o p.m., no sé lo que dice ahí.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué es lo que usted contesta al doctor Ramos de sus hallazgos, *"findings"*?**

**DR. BERMÚDEZ VERA**
Dice, *"Case of a 65-year-old with chronic respiratory failure with prolonged intubation, reason why a tracheostomy placement was requested to promote (ininteligible) from the mechanical ventilation".*
En español. ***"Esto es un paciente de 65 años con historial de fallo respiratorio prolongado, con una intubación prolongada, razón por la cual se pide una, el ponerle una traqueostomía, el ponerle una traqueostomía para promover poderlo sacar del ventilador, de la ventilación mecánica"***, así es que dice.

---

[118] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 121-123; y, *Notas del Cirujano Dr. Bermúdez Vera del 1 de abril de 2019, para remoción de tubo de pecho*, pág. 781 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200. Énfasis nuestro.
[119] Véase, *Órdenes Médicas (Physician's Orders),* pág. 1,519 de la Entrada Núm. 128 de SUMAC, págs. 19 de 100.
[120] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 123-124.

[...]

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuál fue el diagnóstico, doctor?**

[...]

**DR. BERMÚDEZ VERA**
**Que tenía un fallo respiratorio crónico**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Y cuáles fueron las recomendaciones?**
[...]
**Lea lo que dice en las recomendaciones**.

**DR. BERMÚDEZ VERA**
**Okey.** *"On call to tracheostomy on Monday"*.

**LCDA. LÓPEZ GONZÁLEZ**
Okey, ¿qué más?
[...]
**¿Qué más?**
[...]

**DR. BERMÚDEZ VERA**
*Start on Vitamin K therapy*.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Para qué es la terapia de Vitamina K?**

**DR. BERMÚDEZ VERA**
**El paciente tenía una elevación del PT**. El PT es...

**LCDA. LÓPEZ GONZÁLEZ**
¿Qué es eso?

**DR. BERMÚDEZ VERA**
**El PT es una medida de coagulación**, tenemos dos, el PT mide pacientes, **el PT lo que mide son, en la cascada de coagulación**, **aquellos factores de coagulación que se generan en el hígado**, **por lo tanto**, **y ellos son dependientes de Vitamina K**. Y si hay una elevación en esos factores, puede ser que haya una deficiencia de Vitamina K y **una de las cosas que se recomienda** es empezarlas en vitamina, **un tratamiento de Vitamina K para mejorar esa coagulación**.[121]

Al día siguiente, **21 de abril de** 2019, el Dr. Bermúdez Vera hizo unas anotaciones en el expediente médico sobre las condiciones del señor Modestti Torres para la posibilidad de colocarle traqueotomía, quien a esa fecha respiraba asistido de un ventilador:

**DR. BERMÚDEZ VERA**
Cuatro vein.... abril 21 del 2019 a las 11:45 de la mañana, eso es una nota de cirugía. Y el problema dice, *"Fallo respiratorio crónico"*. Pongo en ese que es un (ininteligible) y pongo que **el paciente** *"Under"*, **el paciente está bajo ventilación mecánica**.
Y entonces dice, *"Actualmente, el paciente presenta PT, niveles de PT elevados"*, por lo tanto, el procedimiento se va

---

[121] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 124-128; y, *Reporte de Consulta (Report of Consultation) del Dr. Ramos al Dr. Bermúdez Vera*, pág. 21 de la Entrada Núm. 128 de SUMAC, págs. 21 de 200. Énfasis nuestro.

a detener, se va a, perdóneme, se va a detener Lovenox, la terapia de Lovenox y va a ser revaluado con unos nuevos niveles de PT y PTT, para entonces poder, para poder ser considerado para cirugía al día siguiente.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y este es el día 21?

**DR. BERMÚDEZ VERA**
Y tengo, y pongo entre comillas, *"Ponerle una traqueostomía"*.[122]

El **23 de abril de 2019**, el Dr. Bermúdez Vera hizo la siguiente anotación sobre la condición respiratoria del paciente:

**DR. BERMÚDEZ VERA**
Esto es una nota de cirugía el día abril 23 de 2019 a la 1:15 de la tarde. Hice, la nota de cirugía, **y el problema es un fallo respiratorio crónico**. Aquí dice que e1 **paciente actualmente continúa con una elevación de niveles de PT**, por lo tanto, el paciente se va a empezar en *"fresh frozen plasma"*, yo le voy a dar entonces una **transfusión de *"fresh frozen plasma"***, que es plasma básicamente, para, **y Vitamina K**, tratando de **mejorar la coagulación, los niveles de coagulación**. Y pongo entonces abajo, *"Plan. Vea órdenes"* y firmo al lado de la...[123]

El **30 de abril de 2019**, a las 3:00 de la tarde, el Dr. Bermúdez Vera hizo una anotación sobre la precaria condición médica del paciente que se complicaba con una colecistitis (inflamación de la vesícula biliar). En lo pertinente, expresó:

**DR. BERMÚDEZ VERA**
Sí, *"Actualmente, como una presen... con unos hallazgos clínicos de dolor en el cuadrante superior derecho del abdomen, compatible con una **colecistitis aguda**"* y tiene, y aparentemente tiene piedras, digo, aparentemente no, **dice que tiene piedras**, en los estudios, por esto, **razón por la cual el paciente ha sido consultado mi servicio para manejo quirúrgico**.
Después de evaluar el paciente, que actualmente está inestable, **una coagulopatía**, por esta razón **considero que una colecistectomía percutánea para la resolución de la infección**, del proceso infeccioso, **para dejar luego una posible colecistectomía cuando el paciente presente una mejoría clínica**.

**LCDA. LÓPEZ GONZÁLEZ**
**Explíquenos eso**.

**DR. BERMÚDEZ VERA**
Cuando tenemos pacientes que están inestables o que están en, o están bien enfermos, **en este caso el paciente venía ya con una coagulopatía**, tenía problemas de coagulación, **pues este paciente no se puede considerar**

---

[122] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 128-129; y, *Notas del Cirujano Dr. Bermúdez Vera*, pág. 1,139 de la Entrada Núm. 128 de SUMAC, págs. 140 de 201.

[123] Véanse, *Notas del Cirujano Dr. Bermúdez Vera*, a pág. 1,170 de la Entrada Núm. 128 de SUMAC, págs. 171 de 201; y, la Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 129-130. Énfasis nuestro.

**para un proceso quirúrgico abierto o laparoscópico, no se puede hacer procedimientos que requieran heridas grandes o procedimientos mayores**.

Por lo tanto, no se habla, **no se recomienda remover la vesícula**, si no se recomienda, si hay un proceso infeccioso inflamatorio agudo en la vesícula, **se recomienda que se utilice por vía de un radiólogo invasivo se introduzca un catéter a nivel, cuando llega a la vesícula, para poder drenar su contenido**.

Y entonces, **eso ayuda a disminuir la infección si está ocurriendo, quita todo eso que está dentro de la vesícula y ayuda entonces a que los antibióticos actúan sobre el proceso infeccioso sin alterar o poner en riesgo al paciente y por eso es que se recomienda esto**.

Luego que pasa todo, que el paciente mejora, ya se puede remover el tubito ese, el drenaje y si el paciente mejora, entonces luego se opera con calma sin problemas, **pero en esa fase aguda entendimos en ese momento que no era apropiado para el paciente operarse**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuándo es la última vez que usted ve este paciente?**

**DR. BERMÚDEZ VERA**
Yo creo que esa fue la última vez que yo lo vi.

**LCDA. LÓPEZ GONZÁLEZ**
[...]
**¿Por qué usted no lo vio más?**

**DR. BERMÚDEZ VERA**
Porque no tenía requerimientos quirúrgicos ninguno, yo atendí ese paciente de todos sus requerimientos quirúrgicos que necesitó **y lo que él necesitaba yo iba y lo ayudaba lo trataba de ayudar o buscaba alternativas para ayudarlo**.[124]

**Finalizado el interrogatorio directo, dio inicio el contrainterrogatorio**. A preguntas del abogado de los demandantes/apelantes, el Dr. Bermúdez Vera contestó que, luego de la primera intervención del 14 de marzo de 2019, no vio físicamente al señor Modestti Torres hasta el 20 de marzo de 2019, cuando el nefrólogo le pidió que lo examinara dado que la gangrena se estaba poniendo peor.[125]

También, declaró que tenía conocimiento que al señor Modestti Torres se le estaban dando terapias respiratorias, pero desconocía que el paciente hubiera desarrollado efusiones pleurales, pues no lo trataba por problemas pulmonares, por lo que no

---

[124] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 130-133; y, *Notas del Cirujano Dr. Bermúdez Vera*, pág. 1,258 de la Entrada Núm. 128 de SUMAC, pág. 59 de 101. Énfasis nuestro.
[125] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 148-150.

examinó la placa de pecho.[126] Reiteró que leyó el expediente y que desconocía de las efusiones pleurales del paciente:

**LCDO. DÁVILA DÍAZ**
Lo que le quiero preguntar, doctor, es que **si allí surge que ya el paciente tenía *"fine, fine crackles"***.

**DR. BERMÚDEZ VERA**
Eso es lo que dice ahí.

**LCDO. DÁVILA**
Sí. ***¿Fine crackles* son indicativos de neumonía, doctor?**

**DR. BERMÚDEZ VERA**
**Son indicativos de que hay una infección que puede ser pequeña o grande, eso no dice nada en realidad con eso**.[127]

De igual modo, el Dr. Bermúdez Vera se reafirmó que el señor Modestti Torres desarrolló una falla respiratoria después de la amputación.[128]

En cuanto a la colocación del tubo de pecho que hizo el Dr. Bermúdez Vera al señor Modestti Torres el **22 de marzo de 2019**, sostuvo que, ese mismo día, se enteró a través de la placa que el paciente padecía de efusiones pleurales. Ello, a pesar de que esa información obraba en el expediente médico antes de que el apelante realizara la amputación el 21 de marzo de 2019.[129]

En cuanto a la recomendación para que el cirujano evaluara el reposicionamiento del tubo de pecho que las imágenes de las placas mostraban sobre el nudo centinela fuera de la pared torácica, el Dr. Bermúdez Vera reiteró que no lo hizo porque, a su criterio, no había que reposicionarlo, ello, a pesar de esas imágenes de las placas y las notas del neumólogo. Afirmó que después de cierto tiempo el tubo de pecho perdió su efectividad y hubo que sacarlo.[130]

---

[126] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 150-156.
[127] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 159.
[128] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 168-169.
[129] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 170-173.
[130] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 174-180; *Hallazgos/Impresión de placa de pecho del Departamento de Radiología (Findings/Impression, chest view, Radiology Department),* págs, 409, 410,411 y 417 de la Entrada Núm. 128 de SUMAC, págs. 9,10,11 y 17 de 200; y, *Notas de abril/2/19 Critical Care Evaluation on Mechanical Ventilation*, pág. 802 de la Entrada Núm. 128 de SUMAC, pág, 6 de 201.

Terminado el contrainterrogatorio, **dio inicio el interrogatorio redirecto**. El Dr. Bermúdez Vera explicó que las efusiones pleurales sufridas por el señor Modestti Torres se debían a un fallo congestivo causado por su condición cardiaca al contar una capacidad mínima de 25 o 30 por ciento de *"ejection fraction"*.[131]

Luego de examinar una serie de estudios radiológicos de pecho realizados al paciente,[132] el Dr. Bermúdez Vera contestó que esos resultados no hubieran cambiado el procedimiento quirúrgico practicado el 14 de marzo de 2019 ni del 21 de marzo de 2019.[133]

En ese sentido, la licenciada López le preguntó al Dr. Bermúdez Vera por qué no solicitó estudios de imágenes del paciente:

**LCDA. LÓPEZ GONZÁLEZ**
A usted le hicieron una pregunta que **cuando usted hizo el desbridamiento por qué usted no hizo un estudio de imagen.**

**DR. BERMÚDEZ VERA**
No hice un estudio de imagen, porque ya este paciente estaba, entiendo yo que estaba estudiado, no sé qué le habían hecho, pero estaba estudiado.

**LCDA. LÓPEZ GONZÁLEZ**
¿Cómo usted sabe que estaba estudiado?

**DR. BERMÚDEZ VERA**
Por la familia, cuando la primera intervención.

**LCDA. LÓPEZ GONZÁLEZ**
¿Y la segunda?

**DR. BERMÚDEZ VERA**
¿La segunda intervención? Cuando yo voy la primera intervención, **que hacemos el historial**, yo entendía que ya él había sido tratado de su problema vascular y... (ininteligible)...
[...].
...imágenes. Y entonces, otra de las cosas es que la **clínica de pie diabético** que el paciente tenía lo que me indicaba, yo no tenía que hacerle estudios para qué hacer.[134]

---

[131] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 187-191.
[132] Véanse, las págs. 403, 404, 405, 409, 410, 411, 417, 419, 421, 425, 426, 461, 486 de la Entrada Núm. 128 de SUMAC, págs. 3, 4, 5, 9, 10, 11, 17, 19, 21, 25, 26, 61, 86 de 200. Estos estudios van desde el 13 de marzo de 2019 hasta el 27 de abril de 2019. Además, véase la Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 201-206.
[133] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 206, 211-212. Aunque en la pág. 206 de la TPO se indica que la primera intervención ocurrió el 13 de marzo de 2019, lo correcto es que sucedió el 14 de marzo de 2019.
[134] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 212. Énfasis nuestro.

Además, el Dr. Bermúdez Vera explicó por qué el 14 de marzo de 2019 en la primera intervención quirúrgica de ambos pies, solo incluyó en la hoja de autorización y consentimiento el pie derecho;[135] a pesar de que en el reporte operatorio intervino con los dedos 3-4-5 del pie derecho y los dedos 1-3 del pie izquierdo. [136] En lo pertinente, expresó:

**LCDA. LÓPEZ GONZÁLEZ**
Doctor, **se trajo a la atención y se lo pongo en pantalla, que en este consentimiento usted solamente está mencionando que se está interviniendo con el *"left foot"*.**
[…]
Pues, doctor, dígame, **¿el consentimiento, a qué se refiere este consentimiento?**

**DR. BERMÚDEZ VERA**
Este está pidiendo el consentimiento para hacer un *"cleansing and debridement"*.

**LCDA. LÓPEZ GONZÁLEZ**
*"Cleansing and debridement"*. **¿De qué parte del cuerpo se va a hacer el *"cleansing and debridement"*.**

**DR. BERMÚDEZ VERA**
Bueno, ahí dice, no sé si dice *"Foot"* o *"Right"*, **pero dice *"Right, right fourth toe necrotic ulcer"*.**

**LCDA. LÓPEZ GONZÁLEZ**
Okey.

**DR. BERMÚDEZ VERA**
*"Right foot fourth toe necrotic ulcer"*.

**LCDA. LÓPEZ GONZÁLEZ**
¿El *"Right foot"*?

**DR. BERMÚDEZ VERA**
Sí.

**LCDA. LÓPEZ GONZÁLEZ**
Explíquenos que en su operación de esa ocasión, página 534, **usted menciona en los *"gross findings"*, también menciona el *"left toe"*.**

**DR. BERMÚDEZ VERA**
Sí.
**LCDA. LÓPEZ GONZÁLEZ**
**¿De dónde usted sacó el consentimiento para llevar a cabo ese procedimiento**…

[…]
**DR. BERMÚDEZ VERA**
**Aparentemente dejé de escribir el pie izquierdo.**

---

[135] Véase, Hoja de Autorización y Consentimiento, a las págs. 2,215-2,216 de la Entrada Núm. 128 de SUMAC, págs. 15 y 16 de 52.
[136] Véase, Reporte Operatorio, a la pág. 534 de la Entrada Núm. 128 de SUMAC, págs. 135 de 200.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Alguna razón en particular?**

**DR. BERMÚDEZ VERA**
No le puedo decir ahora mismo, pero, pero aparentemente dejé de escribir el pie izquierdo. **Pero eso estaba hablado con la familia**.[137]

Además, el Dr. Bermúdez Vera explicó por qué en la **segunda intervención** quirúrgica del 21 de marzo de 2019 aparece su firma en la hoja de autorización y consentimiento con fecha del 20 de marzo de 2019.[138] En lo particular, explicó:

**LCDA. LÓPEZ GONZÁLEZ**
... Bueno, ya usted lo explicó, pero vamos, vamos por ello, por si acaso. En la segunda intervención quirúrgica, en el consentimiento se trajo a la atención que usted tenía dos fechas distintas y usted contestó, usted no lo contestó. **Dígame por qué tiene dos fechas -distintas ese consentimiento**.

**DR. BERMÚDEZ VERA**
En esos tiempos, en el hospital los pacientes no los bajaban a sala de opera... pacientes hospitalizados, no los bajaban a sala de operaciones si no tenían el permiso firmado y yo, puede ser que haya pasado el día antes y lo haya llenado y eso es lo que está pasando ahí. Pero este paciente, esos familiares se evaluaron y se habló con ellos **antes** de tomar ese... primero programar el paciente y tomar el consentimiento, **o sea**, **que ese consentimiento sí es consentimiento informado**.[139]

Por último, el Dr. Bermúdez Vera volvió a explicar el procedimiento que utilizó para colocar el tubo de pecho al paciente, y por qué no reposicionó el mismo:

**DR. BERMÚDEZ VERA**
La pleura del paciente. El espacio de la pleura, donde está el líquido. Eso puede ser menos, mayor, dependiendo de cuán sea la efusión. Okey. Tubo de pecho entrando a, esta es las costillas aquí y entre las costillas entra el tubo de pecho. El *"sentinel hole"* está aquí afuera, está fuera aquí.
**El problema aquí es, y aquí está la capa de grasa, y aquí está la capa de la piel y esto crea un sello en esta área subcutánea, que tapa ese *"sentinel hole"*, por eso es que no hay líquido en el tanque y por eso es que nosotros no movimos el tubo**.
Porque después que yo tengo un sello aquí y no esté esto ambiente, **entonces se queda el sistema cerrado y yo lo puedo mantener así sin ningún problema y el tubo funciona sin ningún problema**. Porque es como si yo vengo, el tubo, como el proceso que le pinta el tubo, **volviendo al tubo, si yo tapo este rotito con la grasa, todo lo demás funciona, porque el tubo continúa**.

---

[137] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 213-215. Énfasis nuestro.
[138] Véanse, las págs. 2,217-2,218 de la Entrada Núm. 128 de SUMAC, págs. 17 y 18 de 52.
[139] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 215. Énfasis nuestro.

[...]

**JUEZ PINTADO RODRÍGUEZ**

Okey. Perdóneme un momentito. Licenciada, permiso, voy a repetir lo que entendí, a ver si lo entendí bien. **¿Lo que me está diciendo y a ver si entendí bien, porque esto es técnico, que no removió el tubo porque, en términos coloquiales, la grasa del paciente tapa esa centinela y por tanto, ahí se sella y no, y ahí entonces se está haciendo el trabajo del, del... ¿eso es lo que usted me está diciendo?**

**DR. BERMÚDEZ VERA**

**Eso es lo que le estoy diciendo.**

**JUEZ PINTADO RODRÍGUEZ**

**Okey.**

[...].

**Me estoy haciendo explicar para, para récord.** Está íntimamente ligado a la línea de preguntas, porque aquí fue una línea de preguntas extensa del contrainterrogatorio, **el tubo si fue o no removido.**

**Y en el redirecto se ha explicado, se ha preguntado por qué no se procedió con la recomendación de remover el tubo.** Él dio su explicación y yo estoy repitiendo, a ver si la entendí bien. Así que el Tribunal se sostiene en su determinación. Se puede sentar.[140]

**En el re-contrainterrogatorio**, el Dr. Bermúdez Vera sostuvo que basado en los estudios de imágenes no era correcto decir que, por que el *"sentinel hole"* estaba fuera de *"chest wall"*, eso incluye la piel.[141]

**Finalizado el interrogatorio del Dr. Bermúdez Vera**,[142] el 10 de mayo de 2023 la parte demandada/apelante presentó el testimonio del **Dr. Pablo Rodríguez Ortiz**, en calidad de **perito**.

El Dr. Rodríguez Ortiz es médico cirujano general, de trauma y cuidado crítico con más de 30 años de experiencia. Cursó sus estudios en el Hospital Universitario y Hospital de Veteranos. Desde 1991 forma parte del claustro de profesores en el Recinto de Ciencias Médicas y un nombramiento en el Departamento de Anestesiología. Está colegiado en el *Fellow of American College of Surgeons, Fellow Critical Care of Medicine, Fellow College of*

---

[140] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 222-226. Énfasis nuestro.

[141] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 227-231.

[142] Cabe indicar que el 8 de mayo de mayo de 2023 fue presentado el testimonio del perito (psiquiatra forense) Dr. Raúl López Menéndez para contrarrestar el tema de las angustias mentales presentadas por la parte demandante/apelante.

*American College of Physicians* y del *Fellow College of Chest Physicians*. También es miembro de la Sociedad Panamericana de Trauma y es "*chairman*" de la Federación Iberoamericana de Trauma. Además, tiene privilegios en tres hospitales en Puerto Rico.[143]

Como parte de su Informe Pericial, el Dr. Rodríguez Ortiz examinó el informe pericial del Dr. Timmerman, el récord hospitalario del BMC (en específico, las hospitalizaciones de febrero de 2019 y marzo de 2019) y la demanda del caso de epígrafe.[144]

En su testimonio, el Dr. Rodríguez Ortiz declaró que entre los meses de febrero y marzo de 2019, al señor Modestti Torres se le realizaron 4 estudios en el BMC; a saber: un "*duplex arterial*", arteriograma, ecocardiograma y una mioplastía. El estudio de *duplex arterial* se realizó para interpretar el flujo de la circulación arterial.[145] Los resultados revelaron que el señor Modestti Torres tenía una enfermedad denominada **arteriosclerósica difusa**. En otras palabras, el paciente tenía irregularidades en sus arterias por la presencia de ateromas, calcificaciones que reducen el lumen y, por ende, el flujo de sangre. De ahí, aseguró el perito, proviene la gangrena y las *isquemias*. Continuó explicando que el estudio de "*duplex arterial*" demostró que la circulación del señor Modestti Torres hizo colaterales. Entiéndase, que las arterias localizadas en el muslo o cerca de la rodilla al encontrase **obstruidas**, buscaron una "*ruta alterna*" para poder circular la sangre. Por lo que, estaba "***llegando algo de sangre** debajo de la rodilla hasta los, hasta los dedos de los pies*".[146]

---

[143] Véanse, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 7-26; y, *Curriculum Vitae* del Dr. Pablo Rodríguez Ortiz, Entrada Núm. 125 de SUMAC, págs. 1-76 de 76.

[144] Véanse, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 26-27; y, el *Informe Pericial, el Dr. Rodríguez Ortiz*, Entrada Núm. 125 de SUMAC, págs. 1-12 de 12.

[145] Véase, *Resultado del Departamento de Radiología (Radiology Department) sobre estudio de duplex arterial de las extremidades bajas del paciente el 13/febrero/2019,* pág 49-a de la Entrada Núm. 128 de SUMAC, pág. 51 de 141.

[146] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 27-33.

Por otro lado, el Dr. Rodríguez Ortiz señaló que el ecocardiograma reveló que la función del ventrículo izquierdo del corazón del señor Modestti Torres tenía una **fracción de salida** *("ejection faction")* de entre **25% o 30%**;[147] cuando la fracción de salida **debía ser 50%**, lo que indica un problema cardíaco de bombeo de sangre.[148]

**Sobre la primera intervención del Dr. Bermúdez Vera con el paciente**, el perito indicó que, conforme a la hoja de consulta,[149] fue el **13 de marzo de 2019** cuando el nefrólogo y médico primario, Dr. Rodríguez Castro le hizo la primera consulta al Dr. Bermúdez Vera para que evaluara unas presiones que tenía el señor Modestti Torres en los dedos de los pies.[150] En específico, explicó que en el referido reporte de consulta el Dr. Bermúdez Vera hizo los siguientes hallazgos al examinar el paciente:

> **PERITO: DR. RODRÍGUEZ ORTIZ**
> Sí, él encuentra que tiene úlceras en la pierna derecha, los... tercero, cuarto y quinto dedo, y de la pierna izquierda en el primero y tercer dedo con des... con descarga, (ininteligible) necro... **necrotizante con descarga**.

> **LCDA. LÓPEZ GONZÁLEZ**
> **¿Qué significa necrotizante con descarga?**

> **PERITO: DR. RODRÍGUEZ ORTIZ**
> **Necrotizante indica que es una úlcera**, como, como él describe, verdad, **activa, que está oscura o la circulación deficiente**, **y descarga es importante**, **porque eso diferencia una úlcera isquémica por baja circulación o una úlcera que se da mucho en los diabéticos**, que tiene... **está contaminada porque tiene parte del tejido vivo**, así que esa necesita, **eso necesita desbridar**.
> **Así es que ese drenaje indica que tiene contaminación, esa área, que puede estar necrótica**. **Así que en dedos tiene una combinación, tiene necrosis con un área (ininteligible), indicando infección**.

> [...]
> **LCDA. LÓPEZ GONZÁLEZ**
> **Doctor**, **acláreme si esta línea bajo *"findings"*, firmada por el doctor Bermúdez**, **es lo que usted acaba de decir**.

---

[147] Véase, *Reporte de Ecocardiograma (Echocardiogram Report),* págs. 50-51 de la Entrada Núm. 128 de SUMAC, págs. 53 y 54 de 141.

[148] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 33-37.

[149] Véase, *Reporte de Consulta (Report of Consultation),* pág 10 de la Entrada Núm. 128 de SUMAC, pág. 10 de 200.

[150] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 39.

**PERITO: DR. RODRÍGUEZ ORTIZ**
Es <u>correcto</u>.

**LCDA. LÓPEZ GONZÁLEZ**
Que, **que está necrótico y tiene un *"mild drainage"*. ¿Eso es?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**<u>Sí</u>**.

**LCDA. LÓPEZ GONZÁLEZ**
**Okey**. <u>En el diagnóstico que presenta el doctor Bermúdez, léalo, por favor</u>.

**PERITO: DR. RODRÍGUEZ ORTIZ**
Dice, "Diagnóstico, ***"Right foot toes ulcer"* 3, 4 y 5, y *"left foot toes ulcer"* 1 y 3"**.

**LCDA. LÓPEZ GONZÁLEZ**
<u>¿Bajo recomendación, cuál fue, si alguna?</u>

**PERITO: DR. RODRÍGUEZ ORTIZ**
Dice "(ininteligible) y (ininteligible) *tomorrow"*. **<u>Realizar operaciones para el otro día y</u>**, <u>y que lo dejara sin comer, lo iba a dejar sin comer</u>.[151]

El perito opinó que el desbridamiento debía ser **agresivo** para

**evitar infecciones** y una amputación futura del resto del pie:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Por qué lo opera, doctor?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
<u>Lo opera por la descarga (ininteligible) que tiene en el, en... y es... es una recomendación que la gente que **tiene úlceras diabéticas hay que ser en los *"debridement"* para evitar que esa infección comprometa el resto del pie y en vez de</u>**, **de terminar desbridando un dedo terminas cortando una pierna**.

[...]
**LCDA. LÓPEZ GONZÁLEZ**
... **¿cuál es el propósito, entonces, de hacer este tipo de desbridación, de operación agre... de modo agresivo?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
<u>Como dice la referencia, **hay que hacerlo agresivo**, porque el **problema** es que un **dedo** en un **diabético**, que ya vimos que **la circulación es deficiente**, las células blancas de nosotros, que nos protegen de infecciones, e inclusive, cuando damos antibióticos si no puede llegar en forma adecuada y tiene una infección (ininteligible) tan distante y no llega a la sangre para hacer una placa de defensa y no llegan los antibióticos, **pues esa infección que parece inocua y pequeña ahora**, **mañana va a ser una infección que sigue creciendo y cuando crece**, **crece proximal, verdad**, **hacia**, **hacia la parte de atrás**.</u>
<u>Después del dedo no hay nada, así que tiene... corre hacia atrás y entonces, **en vez de comprometer un dedo compromete el pie**, **la pierna y hay quien termina</u>**

---

[151] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 40-42. Énfasis nuestro.

**perdiendo las extremidades**, el pie, amputación debajo de la rodilla, por encima de la rodilla, etcétera.[152]

En ese sentido, el perito opinó lo siguiente sobre la **úlcera diabética con descarga** que el señor Modestti Torres padecía:

**LCDA. LÓPEZ GONZÁLEZ**
Gracias. Okey. **¿Y qué es una úlcera isquémica?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Una úlcera isquémica es una úlcera por, por circulación, deficiencia de circulación**. No está llegando la cantidad suficiente de oxígeno, y en nuestros casos que tenemos los dedos sanos y los vemos y los... en esta gente usted los ve, son dedos que se ven oscuros. **Cuando tiene gangrena seca es una**... **está modificada** (ininteligible), **está dura**, **una coraza negra**, **no tiene**, **no tiene descarga**, **porque es un tejido que está completamente muerto**, no, no hay, **no hay tejido vivo**, así que no, **no secreta** (ininteligible), no, no... Secreta el tejido que tiene, que tiene ya vida. (Inaudible).

**LCDA. LÓPEZ GONZÁLEZ**
**¿En este caso, este paciente en ese momento tenía una úlcera isquémica?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Tenía una úlcera diabética con secreciones**. Eso es lo que nos diferencia de la isquemia, **que usualmente es un dedo negro**, (ininteligible), **nada más**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Estaba este pie isquémico?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Estaba isquémico. El pie estaba isquémico.**

**LCDA. LÓPEZ GONZÁLEZ**
**¿Por qué?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Está isquémico por los dedos**. Ahora, hay un estudio, hay un procedimiento, **la angioplastia**, que fue parte de las cosas que le hicieron, que le hicieron a él en... un poquito antes de que se admitiera en marzo. **Entiendo que tenía perfusión, mejoró la perfusión, así que le mejoró la circulación ese procedimiento**. Así es que tiene, por su enfermedad diabética prolongada, que es una de las complicaciones más comunes de los diabéticos.
De hecho, la causa principal de enfermedades cardiovasculares en el mundo, sobre todo en Estados Unidos, es la diabetes, y esto como parte de la enfermedad, pues se sigue restringiendo la circulación (ininteligible) y en muchas de estas personas, los diabéticos, la amputación es el procedimiento más común que se hace en los diabáticos, las amputaciones, por la pobre circulación, que eventualmente tiene en los pies. Y si no, no (ininteligible) lo agresivo que es, las amputaciones aumentan, entonces. **Hay que ser agresivos con los diabéticos, porque falta de, de agresividad conlleva amputaciones, posteriormente**.

[...]

---

[152] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 42-44. Énfasis nuestro.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Estaba este pie isquémico al momento que el doctor lo evaluó?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**El dedo es oscuro**…

**LCDA. LÓPEZ GONZÁLEZ**
Okay.

**PERITO: DR. RODRÍGUEZ ORTIZ**
. . . por isquemia, falta de circulación. **Y estoy diferenciando esta úlcera que tenía descarga**. En un paciente diabético debe sospechar que es un paciente que tiene isquemia por la naturaleza de la enfermedad, **pero que tiene descarga, estoy entrando en el campo de una úlcera diabética**, secundaria si es diabético (ininteligible). **No estoy hablando de una úlcera isquémica, isquémica por, verdad, por... por falta de circulación completamente**.[153]

**A tono con el reporte operatorio hecho por el Dr. Bermúdez Vera el 14 de marzo de 2019**,[154] el perito declaró que el diagnóstico del reporte preoperatorio y el postoperatorio coincidían al exponer que el paciente tenía una úlcera del pie derecho, en los dedos 3, 4 y 5, y del pie izquierdo, en el primer y tercer dedo. También, indicó que el tejido necrótico fue enviado al laboratorio de patología.[155]

Conforme obra en el **reporte de laboratorio de patología**,[156] el perito destacó que, los fragmentos de tejidos necróticos de piel removidos, demostraron una infección focal, lo cual indicaba la **necesidad de hacer un desbridamiento**. [157] Al respecto se le preguntó:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Y qué efecto tuvo, si alguno, la intervención del doctor Bermúdez cuando hizo el *"debridement"* o la desbridación?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Pues, **si usted ve aquí el reporte patológico**, y esto es… sabiendo de, que le parece aquel o le parece al otro, **está claro que está infectado**. **La razón de los desbridamientos es para eliminar la infección**, porque en un pie que no **llega buena sangre**, porque está… ni la sangre, **ni**… **sangre con las células blancas**, **ni con los antibióticos**, **si usted**

---

[153] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 44-48. Énfasis nuestro.

[154] Véase, *Reporte Operatorio (Operation Report)*, pág. 534 de la Entrada Núm. 128 de SUMAC, pág. 135 de 200.

[155] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 49.

[156] Véase, *Reporte de Examen de Tejidos de Piel (Tissue Examination Report)*, pág 535 de la Entrada Núm. 128 de SUMAC, pág. 136 de 200.

[157] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 56-57.

**no ataca esa**, **desbridándolo**, **porque ya sabemos que los antibióticos no van a llegar**, ni haciendo una plancha (ininteligible) del cuerpo, van a llegar, **la única forma que uno tiene es eliminando ese foco en forma agresiva y en forma inmediata**.

Usted lo lleva, **desbrida el área, saca el foco de infección y ya no hay infección**, ya los antibióticos, si no llegan, si los (ininteligible) no llegan, no es tan importante, **porque ya el foco de infección usted lo sacó**. Y con esa intervención que hace el doctor Bermúdez, **sacando el foco de infección, disminuye el riesgo de que esa infección se, se vaya a proximal, se vaya hacia el pie o hacia la pierna y termine con amputación**.

[...]
**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué, si algo, hubiese ocurrido si el doctor Bermúdez no hubiese hecho ese desbridamiento?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Pues**, **de nuevo**, **la literatura es clara, dice** *"debridement"* **agresivo para evitar que las infecciones en los pacientes diabéticos con poca circulación progresen**. Y uno lo que trata es de evitar que el paciente termine amputado. Amputación, verdad, en vez de desbridar, que es un... sacar tejido, a una amputación, que es cortar el tejido, verdad, y ... y parte de una extremidad. **Lo que estamos previniendo son las amputaciones posteriores**.[158]

**En cuanto a la sedación utilizada en este procedimiento**,[159] el Dr. Rodríguez Ortiz indicó que era segura y apropiada para este paciente. En lo pertinente, declaró:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Por qué se utilizó la sedación en este caso para la intervención que hizo el doctor Bermúdez... en marzo 14 del 2019 para desbridación?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Sí, porque es una, **es una forma segura de mantener al paciente sin ningún compromiso respiratorio ni... ni cardiovascular mientras se hace una intervención para que el paciente no, no tenga dolor**. Eso se usa en las... en la oficina de los médicos se usa este agente sedante, de lo seguro que es. Y los gastroenterólogos, para hacer endoscopía, usan en cualquier oficina privada, no en el hospital esto, para hacer cualquier intervención, de lo seguro que es esta...[160]

[...].[161]
Yo iba a decir... Pues, pues estaba diciendo que **es tan seguro que se usa en las oficinas privadas de médicos para hacer intervenciones**, no es raro si a una buena

---

[158] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 63-64. Énfasis nuestro.

[159] Véase, *Consulta de Anestesiología (e-Operative/Pain/Anesthesiology Consultation)*, a la pág 529 de la Entrada Núm. 128 de SUMAC, pág. 130 de 200.

[160] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 74. Énfasis nuestro.

[161] Objeción del Lcdo. Dávila en la que la juez permitió la pregunta aclarando que el Dr. Rodríguez Ortiz es un cirujano y como parte de los procedimientos en cirugía sus pacientes están sedados y anestesiados. Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 74-75.

(ininteligible) una artroscopia, eso es lo que le ponen, ese agente sedante, que trabaja rápido y dura poco tiempo, de lo seguro que es.

En mi experiencia, yo constante en mis treinta y pico de años en cuidado... este (ininteligible) manejo de cuidado crítico lo uso constantemente, agentes sedantes y agentes anestésicos y agentes paralizantes, lo mismo que usan los anestesiólogos. **Los anestesiólogos no van a intensivo a supervisarme, a ver si lo estoy haciendo bien o no, es parte de mi práctica diaria**.

De hecho, yo tengo un nombramiento en la Escuela de Medicina Departamento de Anestesiología. Así es que tengo rango del Departamento de Anestesiología, como parte de su facultad por, por este tipo de movimiento, **porque yo entreno a los anestesiólogos del futuro a este tipo de manejo en los intensivos**, cómo usar los agentes sedantes y paralizantes y al... verdad, y agentes como Propofol, que es un anestésico, en los, en el intensivo.

Así es que la... **es tan seguro que se usa, de nuevo, en los consultorios privados**, en las oficinas privadas. De manera que los anestesiólogos utilizaron, entiendo, por la certeza de que es la... **el agente sedante o anestésico más sencillo que puede utilizar, que evita compromisos en el paciente, porque no le afecta el corazón cardiovascularmente hablando**.[162]

En cuanto al **hallazgo de la placa de pecho realizada al paciente el 13 de marzo de 2019**,[163] el Dr. Rodríguez Ortiz opinó que **no contraindicaba el desbridamiento** que se le hizo el Dr. Bermúdez Vera el 14 de marzo de 2019:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Y cuáles fueron los hallazgos?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Y entonces, esto es consistente con un **edema pulmonar cardiogénico**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué es eso?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Eso es que el pulmón**, **esa opaci**... opacificidad (sic), **en vez de verse negro se ve medio blanco**, **posiblemente por líquido que tiene en el, en el pulmón, y eso es consistente con edema pulmonar de origen cardiogénico**. **El corazón deficiente**, no nos sorprende, hay un ecocardiograma que lo dice, anteriormente. **Se ven efusiones**. **Eso es un hallazgo de paciente que tiene disfunción del corazón, son efusiones bilaterales**. Podría ser esperado usando el ecocardiograma que se encontró al principio de (inaudible).

**LCDA. LÓPEZ GONZÁLEZ**
**¿Este estudio**, **en alguna medida contraindicaba la cirugía que intervino el doctor Bermúdez el 14 de marzo del 2019?**

---

[162] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 77-77. Énfasis nuestro.
[163] Véase, *Resultado del 13 /marzo/2019 de la Radiografía de Pecho (Department of Radiology)*, pág. 403 de la Entrada Núm. 128 de SUMAC, pág. 3 de 200.

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Por la sedación, no estaba contraindicada**.[164]

Sobre la **segunda operación** que hizo el Dr. Bermúdez Vera el **21 de marzo de 2019** en la que le <u>amputó</u> el cuarto dedo del pie derecho al señor Modestti Torres, se le preguntó al Dr. Rodríguez Ortiz, lo siguiente:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Por qué lo operó?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
<u>Lo operó porque el paciente tenía</u>... <u>el cuarto dedo se había quedado</u>... **clínicamente se apreciaba, se veía más necrótico y en una preocupación del nefrólogo, de que le preocupaba que el dedo izquierdo estaba, estaba empeorando y le recomienda, por lo menos, lo, lo consulta para que se evalúe el paciente y considere una amputación del dedo**.[165]

**En cuanto a la consulta del 19 de marzo de 2019,** a las 10:30 p.m.,[166] que hizo el Dr. Rodríguez Castro (nefrólogo y médico primario del señor Modestti Torres) al Dr. Bermúdez Vera, el perito indicó que el nefrólogo destacó que, el paciente tenía una condición renal *("end stage renal disease"),* con problemas de gangrena isquémica que estaba empeorando, por lo cual, solicitó que se evaluara la posibilidad de una amputación.[167]

**Conforme al reporte operatorio sobre la amputación del 21 de marzo de 2019**,[168] el perito, Dr. Rodríguez Ortiz informó que el paciente se le aplicó una sedación intravenosa por el anestesiólogo, Dr. Rivera. Señaló que tanto el diagnóstico preoperatorio como el postoperatorio era de *"gangrena seca en el cuarto dedo del pie derecho"*. Continuó declarando que la intervención del Dr. Bermúdez Vera comenzó a las 12:20pm y

---

[164] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 81. Énfasis nuestro.
[165] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 81-82. Énfasis nuestro.
[166] Véase, *Notas de Consulta del Nefrólogo*, pág 590 de la Entrada Núm. 128 de SUMAC, pág. 191 de 200.
[167] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 82-83.
[168] Véase, *Reporte Operatorio (Operation Report),* a la pág 549 de la Entrada Núm. 128 de SUMAC, pág. 150 de 200.

culminó a 12:30pm, por lo que el dedo amputado (4to. dedo del pie derecho), fue enviado al laboratorio.[169]

Acto seguido, se le trajo a la atención del Dr. Rodríguez Ortiz los **resultados del informe patológico**.[170] El perito declaró que el diagnóstico patológico reveló que el señor Modestti Torres tenía una **gangrena con osteomielitis focal**, **por lo que <u>aseguró que esta</u> <u>segunda intervención también estaba indicada</u>**. En lo pertinente, expresó:

**LCDA. LÓPEZ GONZÁLEZ**
**<u>¿Qué es gangrena con osteomielitis focal?</u>**

**PERITO: DR. RODRÍGUEZ ORTIZ**
<u>Sí</u>. <u>Gangrena</u>, <u>pues</u>... **es un tejido que no tiene circulación, que está necrótico, y osteomielitis es la presencia, inflamación del, del hueso. Esto, como sale es una indicación quirúrgica, porque esta osteomielitis, que es un hueso infectado, que es un foco de infección, si no se atiende a tiempo destruye el hueso y se puede diseminar a través de todo, de todo el pie. O sea, que envuelve el tejido circundante**.

<u>Así que esto es una</u>, **una indicación quirúrgica, operar un hueso con osteomielitis**, <u>y esto</u>... <u>O sea</u>, <u>que el que el</u>... <u>la impresión de nefrólogo</u>, <u>que estaba empeorando</u>, <u>que el doctor Bermúdez cuando ve coincide con él</u>, <u>lo amputa</u>, **y está empeorando porque es posible que esa osteomielitis esté comprometiendo más el dedo**. <u>Así que la única forma de radicar eso</u>, <u>verdad</u>, <u>es con</u>, **con esta cirugía que resuelve el problema de**, **de una vez**. **Y esto es una indicación para esa intervención, osteomielitis, la presencia de, de hueso, de hueso infectado**.[171]

**En lo referente a las complicaciones que sufrió el señor Modestti Torres el 21 de marzo de 2019**, el Dr. Rodríguez Ortiz examinó la hoja de anestesia preparada por el anestesiólogo, Dr. Héctor J. Rivera Maldonado,[172] y las notas de enfermería.[173] Indicó que el récord hospitalario demostró que, aun cuando el paciente sufrió una bradicardia, nunca tuvo un fallo respiratorio. Según el récord examinado, los signos vitales y su pulso constatan esta aseveración. Inclusive, el perito señaló que el paciente mantuvo una

---

[169] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 83-85.
[170] Véase, *Reporte de Examen de Tejidos de Piel (Tissue Examination Report)*, pág. 550 de la Entrada Núm. 128 de SUMAC, pág. 151 de 200.
[171] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 86-87. Énfasis nuestro.
[172] Véase, pág. 547 de la Entrada Núm. 128 de SUMAC, pág. 148 de 200.
[173] Véase, págs. 601 y 601 de la Entrada Núm. 128 de SUMAC, págs. 2 y 3 de 200.

curva de CO2 lo cual indica que estaba respirando bien y recuperado de la bradicardia sufrida. Añadió que el récord médico demostró que se manejó de forma **efectiva** y que el traslado a la unidad de cuidado intensivo fue uno seguro.[174]

Por lo cual, el Dr. Rodríguez Ortiz opinó que **no había ninguna relación entre la bradicardia y la intervención de la amputación**. En lo particular, declaró:

> **LCDA. LÓPEZ GONZÁLEZ**
> **¿En su opinión pericial, qué es, qué relación si alguna, tuvo la intervención de la amputación del doctor Bermúdez y la bradicardia que desarrolló este paciente 15 minutos más tarde de él haber terminado la intervención?**
>
> **PERITO: DR. RODRÍGUEZ ORTIZ**
> **En lo que a mí respecta no, no hay ninguna entre la bradicardia**, no el arresto como se ha mencionado hasta el momento, entre la bradicardia y la intervención, porque estas cosas hay que verlas como un completo. Esto no se puede ver en el espacio, un punto en el espacio.
> Un paciente sufre algún compromiso cardio... cardiovascular, usualmente da indicio de que el corazón se está comprometiendo, y estos pacientes, intraoperatoriamente, uno ve que puede... cambios en el pulso, puede a ver cambios en la presión, uno puede ver que desature, el oxígeno baja durante el procedimiento, veinte presiones de los médicos dándole líquidos, poniendo los medicamentos, haciendo intervenciones agresivas para manejar una situación que está ocurriendo.
> **Al paciente le dan una sedación segura, la que se usa en las, en las oficinas de los médicos, que no tiene compromiso cardiovascular, que no tiene compromiso respiratorio**. Así que 15 minutos después de una intervención, un paciente que estuvo estable durante la intervención y que no tuvo evidencia de... intraoperatorio del momento del estrés, que cuando, cuando... (ininteligible) que son las vacunas de defensa, que tú haces (ininteligible) que el pulso suba si no está bien, sí, verdad, y que le, le da un, le da un estímulo al corazón, que puede ser, a lo mejor el paciente puede ser, verdad, provocante, provocador.
> **En este caso este paciente toleró eso sin ningún problema, indicando que no hay una... ninguna relación, porque intraoperatoriamente no tuvo manifestaciones, ni fisiológicamente por el paciente, ni intervenciones anestesiológicas que demostraran que estaban haciendo intervenciones por alguna preocupación. No tuvo arritmia intraoperatoria, mientras lo estaban operando**.
> Así es que yo brego todo el tiempo en intensivo con arresto, con situaciones, con bradicardia, con... no hay... con agentes sedantes como este, **no hay ninguna relación entre la bradicardia que tuvo con el, la intervención que se hizo**.[175]

---

[174] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 88-102.
[175] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 103-104. Énfasis nuestro.

**Ante la falta de relación entre la intervención quirúrgica y la bradicardia sufrida por el señor Modestti Torres**, el perito enfatizó que la muerte del paciente se debió a una infección (sepsis), que es una de las causas de muerte más comunes en los intensivos. Esto lo atribuyó a que el señor Modestti que tenía su salud sumamente comprometida con muchas enfermedades comórbidas, sobre todo, es admitido por problemas renales y las complicaciones cardiacas relacionadas. En específico, indicó:

**LCDA. LÓPEZ GONZÁLEZ**
**¿De qué murió este paciente?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Este paciente murió de, de lo que usualmente mueren los pacientes...
[…]
**Séptico**. **Murió séptico**, **que es la cosa más común de muerte en los intensivos** (ininteligible) causa, está en el foco. Infecciones se ve común en la gente...

**LCDA. LÓPEZ GONZÁLEZ**
¿Sepsis con algún otro tipo de enfermedad, **algún otro**...
**PERITO: DR. RODRÍGUEZ ORTIZ**
**Sí**. **Y usualmente**...
[…]
... **por disfunción respiratoria o una pulmonía por mucho tiempo**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué enfermedades, si alguna, usted sabe de lo que ha leído de este caso que tenía este paciente al momento de su hospitalización en Bayamón Medical Center para la fecha del 12 de marzo del 2019?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Obviamente un paciente bien comprometido**.

**LCDA. LÓPEZ GONZÁLEZ**
¿Qué quiere, qué, qué quiere decir "comprometido"?

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Comprometido, porque tenía muchas enfermedades comórbidas. Comórbidas es que se suman y al final del camino comprometen al paciente**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuáles son esas enfermedades?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Tenía diabetes *mellitus***. Esa diabetes *mellitus* comprometió, **porque afecta la microcirculación del riñón y lo tiene en fallo renal crónico como tenía este paciente *"end stage renal disease"***. **Le afecta... con la arterioesclerosis le afecta el corazón**, **tenía las coronarias envueltas**, este paciente, **afecta el corazón**. **Estaba en fallo cardiaco congestivo y estaba hipertenso**.

> **La sumación de todas estas condiciones en un paciente que se admite a un hospital por una condición, lo, lo admite el nefrólogo**, verdad, por, por sus problemas renales y eventualmente el, **el cirujano interviene por un hallazgo que encuentra el nefrólogo**, indica, verdad, **que la causa de la muerte del paciente no fue una amputación de un dedo o *"debridement"* de un dedo**, que su problema es más complejo que un dedo que se desbridó o un dedo que se amputó con una anestesia segura, que nunca se arrestó y que muere posteriormente.
>
> **Achacarle la muerte a una bradicardia no está dentro de las cosas, verdad, factibles, ni, ni posibles**.[176]

**Sobre el tubo de pecho que el Dr. Bermúdez Vera le colocó al paciente**, el Dr. Rodríguez Ortiz opinó que no tuvo ninguna relación con el fallecimiento del señor Modestti Torres. El tubo de pecho drenó el líquido del pulmón (efusión) efectivamente, que era consistente con el fallo renal congestivo que sufría el paciente.[177]

Para ilustrar su opinión al tribunal, el Dr. Rodríguez Ortiz hizo referencia al libro de medicina *Goldman-Cecil Medicine, 25 ed.*,[178] sobre las complicaciones crónicas vasculares en los diabéticos como el señor Modestti Torres. El perito indicó que, la carga clínica mayor de una diabetes prolongada es el desarrollo de enfermedades vasculares que incluyen complicaciones microvasculares como son: la **retinoplastía** (pérdida de visión o ceguera), **nefropatía** (enfermedades que afectan el riñón), **neuropatía** (perdida de sensación en las piernas) y la **arterioesclerosis acelerada de los vasos grandes y medianos** (grosura y rigidez de los vasos sanguíneos), que se debe a la **hiperglucemia**.[179]

En lo pertinente, el perito explicó las complicaciones de la **hiperglucemia en diabéticos** como el señor Modestti Torres:

> **PERITO: DR. RODRÍGUEZ ORTIZ**
> … Así que la **hiperglucemia de los diabéticos** son los que llevan a estas complicaciones. Que vimos en este paciente, que él arrastró para estas complicaciones. Y, y que de las, cosas que pueden empeorar el cuadro son las enfermedades asociadas, como la hipertensión.

---

[176] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 104-106. Énfasis nuestro.
[177] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 106.
[178] Véase, Lit. del libro *Goldman-Cecil Medicine, 25 ed.,* a las págs. 9, 12, 13 de la Entrada Núm. 125 de SUMAC, págs. 9, 12, 13 de 14.
[179] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 111-112.

Este paciente estaba también **hipertenso**. Todo eso que dije ahí se recoge en ese primer párrafo. Miren eso, *"Diabetes es la causa principal de problemas del co… del corazón, coronarias, fallo cardiaco y stroke en los de 70"*, en la edad de los 70, y la sépti… séptima, de nuevo, es la causa, **séptima causa de muerte en Estados Unidos**.[180]

Además, el Dr. Rodríguez Ortiz destacó en la literatura médica consultada, **el pie diabético y las complicaciones que tuvo en el deceso del señor Modestti Torres**.[181] En específico, indicó:

**LCDA. LÓPEZ GONZÁLEZ**
… nos vamos al párrafo de *"Diabetic foot"*. **¿Qué, si algo, usted quiere traer a la atención del honorable Tribunal?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Primero** nos dice que la **combinación** de la **alteración sensorial**, debido a neuropatía periferal **y perfusión disminuida**, perfusión es flujo, disminuido, se debe a la **ateroesclerosis**, lo que explicamos al principio, de la circulación arterial o a la **disfunción microvascular**, los vasos pequeños, que puede llevar a **ulceración**, lo que tenía el paciente, **infección**, **lo que tenía el paciente cuando se desbrida**, y últimamente lleva a la **amputación de extremidades**.
Y un poquito más abajo dice que la hiperglucemia, parte de los problemas es que la **hiperglucemia afecta la curación de las heridas y altera, verdad, porque altera la función de las células blancas, que son las células que nos defienden de infecciones**. Así es que, verdad, **todo este cuadro que hemos estado discutiendo en este paciente se circunscribe a problemas inherentes del paciente y no a intervenciones que no contribuyeron a… a su deceso**.[182]

También, de la literatura médica consultada, el Dr. Rodríguez Ortiz resaltó que **las úlceras en el pie diabético deben ser tratadas con debridación agresiva como lo hizo el Dr. Bermúdez Vera con el señor Modestti Torres**. Así, señaló:

**PERITO: DR. RODRÍGUEZ ORTIZ**
…La línea número 9, por encima de *"Other associated conditions"* usted cuenta la línea número 9 de abajo hacia arriba y **dice que las úlceras son tratadas con *"debridement"* agresivo del tejido necrótico y antibiótico sistémico, y ese desbridamiento del tejido necrótico fue lo que hizo el doctor Bermúdez. Se rigió por este, por este (ininteligible) de manejo de las úlceras en estos pacientes**.[183]

---

[180] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 112-113. Énfasis nuestro. Además, véase, Lit. del libro *Goldman-Cecil Medicine, 25 ed., Chronic vascular complication,* págs. 9, de la Entrada Núm. 125 de SUMAC, pág. 9 de 14.

[181] Véase, la Lit. del libro *Goldman-Cecil Medicine, 25 ed.,* págs. 12-13 de la Entrada Núm. 125 de SUMAC, págs. 12-13 de 14.

[182] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 114. Énfasis nuestro.

[183] Véase, la Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 118-119. Énfasis nuestro. Además, véase, la Lit. del libro *Goldman-Cecil Medicine, 25*

A tono con su Informe Pericial, el Dr. Rodríguez Ortiz expresó que, en su opinión profesional, **el Dr. Bermúdez Vera no fue negligente en sus intervenciones médicas con el señor Modestti Torres**. En particular, opinó lo siguiente:

> **LCDA. LÓPEZ GONZÁLEZ**
> <u>**Doctor**, explique por qué el doctor Bermúdez no fue negligente en la intervención que él tuvo con el doctor... con el paciente Ángel Modestti, que en paz descanse, en su opinión</u>.

> **PERITO: DR. RODRÍGUEZ ORTIZ**
> <u>Claro</u>. <u>Él recurre a, a una solicitud de, de evaluación de un paciente que se admite por otra condición, condiciones médicas, y notifica el médico que lo... verdad, que es una úlcera que le preocupa, por eso consulta al doctor Bermúdez.</u> **El doctor Bermúdez va a ver al paciente, ve una úlcera, necesita de... desbridación y, y la desbrida como** (ininteligible) **hay que hacer**. **Así que hace intervenciones en forma adecuada**. **Termina amputando un dedo que tenía todos los criterios para ser cortado**. <u>El paciente tiene una bradicardia mucho tiempo</u> **después** <u>que hace la intervención</u>. **Nuevamente, esto no hace una relación, una relación causal, pero sin duda ya expliqué por qué no hay una relación entre esto**. <u>Y eventualmente, parte...</u> **de su bradicardia y sigue con... arrastrando sus problemas que lo llevan a... a la muerte**.
> **No fue el** *"debridement"* **de una extremidad, de unos, dedos que habían que desbridarlos por lo que está establecido en la literatura, no es la amputación de un dedo que había que amputar, establecido así por la literatura**. <u>Y, y eventualmente fallece, no porque hubo que amputarlo... una pierna, porque se puso malo y dentro de su condición hubo que hacerlo, simplemente es el continuo de su diabetes, enfermedad cardiaca, sus co... enfermedades coronarias, sus calcificaciones de, de extremidades, su fallo renal crónico, lo que lo lleva a la muerte.</u>
> **Así que no, no podemos achacarle a un** *"debridement"* **indicado, de una amputación obligada un paciente que viene arrastrando muchos problemas médicos**.[184]

Tomando como base el Informe Pericial el Dr. Timmerman, en el que le atribuye al Dr. Bermúdez Vera cinco (5) desviaciones en el cuidado médico del paciente,[185] <u>el Dr. Rodríguez Ortiz las refuta en su Informe Pericial, a las págs. 8-11</u>.[186] A preguntas de la Lcda. López González, el perito manifestó lo siguiente:

---

*ed., Other associated conditions*, pág. 13 de la Entrada Núm. 125 de SUMAC, pág. 13 de 14.
[184] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 125-127. Énfasis nuestro.
[185] Véase, *Informe Pericial del Dr. Timmerman,* págs. 7-9 de 10, Entrada Núm. 123 de SUMAC.
[186] Véase, *Informe Pericial de Dr. Rodríguez Ortiz,* págs. 8-11 de 12, Entrada Núm. 125 de SUMAC.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Leyó usted el informe del perito doctor Timmerman, según surge de su primera página de la... el informe suyo?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Es correcto.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuál es la opinión del doctor Timmerman con relación a la negligencia del doctor Bermúdez?**
**PERITO: DR. RODRÍGUEZ ORTIZ**
Pues, pues lo escribe en cinco, en cinco... **habla con relación a que no había que desbridar la herida**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué opinión tiene usted sobre esa aseveración de, del perito de la parte demandante?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Pues, que **difiero**, verdad, **de su apreciación. Aquí lo he demostrado con literatura**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿En qué usted difiere?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
En que había que desbridar una extremidad húmeda que está infectada. De hecho, se cultivó esa, esa... y tenía una *Morganella* y *Acinetobacter baumannii*, tenía *E. coli*, tenía bacterias en la, en, en el tejido que se le, que se cultiva de lo que se desbrida, dándole fuerza a la desbridación, **porque eso es una bacteria eventualmente compromete al paciente**. Así es que...[187]

En específico, el Dr. Rodríguez Ortiz **difiere** del punto núm. 1

sobre el tema ***Debridement of arterial ulcers****,* del Informe Pericial

del Dr. Timmerman:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué otro punto trae el doctor Timmerman con negligencia del doctor Bermúdez Vera?**

[...]
**PERITO: DR. RODRÍGUEZ ORTIZ**
[...]
La **desbridación de la úlcera arterial** es... Ya hablé, verdad, de, de los... **descargas**, de los cultivos positivos, del foco de infección que decía. **El patólogo dice que estaba infectado**, el cultivo dice que estaba infectado. **En la literatura dice que hay desbridar extensamente para evitar que se comprometa, y eso fue lo que hizo el doctor Bermúdez**.  Así que, verdad, la apreciación del doctor Timmerman, no estoy. . . usted me está diciendo que él dice una cosa y yo interpreto esto de otra manera.[188]

---

[187] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 127-128. Énfasis nuestro.
[188] A continuación se expone el issue núm. 1 en cuanto al tema: ***Debridement of arterial ulcers****,* a la pág. 8 del Informe Pericial del Dr. Rodríguez Ortiz, que difiere de la opinión del Dr. Timmerman. En lo pertinente, expresa:
   1. *"Debridement of arterial ulcers"*. Si no puede mejorarse la perfusión de las úlceras que presentan con *debris* y secreciones por su enfermedad periferovascular severa, con alguna intervención invasiva para mejorar la perfusión en un caso ocasionado por un proceso de infección, como el caso

En cuanto al punto núm. 2 sobre el tema ***Treatment options for dry gangrene in consideration of the whole patient*** del Informe Pericial del Dr. Timmerman, el Dr. Rodríguez Ortiz **difiere**:

> **LCDA. LÓPEZ GONZÁLEZ**
> **¿Qué otra aseveración usted no está de acuerdo con el informe, con la imputación de negligencia con el doctor Timmerman contra el doctor Bermúdez?**
> **PERITO: DR. RODRÍGUEZ ORTIZ**
> Pues, lo mismo. Básicamente, (ininteligible) lo mismo. **Gangrena seca o no**, que interviene el doctor Bermúdez, él sabe lo que encontró, que básicamente el 1 y 2 eran para mí, puntos muy similares.[189]

En el punto núm. 3 sobre el tema ***Local Wound Care Treatment of Arterial Ulcers*** del Informe Pericial del Dr. Timmerman, el Dr. Rodríguez Ortiz **difiere**:

> **LCDA. LÓPEZ GONZÁLEZ**
> **La próxima página de su informe** de la par... Esta es la continuación de la...
>            [...]
>
>     **El 3**.
>     **PERITO: DR. RODRÍGUEZ ORTIZ**
>     *"**Local wound care** (ininteligible)"*, pues ya, de nuevo. **El libro lo dice, que hay que desbridarlo. El patólogo lo confirma, que tiene área de infección, y osteomielitis como hueso contaminado, que es una indicación**

---

que nos ocupa, esto requiere desbridamiento para controlar el proceso séptico. Su desbridamiento no tuvo consecuencias en este paciente que no requirió de intervenciones más agresivas en estos dedos, ni ocasionó la perdida de los dedos o la amputación del pie. Así que esta alegación es académica.
Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 128-129. Énfasis nuestro.

[189] A continuación se expone el issue núm. 2, ***Treatment options for dry gangrene in consideration of the whole patient***, a las págs. 8-9 del Informe Pericial del Dr. Rodríguez Ortiz, que difiere de la opinión del Dr. Timmerman. En lo pertinente, expresa:

2.  *"Treatment options for dry gangrene in consideration of the whole patient"*. Las úlceras descritas por el Dr. Bermúdez, que fue el cirujano que se expuso a este desbridamiento, estaban drenando secreciones según él establece. Esto no es *"dry gangrene"*. No puede ser que el perito demandante establezca categóricamente un *"dry gangrene"* cuando el cirujano que interviene contemporáneo a los hechos, establece una ulcera con descarga, que obviamente no puede ser gangrena seca. De hecho, la patología habla de un foco de infección. Esto requiere desbridamiento. Un tejido necrótico no se infecta porque es un tejido momificado. Este tejido momificado no se puede debridar porque es una "coraza" negra seca y solo con una amputación se podría debridar. Y como establecí, el punto es académico cuando no hay resultado negativo en el paciente por su intervención, que estaba indicada. Este paciente mantuvo sus dedos. Ambas debridaciones se hicieron con la misma sedación del 14 de marzo, las mismas que no le impusieron una carga al corazón y no ocasionaron la bradicardia que desarrolló el paciente y que se evidencia en la cirugía del 21 de marzo, a los 15 minutos posterior a la intervención del Dr. Bermúdez. En este caso desarrolla de súbito una bradicardia secundaria a su condición cardíaca restringida. Pero la intervención no le causó liberación de catecolaminas al observar los vitales (presión sanguínea, pulso, respiración y saturación) una vez estos estaban totalmente normales.
Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 129-130. Énfasis nuestro.

**quirúrgica y el cultivo positivo**. Tú sabes, **todo lo que evidencia, no es que me parezca**, yo voy a... úlcera seda (sic) o húmeda, no, yo no estoy de acuerdo, no hay que... **Mire, le estoy dando evidencia objetiva, un cultivo positivo, una osteomielitis por el patólogo, gente diferente que no está aquí, no está, no está en controversia, está bajo su impresión, yo no estoy analizando**.
Cultivo positivo del patólogo. Las biopsias positivas y un tejido que se vio que está infectado con dos, con dos bacterias que están establecidas.[190]

En el punto núm. 4 sobre el tema ***Pre-operative Care and Professional Standards*** del Informe Pericial del Dr. Timmerman, el Dr. Rodríguez Ortiz **difiere**:

**LCDA. LÓPEZ GONZÁLEZ**
**El próximo punto que el doctor Timmerman trae como una negligencia del doctor Bermúdez es el número 4 que usted observa en su informe, página 9**. **Díganos qué quiere usted traer a la atención, en qué**...

**PERITO: DR. RODRÍGUEZ ORTIZ**
Pues, quiero traer.
[...]
**Que el problema del paciente, el problema es, él no fue admitido por unas úlceras, el paciente (ininteligible) tiene problemas serios y está viendo, está siendo visto por especialistas, el cardiólogo, el neumólogo, el nefrólogo, esos son los que tienen que dar seguimiento a un paciente con tantas condiciones médicas**. **El cirujano lo que hace es hacer las intervenciones que**... **Sus problemas cardiacos, renal, no los atiende él, y él estaba atendiendo una parte por... que fue amputada** (inaudible).
**Así es que él va, hace las intervenciones. No falta al cuidado cuando él hace las cosas que tiene que hacer, ya aquí hemos demostrado que sus intervenciones fueron adecuadas y que solo... y que es un paciente que no fallece por la, por una *"debridement"*, sino que fallece por la conglomerada de sus condiciones médicas**.
**Él no muere por, por un *"debridement"*, muere porque tiene fallo renal, fallo cardiaco congestivo, problema de las coronarias, tiene fallo renal crónico, tiene hipertensión, tiene diabetes**. **O sea, es la sumación de una tras otra, y esto es algo que es conocido en literatura médica, un paciente de mucha, mucha**

---

[190] A continuación se expone el issue núm. 3, sobre el tema: ***Local Wound Care Treatment of Arterial Ulcers,*** a la pág. 9 del Informe Pericial del Dr. Rodríguez Ortiz, que difiere de la opinión del Dr. Timmerman. En lo pertinente, expresa:
3. *"Local Wound Care Treatment of Arterial Ulcers"*. Aun cuando he sido insistente en este tema, la intervención del Dr. Bermúdez del 14 de marzo y el 21 de marzo fueron toleradas por el paciente. Las mismas se hicieron para controlar un proceso de infección en los dedos que requirieron desbridamiento y de una amputación por osteomielitis por lo que estaba indicada. Ambos fueron identificados por el patólogo como con áreas de infección (3/14/2019) y osteomielitis (3/21/2019). No progresó la infección ni tuvo perdida de los dedos de los pies, que no fuera el amputado por la osteomielitis. De manera que es académico los argumentos del perito demandante cuando le achaca la muerte a realizar un desbridamiento en una úlcera infectada y no a la sepsis de origen pulmonar que desarrolló este paciente y que la literatura establece que es alta.
Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 130-131. Énfasis nuestro.

**comorbilidad**. **No podemos, verdad, mirar la hoja del bosque frondoso, tenemos que ver el conglomerado de cosas.**[191]

De igual modo, el Dr. Rodríguez Ortiz **difiere** del punto núm.

5 sobre el tema: ***Postoperative Care and Professional Standards***

del Informe Pericial del Dr. Timmerman:

**LCDA. LÓPEZ GONZÁLEZ**
El punto número **5** de su...

**PERITO: DR. RODRÍGUEZ ORTIZ**
Volvemos a lo mismo, que si está indicado...
[...]
Pues, lo mismo. Que él, él cumplió el (ininteligible) haciendo la osteomielitis, porque había que hacerla. Esto es una, esto es una indicación quirúrgica. **Osteomielitis se trata con, con amputación del... Y la condición que tenía, pues, él hizo lo que dicen, lo que dicen los libros que hay que hacer**.[192]

---

[191] A continuación se expone el issue núm. 4, sobre el tema: ***Preoperative Care and Professional Standards***, a las págs. 9-10 del Informe Pericial del Dr. Rodríguez Ortiz, que difiere de la opinión del Dr. Timmerman. En lo pertinente, expresa:

4. *"Preoperative Care and Professional Standards"*. El paciente era evaluado diariamente por su médico primario (internista) y otros especialistas como cardiólogos, neumólogos, intensivistas, nefrología, etc. Estos deberían atender las condiciones médicas que podrían ser las causas de su deterioro. No hay evidencia de que la falta de evaluación del Dr. Bermúdez hubiera causado un deterioro en el paciente. La intervención del 21, estaba justificada una vez el dedo tenía osteomielitis por lo que la amputación estaba indicada. El paciente se interviene con sedación y se observa por la falta de respuesta simpática manifestada por una respuesta intraoperatoria normal sin manifestar taquicardia, hipo o hipertensión, taquicardia o bradipnea y con saturación normal. El anestesiólogo, responsable directo de administrar la anestesia, en casos de duda de la condición del paciente, cancela las intervenciones y las condiciona a un *"clearance médico"*. Esto no ocurrió en este caso. Y esto fue así porque los criterios preoperatorios objetivos del paciente que se documentan en el récord no identifican a un paciente deteriorado. Esto no ocurrió en este caso. Y esto fue así porque los criterios preoperatorios objetivos del paciente que se documentan en el récord no identifican a un paciente deteriorado, ni clínica ni termodinámicamente.

Ninguno de estos 4 puntos previos establece negligencia de parte del Dr. Bermúdez una vez el paciente desarrolla un evento cardiaco por su disfunción cardiaca severa ya conocida o por el SSS, en un paciente con indicaciones quirúrgicas. Además de que fue evaluado por múltiples especialistas, tanto preoperatoriamente como intraoperatorio demostrando vitales normales, respiraciones normales (17/minutos) y saturando perfectamente al 100%. La ausencia de dificultad respiratoria y la auscultación por el anestesiólogo, describe unos pulmones claros. Estos hallazgos anteriores apoyaban la ausencia de disfunción pulmonar.

Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 131-132. Énfasis nuestro.

[192] A continuación se expone el issue núm. 5, sobre el tema: ***Postoperative Care and Professional Standards***, a las págs. 10-11 del Informe Pericial del Dr. Rodríguez Ortiz, que difiere de la opinión del Dr. Timmerman. En lo pertinente, expresa:

5. *"Postoperative Care and Professional Standards"*. Múltiples especialistas evaluaron al paciente por su condición crónica. La amputación de una osteomielitis (infección del dedo), en un paciente con pobre perfusión causado por enfermedad arteriosclerótica periferovascular como por diabetes, no lo ayudaron a sanar y se convirtieron sus dedos infectados en un foco infeccioso. [...].

Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 132. Énfasis nuestro.

Igualmente, el Dr. Rodríguez Ortiz opinó no estar de acuerdo con la conclusión que hizo el Dr. Timmerman **sobre el tubo de pecho que el Dr. Bermúdez Vera le colocó al paciente**. Partiendo del segundo párrafo del punto 5 de su Informe Pericial, expresó lo siguiente:

> **LCDA. LÓPEZ GONZÁLEZ**
> **<u>En su última página, luego de que usted menciona los cinco puntos que usted difiere totalmente del doctor Timmerman, usted llega…</u>**
>
> **PERITO: DR. RODRÍGUEZ ORTIZ**
> <u>No hay una más arriba.</u>
>
> **LCDA. LÓPEZ GONZÁLEZ**
> […]
> <u>Después de 5, después del 5, doctor, me voy a la próxima página 11…</u>
>
> […]
>
> **PERITO: DR. RODRÍGUEZ ORTIZ**
> **Es que había un 'issue' en un tubo de pecho, que…**
>
> **LCDA. LÓPEZ GONZÁLEZ**
> <u>Esa, aquí está. Ahí usted lo menciona.</u>
>
> **PERITO: DR. RODRÍGUEZ ORTIZ**
> Ah. Ah. Sí, ahí. <u>Si los agujeros del tubo de pecho están fuera y han creado un vacío para la</u> (ininteligible), <u>con… contribuye a eso tampoco. Eso, de hecho, yo podría explicarle y tengo un</u> (ininteligible) <u>de pecho a ese historial, es inmaterial.</u> **Él fue a drenar una efusión y el tubo de pecho drenó la efusión**.
> **Así es que drenó la efusión**, <u>hizo lo que tenía que hacer y ese orificio que está afuera,</u> **y si usted quiere yo se lo puedo aclarar**, **no contribuyó a nada**, **porque la función del tubo de pecho es drenar una efusión y la drenó completa**. <u>Y si, y si quiere le explico,</u> <u>verdad, si,</u> <u>si tienen su… verdad, como una controversia, porque no quisiera dejar eso abierto, si tengo que explicarlo, tengo el tubo de pecho y explico.</u>[193]

Mediante un dibujo, el Dr. Rodríguez Ortiz procedió a ilustrar al TPI sobre la colocación del tubo de pecho hecho al paciente por el Dr. Bermúdez Vera para drenar la efusión. Así, explicó tres posibles escenarios:

---

[193] Procedente del **segundo párrafo** del punto núm. 5, sobre el tema: *Postoperative Care and Professional Standards,* a la pág. 11 del Informe Pericial del Dr. Rodríguez Ortiz, que difiere de la opinión del Dr. Timmerman. En lo pertinente, expresa: […] *Si los agujeros de los tubos de pecho están fuera, aun cuando no crean un vacío para drenar la efusión, no contribuyen a su condición de los dedos, ni a su condición pulmonar, ni a su muerte. Son puntos establecidos por el perito demandante, que no contribuyen a la muerte de este paciente.*
  Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 133-134. Énfasis nuestro.

**PERITO: DR. RODRÍGUEZ ORTIZ**

[...]

**En el caso que nos compete es una efusión**. No es sangre, líquido, que tiene, tiene diferentes proteínas y lleva (ininteligible). Entonces, cuando uno (ininteligible) tubo de pecho lo pasa a través de las costillas. **Y yo voy acercarme si usted me lo permite para hacer un escenario de la tres posibilidades**.[194]

[...]

Uno tiene 12 (ininteligible) costillas, un tubo de pecho y un es un proceso bien doloroso, uno tiene que poner... anestesiar y pasar esto con un, con un... se llama (ininteligible) para abrir la piel, ir metiendo eso hacia adentro y cuando está entrando en la costilla mete como un (ininteligible) puñal. **Ese cuello, abrirlo, y entonces cuando uno lo abre uno saca el instrumento, lo pone en el instrumento, lo pasa a través de la piel y lo empuja hacia adentro. De momento ese tubo de pecho va a entrar (ininteligible) y si tiene aire, lo saca, y si tiene sangre, lo saca, y si tiene efusión, la saca**.

**Hay tres posibilidades**. **Ese tubo de pecho entra**... Voy a dibujar las... las bolitas o los, los drenajes, hasta lo último, hasta lo último. Y todas esas, y todo ese (ininteligible) piel. Esta es la última, y tiene (ininteligible) una línea blanca... Una placa, usted lo ve, no ve todo esto, todos esos (ininteligible), solamente ve un (ininteligible), porque la placa, usted ve una línea blanca.

Usted sabe que el centinela es el último edificio, está (ininteligible) radio opaca, o sea, que usted puede ver la placa. Entonces, usted ve la placa y lo único que ve, una placa... esto es una placa de, de pecho, esto es un. . . pa' para ver si la vemos, (ininteligible), un... una línea, una línea, y usted sabe que esa línea.., a los que tienen esa línea (ininteligible). **Y eso quiere decir que el resto del tubo de pecho** (ininteligible) **completito, está**, **está acá adentro y que justo donde termina la línea está el último**, **el último espacio, que es el centinela**.

Usted hace una placa de pecho y ve que está ese centinela (ininteligible) adentro, su (ininteligible) está a... adentro. Qué pasa. Este está (ininteligible) centinela...

**Cabe otra posibilidad que esté los**... **dentro y el último**, **el centinela, que en este caso estaba dentro, se encuentre entre la costilla y el... Este fue el caso del doctor Bermúdez, de la alegación del perito, que estaba mal puesto, porque no estaba** (ininteligible), **y estaba... esa es la posibilidad** (ininteligible) **y esté** (ininteligible) **todos aquí y que el centinela esté afuera, evidencia, fuera de la piel**. Estos dos, (ininteligible). Usted ve...[195]

[…].[196]

Pues, lo que estoy claro, lo que estoy diciendo, porque estoy claro, Señora Juez, es (ininteligible) **por fuera, o está fuera del pecho, pero dentro de la piel** (ininteligible). **Este y este se usaron efectivamente, porque la efusión es líquido, es un tubito** (ininteligible) **y eventualmente se llena un 'canister' de la efusión** (ininteligible), **y en el caso de este caso se drenó completo la efusión, así que funcionaron**.

---

[194] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág.136. Énfasis nuestro.

[195] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 138-140. Énfasis nuestro.

[196] El TPI no permitió la objeción del Lcdo. Dávila Díaz, abogado de la parte demandante/apelada. Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 140-141.

> Lo que dice Tim… **el doctor Timmerman**, yo no sé qué queja (ininteligible) tiene el tubo de pecho (ininteligible), estaba el 'issue'. **Esta** (ininteligible) **efusión**, **lo que drena esto**, **no es que te lo deja ver**, (ininteligible), **aquí usted tiene un conector que va** (ininteligible) **y colecta líquido**. **Esa efusión está chupando** (ininteligible).
>
> Si usted lo pone aquí (ininteligible) está cerrado por completo, esto está cerrado, porque el último tubito está adentro. **Este está cerrado, porque, aunque el tubito no está dentro del pecho, no está por fuera, y el tejido alrededor causa el efecto mecánico de cerrar el defecto** (inaudible).[197]
>
> […].[198]

Luego de reiterar en permitir el testimonio del Dr. Rodríguez Ortiz como perito sobre el tubo de pecho, la juez Pintado Rodríguez esboza lo que hasta ese momento entendía sobre el tema:

### JUEZ PINTADO RODRÍGUEZ

> Okey. Eso fue… Pero él explicó en ese momento lo que tenía que ver, no habló en términos teóricos. No habló en términos teóricos.
>
> **Okey**. **Ahora el doctor que está cualificado como perito está hablando sobre el tubo que fue materia de prueba pericial del doctor Timmerman, una parte importante de su testimonio en cuanto a si el tubo estaba bien o no colocado**. Y el doctor, por eso es que ahorita hice la expresión de que los dibujos son a manera de ilustración, está dando su opinión pericial sobre las, las tres alternativas o los tres ambientes que pueden ocurrir en la colocación de un tubo.
>
> **El tubo totalmente adentro, estoy repitiendo lo que estoy aprendiendo**, **el tubo que esté parcialmente… el último orificio centinela afuera y el tubo que está todo afuera**. Está, está hablando esa… que sería el tercero, que se… **que sería el tercero, que está bastante afuera**. Que esas son las tres, tres cosas que pueden ocurrir en la colocación de un tubo.
>
> **Él lo ha explicado y está hablando, entonces, de la segunda opinión, que es la que el doctor Timmerman, el perito de la parte demandante trajo a la ilustración de este Tribunal para indicar, según el perito de la parte demandante, que el tubo que tenía el causante estaba mal puesto, y él como perito está dando su explicación de la opinión del perito suyo**.[199]
>
> […].[200]

---

[197] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 141. Énfasis nuestro.

[198] Nuevamente, el TPI no permitió la objeción del Lcdo. Dávila Díaz, abogado de la parte demandante/apelada. Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 142-143.

[199] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 143-144. Énfasis nuestro.

[200] Por tercera vez, el Lcdo. Dávila Díaz, abogado de la parte demandante/apelada, objetó el testimonio del perito sobre el tubo de pecho y el TPI lo declaró no ha lugar. Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 144-146.

Finalmente, el Dr. Rodríguez Ortiz culminó su testimonio explicando por que el tubo de pecho **estaba bien colocado y drenó la efusión**. En específico, explicó:

> **PERITO: DR. RODRÍGUEZ ORTIZ**
> Como no. Si el último orificio estuviera afuera, usted (ininteligible). **Así es que si este orificio estuviera afuera**, **cuando usted succiona**, **succiona hacia afuera**, **no drena la fusión**, y si voy a... hacia el caso (ininteligible), **pero ese no fue el caso**, **no estaba** (ininteligible) **fuera de la piel**, **de manera que estaba adentro y esto lo** (ininteligible) **con un parcho**, **con un**, **con un parcho**, **como un** (ininteligible) **algo que está evitando**, **verdad**, **está**, **está** (ininteligible) **que la efusión funcione y drene la** (ininteligible).
> **Es tanto así**, **esto es académico**. **Es tan**, **es tan dramático**, **porque con la efusión se drenó**. **Por qué estamos hablando de un tubo que está mal puesto si la efusión se**, **se drenó**. **O sea**, **que eso son dos cosas que no le dan validez a lo que dice**, **que se drenó lo que tenía y que este tubo** (ininteligible). Que eso, después de 2,000 (ininteligible) tubos de pecho que yo he puesto en mi vida. **No tengo de esto** (ininteligible), **licenciada**, **ninguna duda**.[201]

Por otro lado, **en el contrainterrogatorio del Lcdo. Dávila Díaz**, el Dr. Rodríguez Ortiz declaró que, coincidía con el Dr. Timmerman, de que el paciente tenía problemas de circulación. Distinguió que en el cultivo realizado al paciente el **13 de febrero** reveló bacterias de *Morganella* y *Estafilococo aureus*; no obstante, en **el cultivo de marzo** reveló bacterias de *Morganella* **y *E. Coli*.**[202] También, indicó que en casos de **gangrena seca**, la auto amputación es una opción.[203] Reiteró que el paciente tenía una

---

[201] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 147-148. Énfasis nuestro.

Cabe destacar la **Conclusión**, a la pág. 11 del Informe Pericial del Dr. Rodríguez Ortiz, En lo pertinente, concluyó:

Usando los argumentos anteriores me reafirmo en la ausencia de negligencia del Dr. Bermúdez en el manejo de este paciente que estaba padeciendo de una condición cardíaca deteriorada que le afectaba su estabilidad cardíaca, pulmonar y periferovascular. Todas sus condiciones médicas estaban consultadas con subespecialistas y manejada por estas. Posterior a la intervención del Dr. Bermúdez, el paciente desarrolló una bradicardia, como un evento de su deteriorada condición cardiovascular, en momento en que los vitales alertaban de que el paciente no estaba comprometido termodinámicamente y una vez que el anestesiólogo, en su evaluación cardiorrespiratoria preoperatoria no encontró alguna contraindicación para alguna intervención quirúrgica en un paciente con una indicación quirúrgica que había que atender. De manera que la muerte de este paciente fue por un cuadro séptico causado por una pulmonía, evento no relacionado a la intervención de una extremidad como la que fue realizada por el Dr. Bermúdez. [...].

[202] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 165.
[203] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 167.

úlcera isquémica con descarga.[204] En particular, hizo hincapié en que la auto imputación es viable en casos donde el paciente no tenga **osteomielitis**,[205] como era en este caso. Acorde con el expediente, reconoció una anotación que indicaba que a las 12:35 de la tarde el paciente estaba en ventilación mecánica.[206] Reiteró que el tubo de pecho drenó la efusión del paciente, por lo que funcionó bien.[207] Especificó, que la efusión pleural se debía a las disfuncionalidad cardiaca que el paciente sufría, razón por la cual no mejoraba. Concurrió que las efusiones pleurales y un pulmón colapsado no contribuyeron con el mejoramiento respiratorio del paciente.[208]

  **En el interrogatorio redirecto** el Dr. Rodríguez Ortiz reiteró la relación entre la efusión pleural y las condiciones cardiacas que padecía el señor Modestti Torres. En lo pertinente, explicó:

**LCDA. LÓPEZ GONZÁLEZ**
**Doctor, ¿qué condición tenía este paciente que le causó el fluido pleural?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Pues, tenía, como parte de sus condiciones crónicas, fallo cardiaco congestivo, y una de las manifestaciones de fallo cardiaco congestivo es la... desarrollo de efusiones pleurales. El problema es que mientras tenga esta condición va a seguir produciendo efusiones...
[...]
. . . **va a seguir produciendo efusiones pleurales**. Así que es una condición que es muy difícil de manejar, **porque su disfunción cardiaca no mejoraba**, ya lo sabíamos de antemano. Así es que no es raro que persista, porque cada día (ininteligible) de pecho iba a seguir produciendo las, las efusiones, porque seguían constantemente (ininteligible) difusión, **iba a seguir produciendo efusiones**.

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué consecuencia tiene el yo remover el tubo de pecho y que el paciente tenga una efusión pleural nuevamente?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Es más, que (ininteligible) sigue acumulando porque es un corazón disfuncional que... secundario a su cronicidad, pues no, no mejora. Así que...

---

[204] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 168-170.
[205] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 192-193.
[206] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 196-197.
[207] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 205-208.
[208] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 208-213.

[...]
...**si le remueve el tubo de pecho va a seguir acumulando**, **porque parte de las manifestaciones de la efusión cardiaca**, **fallo cardiaco congestivo**, **es efusión pleural**, **una manifestación**.

**LCDA. LÓPEZ GONZÁLEZ**
De las placas que le enseñaron el, el radiólogo decía que estaba fuera del *"chest wall"*. **¿Qué significa que está fuera del *"chest wall"*, está fuera de la piel qué significa?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**No**. **El centinela**, **que es el último orificio**, **no está dentro del pecho**, **así que no estaba afuera**, **no estaba fuera de la piel**, **no se veía**, **estaba en el espacio entre el pecho y la piel**, **en el espacio que está compuesto por el tejido subcutáneo y eso cierra el defecto**.
**Si el radiólogo recomienda que se reposicione**, **pero el cirujano evalúa que está haciendo lo que tiene que hacer**, **no está comprometiendo el drenaje**, **pues el radiólogo hizo una recomendación**, **él no es cirujano y no conoce la dinámica de por qué el tubo**, **en el sitio que está funciona o deja de funcionar**. **Eso es una interpretación del cirujano**.[209]

**En cuanto al tema de la auto amputación y el tipo de gangrena que el paciente sufría**, el perito respondió lo siguiente a la pregunta de la Lcda. López González:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Cuánto tarda la auto amputación?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Bueno, auto amputación es variado (ininteligible), no se sabe, pero se... **en gangrena seca**, **ya hemos establecido que este paciente no tenía gangrena seca**, no porque lo diga Pablo Rodríguez o (ininteligible) un informe, **el patólogo o dice que ese... tenía infección y el laboratorio dice que tenía presencia de, de bacteria**.
**Así es que eso no es un dedo que se podía dejar que se auto amputara**, **porque seguía empeorando y las bacterias que a lo mejor pudo haber tenido por un tiempo**, **cuando el nefrólogo lo**, **lo revalúa**, **el doctor Bermúdez lo revalúa**, es un dedo que ha cambiado sus características, **está empeorando**. Ese dedo no, no se va a auto amputar y cuando se hace la amputación se encuentra un poco de osteomielitis. O sea, **que tiene osteomielitis, tiene infección y tiene**... **tiene presencia de bacterias en un cultivo**.[210]

Más adelante el Dr. Rodríguez Ortiz explicó la evaluación que hizo el anestesista al señor Modestti Torres en cuanto a los *"fine crackles"* que padecía y la consecuencia de no amputarle el dedo

---

[209] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 218-220. Énfasis nuestro.
[210] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 220-221. Énfasis nuestro.

gangrenado con osteomielitis. Sobre el particular, manifestó lo siguiente:

**LCDA. LÓPEZ GONZÁLEZ**
**¿Qué efecto tiene ese *"fine crackles"* con relación a la amputación?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
Sí, eso es lo que te voy a explicar ahora.
[…]
Si tú tienes ese hallazgo, pero estás saturando 100%, el pulmón está saturando completo, tienes una interpretación de un anestesiólogo, que puede tener un caso, si le preocupa, para mejorar su condición, porque el responsable de anestesiar, él, él de... estar seguro (ininteligible) no tiene que tomar esa responsabilidad. El anestesiólogo...
[…]
**De**, **de detener el caso**, **de detener el caso**…

**LCDA. LÓPEZ GONZÁLEZ**
**¿De detenerlo?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
…**eso**…

**LCDA. LÓPEZ GONZÁLEZ**
**¿Pararlo?**

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Claro**. **El cirujano determina que hay que operar el paciente y el anestesiólogo tiene que dar el visto bueno para que el paciente se opere**. Y si está saturando 100% y si el paciente, él amputa y la amputación está bien, y tiene buenas presiones y tiene buen pulso, la presencia aislada uno no opera hallazgos amputatorios *"crackles"*, uno opera un paciente que tenga buenas impresiones, que tenga pulso, que esa saturación al 100%, que tenga... que no tenga evidencia de un deterioro.
Sabemos que tiene sus condiciones (ininteligible) respiratorias, pero tiene una condición quirúrgica de un pie que se está empeorando, que si no hacemos nada...
Ahora sabemos que esto, el paciente siguió deteriorando. Parte de su, de su enfermedad (ininteligible) enfermedad, pero el problema es que tenía una condición que necesitaba medicarse, ameritaba operarse porque había empeorado la apariencia física del dedo, **y la biopsia demuestra que estaba en lo correcto el nefrólogo cuando le preocupa, consulta al doctor Bermúdez y están**… que está **de acuerdo y encuentra un foco de osteomielitis**, que ya sabemos **que si no se opera sigue comprometiendo el pie**, iba a terminar, posiblemente, una amputación de todo el pie.
**En un paciente que está frágil del corazón, una cirugía mayor como esa hubiera sido un riesgo**, **así que había que evitar que esa**… se comprometiera más el pie, porque una amputación en un paciente con disfunción del corazón, fallo renal, verdad, con enfermedades coronarias hu... lo hubiese puesto en una condición, verdad, bien frágil para una cirugía mayor, corno es una amputación por debajo de la rodilla. La, la mortalidad de un paciente como este, como 40, 50%. 0 sea, que había que evitar que eso ocurriera.

**LCDA. LÓPEZ GONZÁLEZ**
Mi pregunta iba a ser, **qué consecuencias hubiese tenido el paciente si no le amputábamos el dedo**.

**PERITO: DR. RODRÍGUEZ ORTIZ**
**Ese es el problema, que está establecido que la osteomielitis es una condición quirúrgica, que es una emergencia**...

[...].[211]

...que causa destrucción del hueso y afecta el tejido circundante y puede coger tejido circundante, puede agravar y entonces, en vez de amputar un dedo, el pie, y se hizo con sedación. **Una amputación de una rodilla no se puede hacer con sedación**, es con anestesia general, y está establecido que, en gente con problemas de las coronarias, problemas del corazón, la mortalidad de una amputación, que uno diría... es de cerca del 40 a 50, se puede morir 4 de cada 10 o 5 de cada 10, casi la mitad, por una amputación bajo la rodilla. **En un paciente tan frágil, había que evitar eso**.[212]

**En el re-contrainterrogatorio** el Dr. Rodríguez Ortiz afirmó que a pesar de la condición cardiaca del paciente había que colocar el tubo de pecho.[213] Estuvo en desacuerdo con la afirmación de que en una gangrena seca hay bacterias.[214]

Así, finalizó el desfile de prueba por la parte del Dr. Bermúdez Vera.

**3.**

**En tercer orden, examinemos la prueba presentada por la parte codemandada, Hospital BMC.**

En cuanto a la prueba presentada por el Hospital BMC, **el 11 de mayo de 2023**, el **internista y médico primario**, Dr. Amparo Flores y el **nefrólogo y médico primario**, Dr. Rodríguez Castro declararon **como testigos del BMC**.

**El primer testigo** en declarar fue el **Dr. Amparo Flores**, internista y médico primario del señor Modestti Torres. Testificó que conoció al paciente cuando fue admitido por el médico

---

[211] Objeción del Lcdo. Dávila Díaz que luego retiró.
[212] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 222-225. Énfasis nuestro.
[213] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 225-226.
[214] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 228-229.

(emergenciólogo) de la Sala de Emergencias del BMC. El señor Modestti Torres tenía una infección (gangrena) en el pie derecho, y fue referido al hospital por el Dr. Salvador Mercado Olivera, radiólogo intervencionista, quien lo había atendido anteriormente en el HAM.[215]

El internista y médico primario indicó que el señor Modestti Torres tenía unas **condiciones de diabetes** al momento de llegar a Sala de Emergencias. En específico, estaba en hemodiálisis, tenía un historial de cirugía de corazón abierto con problemas cardíacos como cardiomiopatías dilatadas y mala circulación. Siguió declarando que luego de admitir al señor Modestti Torres a sala de emergencias, le brindó como parte del tratamiento de sus condiciones, antiplaquetarios y antibióticos. Además, solicitó la ayuda de varios subespecialistas como infectólogo, nefrólogo, cardiólogo, gastroenterólogo, radiólogo invasivo y cirujano. De manera que, desde que el paciente fue admitido al BMC, el Dr. Amparo Flores **lo veía todos los días**. Señaló, que la mayor condición médica *(chief complaint)* que aquejaba al paciente cuando llegó a la sala de emergencia, eran los dedos necróticos e infectados del pie derecho, debido a la mala circulación.[216] Al respecto, el Dr. Amparo Flores declaró:

> **LCDO. ORTIZ RIVERA**
> **¿Cuándo usted dice: "los dedos necróticos infectados", a que se refiere, doctor?**
>
> **DR. AMPARO FLORES**
> Tenía gangrena, debido a la mala circulación, ¿verdad?. Estaban infectados. Unos dedos negros necróticos, como se llama. Un tejido, verdad necróticamente… Y tenía el, el tercero, cuarto y quinto dedo del, del pie derecho y uno, dos y tres del lado izquierdo, de la pierna izquierda.
>
> **LCDO. ORTIZ RIVERA**
> **¿Cómo, cómo se veían esos dedos, doctor?**
>
> **DR. AMPARO FLORES**
> Estaban **necróticos**, estaban **negros**, estaban **infectados**.

---

[215] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 18-19, 21.
[216] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 25-27.

**LCDO. ORTIZ RIVERA**
¿Cuándo usted dice: **"negros"**, se refiere a todo el, el, el dedo?

**DR. AMPARO FLORES**
**Los dedos, los dedos nada más. La parte distal.**

**LCDO. ORTIZ RIVERA**
Por eso. **¿Pero todo el dedo o parte del dedo?**

**DR. AMPARO FLORES**
**Todo el dedo. Todos los dedos.**

**LCDO. ORTIZ RIVERA**
**¿Todos los dedos estaban necróticos?**

**DR. AMPARO FLORES**
**La parte distal, mayormente distal, pero prácticamente todo el dedo, los dedos.**[217]

**Sobre los tratamientos que le brindaron al señor Modestti Torres mientras estuvo hospitalizado en BMC**, el internista y médico primario declaró que le administró dos tipos de antibióticos —***Vancomicina y Zosyn***— para la infección con tejido necrótico que tenía el paciente. Además, de la insulina, se le aplicó antidiuréticos, antiplaquetarios que son medicamentos para la presión y circulación que sirven para controlar la diabetes.[218]

**El contrainterrogatorio** lo inició la Lcda. López González en representación del apelado, Dr. Bermúdez Vera.

El Dr. Amparo Flores reiteró que, durante la hospitalización del señor Modestti Torres, **era el médico a cargo de su cuidado**.[219] De igual modo, indicó que, desde Sala de Emergencia y durante la hospitalización del paciente consultó con distintos subespecialistas para tratar las diversas condiciones, como infectólogo, nefrólogo, cardiólogo, gastroenterólogo y servicio de cirugía.[220]

**El segundo testigo del BMC** fue el **Dr. Rodríguez Castro**, nefrólogo y médico primario del señor Modestti Torres. Declaró que conoció al paciente desde una hospitalización que tuvo en el BMC,

---

[217] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 27-28.
[218] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 28, 31-32.
[219] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, pág. 35.
[220] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 37-31.

ya que su anterior nefrólogo no tenía privilegios en ese hospital. Desde entonces, fungió como su nefrólogo principal, por lo que durante la hospitalización del paciente hizo el rol de médico primario, ya que los pacientes de diálisis se atienden frecuentemente con sus nefrólogos. Por esa razón, el Dr. Rodríguez Castro supervisó los tratamientos renales y las condiciones relacionadas del paciente durante su hospitalización.[221]

**Sobre el cuadro clínico del señor Modestti Torres**, el Dr. Rodríguez Castro declaró que el paciente padecía de diabetes tipo 2 desde hacían varios años. Comenzó a tratar al señor Modestti Torres, ya el paciente llevaba **más de un año en hemodiálisis con una enfermedad cardiovascular severa**. Además, había sido **operado de corazón abierto** y tenía un **problema de circulación en las arterias de sus extremidades** conocida como enfermedad periferovascular significativa. Súmese a todo esto, que el señor Modestti Torres también **padecía anemia y paratiroides, enfermedades asociadas a su enfermedad renal**.[222]

El Dr. Rodríguez Castró declaró que él consultó al cirujano, Dr. Bermúdez Vera porque el señor Modestti Torres **tenía** —por su enfermedad vascular— **un dedo necrótico con gangrena**. Esto le preocupó ya que, si no se trataba, podía propagarse.[223]

**En el contrainterrogatorio de la Lcda. López González**, el Dr. Rodríguez Castro aclaró que en la consulta que le hizo al cirujano, Dr. Bermúdez Vera era para que evaluara la posibilidad de amputar el dedo.

**Por último, el 12 de mayo de 2023** el Dr. Rodríguez Morales testificó como **perito del BMC**.

---

[221] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 46-47.
[222] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 52-54.
[223] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 54 y 56.

**El Dr. Rodríguez Morales** es cirujano desde 1975, tiene un entrenamiento en la cirugía de trauma, fue profesor en la Escuela de Medicina de la Universidad de Puerto Rico y ha fungido como perito en varios casos de impericia médica.[224]

Para realizar su **Informe pericial**,[225] el Dr. Rodríguez Morales examinó los expedientes médicos del señor Modestti Torres provenientes del HAM y del BMC, junto con la demanda que inició este caso. De igual forma, examinó los informes periciales del Dr. Danniel S. Timmerman y el Dr. Pablo Rodríguez Ortiz. Su trabajo consistió en evaluar esos expedientes, el manejo del paciente y dar su opinión sobre las alegaciones de negligencia.[226]

El Dr. Rodríguez Morales encontró que el señor Modestti Torres era un paciente con múltiples condiciones de salud. Al respecto, indicó:

> **PERITO/DR. RODRÍGUEZ MORALES**
> Pues este paciente, verdad, de 65 años, cronológicamente, con múltiples condiciones médicas, entre ellas **diabetes mellitus de muchos años**, con **fallo en los riñones**, recibiendo un tratamiento de **hemodiálisis 3 tres veces en semana por alrededor de un año**, también paciente con **enfermedad coronaria**, la cual se le había hecho una **cirugía de puentes coronarios**, **3 puentes autocoronarios** y que se encontraba en **fallo coronario crónico con efusiones pleurales**.
> Este es un paciente que también, pues tenía **enfermedad periferovascular periférica**... […].[227]

En cuanto a los hallazgos del estudio que el Dr. Rodríguez Morales hizo sobre la hospitalización y tratamiento brindado al paciente, expresó lo siguiente:

> **PERITO/DR. RODRÍGUEZ MORALES**
> Más allá, esto es un paciente, de nuevo, que sufre de un trauma en un pie, desarrolla una úlcera, una necrosis, por lo que es referido por su médico primario el doctor Flores, que lo admite en febrero. **Se evalúa según exige es estándar *"of care"*, se evalúa ese problema, se le hace una arteriografía por el doctor Marcado, se determina que se puede ayudar al paciente en la circulación de ese pie,**

---

[224] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 19-22. Además, véase el *Curriculum Vitae* del Dr. Gilberto Rodríguez Morales, Entrada Núm. 129 de SUMAC, págs.1-4 de 4.

[225] Véase, Informe Pericial del Dr. Gilberto Rodríguez Morales, Entrada Núm. 129 de SUMAC, págs. 1-4 de 4.

[226] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 25.

[227] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 29. Énfasis nuestro.

> **mediante un procedimiento endovascular. Se transfiere al Hospital Auxilio Mutuo para llevar a cabo el mismo, se realiza en una forma exitosa**. Se regresa al paciente al Hospital Bayamón Medical Center. **Se continúa con el tratamiento, tanto del pie, como de las condiciones generales del paciente**. Inicialmente se le hace un desbridamiento y limpieza de la herida bajo sedación el **14 de marzo de 2019**. Posterior a eso se lleva nuevamente a sala y bajo sedación intravenosa se hace una amputación de ese dedo que estaba necrótico, infectado con osteomielitis a … **el día 21**.
>
> Estando en sala de operaciones se desarrolla una bradicardia que progresa a un arresto, requiere que se intube al paciente y se lleve a intensivo, **posteriormente**, donde deteriora su función pulmonar por cuenta de una pulmonía y su condición cardiaca por su enfermedad coronaria (ininteligible) y lamentablemente fallece posterior a eso (inaudible).[228]

**Con relación los procedimientos de debridación y amputación que el Dr. Bermúdez Vera le dio al señor Modestti Torres**, el Dr. Rodríguez Morales opinó que hizo lo correcto, ya que el paciente tenía úlceras diabéticas, infección y falta de sangre en el cuarto dedo del pie derecho. Así, opinó sobre el tratamiento del Dr. Bermúdez Vera:

> **LCDO. ORTIZ RIVERA**
> Muchas gracias, Doctor, **¿con relación al tratamiento dispensado al paciente por el doctor Bermúdez, cuál es su opinión?**
>
> **PERITO/DR. RODRÍGUEZ MORALES**
> **Yo creo que se hizo lo que tenía que tenía que hacer con relación al problema para él cual fue requerido, evaluar y tratar**.
>
> **LCDO. ORTIZ RIVERA**
> **¿Cuál era el problema?**
>
> **PERITO/DR. RODRÍGUEZ MORALES**
> Pues, **el problema era la falta de sangre en el cuarto dedo y las úlceras diabéticas** que tenía el paciente, **la infección**.[229]

**Sobre el informe pericial del Dr. Timmerman**, el Dr. Rodríguez Morales opinó que el **estándar de cuidado** en el caso del señor Modestti **fue el indicado**. En específico, la limpieza y el desbridamiento del área afectada para así mejorar la circulación. Contrario a lo que opinó el Dr. Timmerman, el Dr. Rodríguez Morales

---

[228] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 32-33. Énfasis nuestro.
[229] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 33-34.

opinó que las úlceras del señor Modestti Torres no eran arteriales.

En lo pertinente, el perito declaró:

**LCDO. ORTIZ RIVERA**
Doctor, usted estuvo aquí en sala cuando el doctor Timmerman declaró ante este Tribunal, ¿correcto?

**PERITO/DR. RODRÍGUEZ MORALES**
Cierto.

**LCDO. ORTIZ RIVERA**
Y usted nos indicó anteriormente que leyó el informe pericial del doctor Timmerman también.

**PERITO/DR. RODRÍGUEZ MORALES**
Eso es correcto.

**LCDO. ORTIZ RIVERA**
**¿Con qué, comentarios o conclusiones del doctor Timmerman sobre la labor desempeñada por el doctor Bermúdez, usted no está de acuerdo?**

**PERITO/DR. RODRÍGUEZ MORALES**
**No, yo no creo que el, el *"issue"* de manejo de las, de las úlceras del pie diabético en el paciente**, **pues el *"standard of care"*, verdad, el, estándar de cuidado es limpieza, desbridamiento y mejorar la circulación, lo cual se hizo en este paciente**. No creo, contrario a lo que opinó el doctor Timmerman, de que sea contraindicado hacer desbridamiento, **ya que yo no creo que en este caso en particular el problema era una úlcera arterial, como él representó**.[230]

Conforme surge del expediente médico del HAM,[231] y un dibujo que el que el Dr. Rodríguez Morales explicó, el señor Modestti Torres padecía de enfermedad periferovascular, **por lo que tenía parte de sus arterias parcialmente obstruidas**. Inclusive, el **radiólogo intervencional Dr. Salvador Mercado**, realizó de manera exitosa una angioplastia percutánea para mejorar la circulación del paciente.[232]

El Dr. Rodríguez Morales resaltó el estudio de *"duplex arterial"* bilateral de las extremidades inferiores que se le realizó al señor Modestti Torres el **24 de abril de 2019** en el BMC.[233] Según el perito, este estudio demostró que, a pesar de tener una obstrucción

---

[230] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 34. Énfasis nuestro.

[231] Véase, expediente médico del Hospital Auxilio Muto, págs. 105-106 de la Entrada Núm. 128 de SUMAC, págs. 28-29 de 55.

[232] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 34-42.

[233] Véase, *Estudio de "duplex arterial" bilateral de las extremidades inferiores del expediente médico del BMC*, pág. 495 de la Entrada Núm. 128 de SUMAC, pág. 95 de 200.

parcial en las arterias, **el paciente tenía suficiente circulación para mantener vivas sus extremidades**. Entre estas, el pie derecho.[234]

**El perito del BMC resaltó que este resultado contradecía la opinión pericial del Dr. Timmerman**, quien había declarado que el señor Modestti Torres no tenía circulación y que por ello, los procedimientos —de desbridamiento, limpieza del pie y la amputación— que realizó el Dr. Bermúdez Vera estaban contraindicados.[235]

Además, el **Dr. Rodríguez Morales** enfatizó que, a su entender, el procedimiento de revascularización que se le realizó al señor Modestti Torres con anterioridad en el HAM, mejoraron mucho las posibilidades de cicatrizar y sanar. Por ello, se reiteró en que el Dr. Bermúdez Vera **siguió el estándar de cuidado**.[236]

**En cuanto al cultivo de esputo que se le realizó al paciente Modestti Torres el 6 de abril de 2019**,[237] el cual arrojó un resultado positivo a las bacterias: *"Acinetobacter baumannii"* y *"E. coli"*, el Dr. Rodríguez Morales opinó que estas bacterias son agresivas y resistentes a la gran mayoría de los antibióticos. Esto constituye un problema en la unidad de cuido intensivo, y específicamente, con **pacientes inmunosuprimidos** como el señor Modestti Torres, lo que fue bien significativo la presencia de ambas bacterias en ese momento, pues la presencia de *"shock"* por sepsis fue el detonante de la muerte del paciente.[238]

**En cuanto a la consecuencia de no haberle amputado el dedo al paciente**, la opinión pericial del Dr. Rodríguez Morales es que la necrosis del cuarto dedo del pie derecho fue a causa de una

---

[234] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 42-44.
[235] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 44.
[236] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 47.
[237] Véase, resultado de cultivo del expediente médico del BMC, la pág. 182 de la Entrada Núm. 128 de SUMAC, págs. 182 de 200.
[238] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 53, 56-57.

infección que afectó la circulación particular de la parte distal del dedo. De no haberse eliminado el dedo, la gangrena hubiese progresado ascendente en la extremidad. En ese caso, el paciente se arriesgaba al desarrollo de una sepsis o con una amputación a un nivel más alto.[239]

---

[239] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 58.
A continuación se expone la **Opinión Pericial**, a las págs. 3-4 del Informe Pericial del Dr. Gilberto Rodríguez Morales. En lo pertinente, expresa:

La historia natural de la enfermedad conocida como diabetes es devastadora ya que afecta todos los órganos y tejidos del cuerpo humano. Afecta la micro vascularidad de los tejidos, de esta forma dañando los riñones causando fallo renal. Esto a su vez hace que suba la presión arterial causando daño a las arterias coronarias con mayor incidencia de infartos. El endurecimiento de las arterias del cerebro también produce cambios que aumentan la incidencia de derrames cerebrales. Se afectan los nervios periféricos causando neuropatías y múltiples problemas visuales. Una vez comienza ese ciclo de daño a los tejidos, el mismo es progresivo e irreversible, no importa que hagamos. Desgraciadamente solo podemos ofrecer tratamiento de soporte paliativo, en la mayoría de las ocasiones en forma muy limitada. Esta realidad es sumamente frustrante, tanto para los pacientes como para los proveedores de servicios médicos.

**Ese es el caso ante nos.**

Para el momento de los hechos el Sr. Modestti tenía una condición avanzada de su enfermedad. Ya para ese entonces era paciente de hemodiálisis crónica, había sido sometido a cirugía cardiaca con puentes coronarios y aun así su corazón apenas funcionaba adecuadamente con tan solo una fracción de eyección de 25 a 30%, agravado por una cardiomiopatía dilatada. Esto a su vez producía un fallo congestivo cardiaco crónico, lo cual se reflejaba con las efusiones pleurales bilaterales y sus problemas y condiciones asociados, como lo fue la pulmonía que requirió soporte ventilatorio mecánico.

Los estudios radiográficos confirmaban la extensión de la aterosclerosis que el Sr. Modestti padecía, tanto a nivel del tronco de su cuerpo como de las extremidades. Esta enfermedad de estenosis y oclusión de las arterias de sus extremidades (enfermedad perifero-vascular) era la responsable de los problemas de úlceras e infecciones en sus pies. El tratamiento de esta condición de forma paliativa (no curativa) pudiera ser en algunas ocasiones con procedimientos que aumenten la circulación a la extremidad concernida. En el caso del Sr. Modestti esto se trató por el Dr. Mercado, pero no fue posible hacerlo. En casos como este la alternativa es la amputación.

Cuando lo riñones no funcionan y el corazón apenas puede bombear una fracción de su sangre a los tejidos del cuerpo, es de esperarse que todos los sistemas colapsen y no funcionen adecuadamente. Esa es la condición y no es negligencia su paliación o tratamiento.

Interesantemente, el Dr. Timmerman no presenta un cuadro clínico real de la seriedad de la condición del Sr. Modestti y solo menciona el servicio de "nefrología" para decir que fueron quienes consultaron al Dr. Bermúdez. No menciona en ningún momento el hecho de que el paciente recibía hemodiálisis tres veces a la semana y tampoco menciona el hecho que había sido operado de corazón abierto. Estas "comorbilidades" tan importantes en el caso del Sr. Modestti ni siquiera el Dr. Timmerman las menciona en el último párrafo de la página 8 de su informe, en donde él nos da un listado de las "múltiples comorbilidades" que contribuían a las ulceras arteriales del paciente y su deterioro.

El Dr. Timmerman no hace imputación alguna de negligencia contra el Bayamón Medical Center y su personal. El solo se limita a señalar discrepancias de juicio clínico que él tiene con el tratamiento quirúrgico ofrecido por el Dr. Bermúdez, de acuerdo con su interpretación del expediente médico del paciente Ángel F. Modestti Torres. Con mayor probabilidad el fallo cardiaco, el fallo renal y el fallo respiratorio con infección y sepsis *(A. Baumanii)* fueron las causas principales del fallecimiento en este paciente y no el manejo de las úlceras de sus pies.

Con un alto grado de certeza médica soy de la opinión de que no ocurrió una desviación de la mejor práctica de la medicina en la atención del paciente Ángel F. Modestti Torres, por parte del Bayamón Medical Center y su personal durante su atención entre el 13 de febrero y el l2 de mayo de 2019.

**En el contrainterrogatorio** realizado por el Lcdo. Dávila Díaz, el Dr. Rodríguez Morales indicó que en su Informe Pericial no está el hecho de que el 12 de marzo de 2019 el señor Modestti Torres regresa nuevamente al BMC mediante traslado del HAM, luego de un fallido intento del Dr. Mercado de realizar una angioplastia a la pierna del paciente.[240] No concurrió con la afirmación de que un cirujano que no revisa los expedientes médicos del paciente antes de intervenirlo incumple con el estándar de cuido médico.[241] Tampoco concurrió con la afirmación de que la responsabilidad del cirujano no se detiene con la intervención de otros facultativos.[242] De igual modo, no estuvo de acuerdo de que la bradicardia sufrida por el paciente fue causada porque estaba en la sala de operaciones.[243]

**Con ese testimonio, se dio por terminado el desfile de prueba y las partes argumentaron su prueba ante el TPI.**

**4.**

**En cuarto orden, examinemos la sentencia emitida por el TPI.**

El **17 de noviembre de 2023** el TPI dictó la Sentencia apelada declarando ha lugar la demanda en daños y perjuicios. En la referida Sentencia, [244] se hicieron constar los siguientes **hechos estipulados**:

1. *Para el 2019 el paciente Ángel F. Modestti Torres de 65 años, estaba casado con Maritza López de 64 años y tenía dos hijos, Ángel de 39 años y Nathalie de 36 años.*
2. *Para el 11 de marzo de 2019 a las 6:00 pm, Don Ángel F. Modestti Torres acudió a la Sala de Emergencias del*

---

[240] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 62.
[241] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 63.
[242] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 65.
[243] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 71-72.
[244] Cabe destacar que en la Sentencia el TPI incluye 59 hechos incontrovertidos proveniente de una Resolución del 25 de febrero de 2022 que atendió una Solicitud de Sentencia Sumaria presentada por el Hospital BMC, a la que a su vez, los demandante/apelados se opusieron. También, determinó 12 hechos materiales en controversia. Resolvió con un no ha lugar la moción de sentencia sumaria del BMC. Véase, Resolución del 25 de febrero de 2022, Entrada Núm. 100 de SUMAC, págs. 1-29 de 29.

*Hospital Auxilio Mutuo con una queja de "tengo una ulcera en el pie".*

3. *El médico de la Sala de Emergencias del Hospital Auxilio Mutuo obtuvo del propio paciente Don Ángel R. Modestti Torres, su historial pasado de las condiciones médicas que eran, fallo renal terminal (ESRD) para la cual estaba en tratamiento de diálisis tres veces en semana (L-MV), diabético e hipertenso.*

4. *El Dr. Eddie Rodríguez, Nefrólogo era el médico que atendía la condición de fallo renal terminal (ESRD) de Don Ángel F. Modestti Torres y tenía privilegios en Bayamón Medical Center en Bayamón.*

5. *El 12 de marzo de 2019 a las 12:21 pm Don Ángel F. Modestti Torres fue trasladado por ambulancia de la Sala de Emergencias del Hospital Auxilio Mutuo en Hato Rey a la Sala de Emergencia del Bayamón Medical Center en Bayamón, toda vez que allí estuvo hospitalizado previamente, el 13 de febrero de 2019 para tratamiento de ulcera del 4to dedo del pie derecho y celulitis.*

6. *El Dr. Ariel F. Bermúdez Vera, Cirujano no intervino en la hospitalización del 13 al 21 de febrero de 2019 de Don Ángel F. Modestti Torres en el Bayamón Medical Center.*

7. *El Dr. Ariel E. Bermúdez Vera, Cirujano, para la fecha de los hechos del caso del 12 de marzo de 2019, gozaba de privilegios en Bayamón Medical Center y los mismos nunca le han sido revocados ni suspendidos.*

8. *El 13 de marzo de 2019 el Dr. Eddie Rodríguez Castro, Nefrólogo del paciente le solicito consulta al Dr. Ariel E. Bermúdez Vera, Cirujano, para que atendiera unas ulceras en los dedos del pie izquierdo y derecho del paciente.*

9. *Dr. Ariel E. Bermúdez Vera, Cirujano, evaluó al paciente y al encontrar que no tenía mucha piel necrótica y tenía tejido viable, discutió con el paciente las alternativas de tratamiento y se decidió por realizar una debridación y limpieza del área.*

10. *La intervención quirúrgica realizada por el Dr. Ariel E. Bermúdez Vera, Cirujano, el 21 de marzo de 2019, fue de la amputación del 4to dedo metatarso del pie derecho la cual comenzó a las 12:20 pm concluyendo a las 12:30 pm.*[245]

Consta en la Sentencia 226 determinaciones de hechos, y en ese orden, se destacan las **condiciones médicas del señor Ángel Modestti Torres**, como **determinaciones de hechos** que hizo TPI:

1. *Ángel Modestti Torres fue trasladado en ambulancia desde la Sala de Emergencias del Hospital Auxilio Mutuo hasta la Sala de Emergencias del Bayamón Medical Center en Bayamón el 12 de marzo de 2019, para ser evaluado por una úlcera debajo de sus dedos del pie derecho.*

2. *Modestti Torres era paciente de diabetes.*

3. *Modestti Torres tenía fallo renal.*

4. *Este tenía tratamiento de diálisis tres veces en semana.*

5. *Era operado de corazón abierto.*

6. *Padecía de mala circulación.*

7. *También era hipertenso.*

---

[245] Apéndice V del recurso de apelación, págs. 11-12.

El Dr. Jesús Amparo Flores declaró **como testigo del BMC** y el TPI realizó las siguientes **determinaciones de hechos**:

8. *El Dr. Jesús Amparo Flores, fue el médico internista que admitió a Modestti Torres en Bayamón Medical Center el 12 de marzo de 2019.*
9. *Al evaluarlo le recetó antibióticos y lo refirió a servicios con subespecialista.*
10. *Hizo solicitud de consulta con: infectólogo, cardiólogo, nefrólogo y gastroenterólogo.*
11. *También le recetó medicamentos para la presión, diabetes, antiplaquetarios y antiácidos.*
12. *El Dr. Jesús Amparo Flores es médico internista desde el 1996.*
13. *Este tiene privilegios en el Bayamón Medical Center y Dr. Center de Bayamón.*
14. *El Dr. Amparo Flores vio a Modestti Torres desde el primer día que entro por Sala de Emergencias y días subsiguientes durante su hospitalización.*
15. *Modestti Torres fue admitido a Bayamón Medical Center bajo el Dr. Amparo Flores.*
16. *El Dr. Amparo Flores no fue médico de Modestti Torres antes de que este llegara al hospital.*

En cuanto al testimonio del Dr. Eddie Rodríguez Castro **como testigo del BMC**, el TPI hizo las siguientes **determinaciones de hechos**:

17. *El Dr. Eddie Rodríguez Castro es nefrólogo con privilegios en Bayamón Medical Center.*
18. *El Dr. Eddie Rodríguez Castro, era el nefrólogo de Modestti Torres.*
19. *El Dr. Rodríguez Castro era quien supervisaba el tratamiento de hemodiálisis de Modestti Torres.*
20. *El Dr. Rodríguez Castro era el médico primario de Modestti Torres.*
21. *El Dr. Rodríguez Castro atendía con frecuencia a Modestti Torres.*
22. *Lo atendió mientras estuvo hospitalizado.*
23. *El Dr. Rodríguez Castro catalogó a Modestti Torres como un paciente bien comprometido debido a sus condiciones de salud:*
    a. *Cardiovascular.*
    b. *Renal.*
    c. *Diabetes tipo II.*
    d. *Con diálisis desde hace más de un año.*
    e. *Operado de corazón abierto.*
    f. *Periferovascular.*
    g. *Anemia.*
    h. *Paratiroides.*
24. *También le brindaba tratamiento para anemia.*
25. *El Dr. Rodríguez Castro fue quien consultó al Dr. Ariel Bermúdez.*
26. *Lo consultó porque Modestti Torres tenía gangrena.*

27.     *El Dr. Rodríguez Castro advirtió que la gangrena se propaga sino se trata la infección.*

28.     *El referido lo hizo para evaluación.*

29.     *Quien toma determinación si procede o no la amputación es el cirujano. En este caso el Dr. Ariel Bermúdez.*

30.     *La consulta con el Dr. Bermúdez se hizo el 13 de marzo de 2019.*

31.     *La consulta se realizó para que atendiera la úlcera del pie derecho.*

Con respecto al testimonio del **apelante**, Dr. Bermúdez Vera, **quien declaró como testigo,** el TPI realizó las siguientes **determinaciones de hechos**:

32.     *El codemandado Dr. Ariel Bermúdez es médico cirujano desde el 1996, debidamente autorizado a practicar la medicina en Puerto Rico.*

33.     *Su número de licencia es 10950.*

34.     *Posee una certificación en cirugía laparoscópica.*

35.     *Es graduado en medicina de la Escuela Universidad Central del Caribe, en el año 1989.*

36.     *Para la fecha de los hechos el codemandado Dr. Bermúdez tenía (y tiene) privilegios en el Bayamón Medical Center.*

37.     *Lleva a cabo procedimientos de cáncer del seno, cáncer en general, enfermedades periferovasculares, vasos, tiroides, paratiroides y extremidades, entre otros.*

38.     *Actualmente no está haciendo cirugía vascular.*

39.     *Fue el jefe de cirugía de Bayamón Medical Center desde el 2015 hasta septiembre de 2022.*

40.     *Entre las funciones que tenía le correspondía organizar las guardias, dar recomendaciones de manejo y mejoramiento de servicios.*

41.     *Se catalogó así mismo como "un cirujano con bastante trabajo".*

42.     *Realiza un promedio de 20 cirugías semanales.*

43.     *Como parte de su práctica atiende pacientes con pie diabético.*

44.     *De diez (10) pacientes hospitalizados cuatro (4) son por pie diabético.*

45.     *Ha recibido entrenamiento en desbridación de úlceras.*

46.     *En el Hospital de Veteranos realizó una clínica en pie diabético.*

47.     *El Dr. Ariel Bermúdez no conocía ni había tratado a Modestti Torres, previo a la consulta que le hicieran el 13 de marzo de 2019.*

**Sobre los sucesos que dieron lugar a la controversia de epígrafe**, el TPI expuso las siguientes **determinaciones de hechos**:

48.     *Luego de evaluar al paciente y obtener el consentimiento para el procedimiento, optó por realizar un desbridamiento y limpieza del área.*

49. *El 13 de marzo de 2019, se le hizo una placa de pecho a Modestti Torres que reveló efusiones pleurales bilaterales.*

50. *El 14 de marzo de 2019, fue evaluado por el departamento de anestesia.*

51. *Ese mismo día el Dr. Ariel Bermúdez llevó a cabo el procedimiento de limpieza y desbridación de los dedos 3, 4 y 5 del pie derecho.*

52. *El procedimiento duró 10 minutos (11:50 am a 12:00 pm).*

53. *Luego del procedimiento de la desbridación Modestti Torres estaba bien.*

54. *Al próximo día en la mañana él se dio un baño.*

55. *El vendaje se mojó y no se lo cambiaron.*

56. *El vendaje olía mal.*

57. *Modestti Torres estuvo varios días sin curación.*

58. *Este desarrolló flema en el pecho.*

59. *Modestti Torres tenía mucha flema y tos.*

60. *El tejido removido fue enviado a patología.*

61. *Informe de patología reflejó como diagnóstico "Fragments of necrotic Tissue, focally infected".*

62. *En la intervención del 14 de marzo de 2019, el paciente Modestti Torres no sufrió o tuvo ninguna complicación (durante el proceso).*

63. *Para el desbridamiento se utilizó sedación.*

64. *El desbridamiento se hizo para retirar tejido no vivo.*

65. *Ese tejido no vivo es tejido necrótico.*

66. *Modestti Torres poseía bastante tejido necrótico.*

67. *Luego de la desbridación le recetó medicamentos para el dolor.*

68. *El Dr. Ariel Bermúdez no habló con familiares de Modestti Torres durante el periodo post operatorio.*

69. *El cuidado post intervención consistió en vendaje húmedo con agua salina.*

70. *Para el procedimiento de desbridación el Dr. Ariel Bermúdez no ordenó estudios de imagen.*

71. *El Dr. Ariel Bermúdez no atendió a Modestti Torres luego de la desbridación.*

72. *Específicamente no dio seguimiento los días 15, 16, 17, 18 y 19 de marzo de 2019.*

73. *Periodo de tiempo en el que se empeoró el dedo del pie derecho que fue objeto del procedimiento de desbridamiento.*

74. *Periodo de tiempo en que se desarrollaron las condiciones respiratorias.*

75. *El 16 de marzo de 2019, el causante comenzó a ser tratado con terapias respiratorias.*

76. *Este recibió 15 terapias respiratorias en total.*

77. *La última fue recibida el 20 de marzo de 2019.*

78. *El 17 de marzo de 2019 se le hicieron al causante pruebas de radiología que detectaron acumulación de agua en los pulmones. La cual reveló "bilateral pleural effusions large on the right side as well as bilateral atelectasis".*

79. *Las efusiones pleurales bilaterales previas (encontradas en la placa del 13 de marzo de 2019) empeoraron.*

80. *El 18 de marzo de 2019 se consultó vía teléfono al Dr. Bermúdez.*

81. *El 19 de marzo de 2019, el Dr. Eddie Rodríguez, solicitó segunda consulta con el Dr. Ariel Bermúdez, porque el cuarto dedo del pie derecho estaba necrótico.*

82. *El 20 de marzo de 2019 Modestti Torres fue evaluado por Infectólogo quien observó "fine crackles" en su examen respiratorio.*

83. *El 20 de marzo de 2019 fue evaluado Modestti Torres por el Dr. Bermúdez. Fue a verlo porque el nefrólogo lo llamó.*

84. *El 20 de marzo de 2019 el Dr. Bermúdez hizo orden para equipo de manejo de úlceras y heridas.*

85. *Se calendarizó cirugía para amputar el dedo para el día siguiente.*

86. *El Dr. Ariel Bermúdez decidió amputar sin ver las placas de pecho.*

87. *No conocía que el paciente tenía efusiones pleurales.*

88. *Sí conocía que estaba con terapias respiratorias.*

89. *Las imágenes reflejaban que paciente tenía indicios de pulmonía.*

90. *Dr. Bermúdez no tomó en consideración los problemas pulmonares de Modestti Torres.*

91. *El 21 de marzo de 2019, se le amputó el cuarto dedo del pie derecho a Modestti Torres.*

92. *Para este procedimiento también se utilizó sedación, no anestesia.*

93. *Modestti Torres tenía el cuarto dedo del pie derecho infectado por gangrena.*

94. *El reporte de patología informó: "Gangrene and focal osteomielitis clinically form Right foot, fourth toe distal phalange".*

95. *Su diagnóstico fue de gangrena seca.*

96. *El anestesiólogo dio el visto bueno para la intervención.*

97. *Previo a las dos intervenciones realizadas a Modestti Torres en el Bayamón Medical Center a este se le había realizado una cirugía cardiaca con puentes coronarios. Paciente no recibía cantidad suficiente de sangre en extremidad derecha.*

98. *El procedimiento 21 de marzo de 2019 comenzó a las 12:20 pm y culminó a las 12:30 pm.*

99. *Modestti Torres desarrolló bradicardia estando bajo el cuidado de departamento de anestesia.*

100. *Fue colocado en ventilador a las 12:35 pm.*

101. *A Modestti Torres lo tuvieron que intubar.*

102. *Fue intubado a las 12:40 pm.*

103. *Fue transferido a la unidad de Cuidado Intensivo.*

104. *El Dr. Ariel Bermúdez se encontraba haciendo las notas post operatorias cuando le dijeron que Modestti Torres lo tuvieron que intubar.*

105. *La diferencia entre la culminación de la amputación y que el paciente fuese trasladado a intensivo es de apenas cinco minutos.*

106. *El Dr. Ariel Bermúdez habló con esposa de Modestti Torres para informarle que esposo tuvo problemas de bradicardia y que lo tuvieron que intubar.*

107. *El Dr. Ariel Bermúdez no leyó los estudios de imagen previo a los procedimientos que llevó a cabo.*

108. *El 21 de marzo de 2019, el Dr. Jesús Amparo Flores encuentra en los pulmones de Modestti Torres crepitaciones basales ("fine crackles").*

109. *El 22 de marzo de 2019, el hijo de Modestti Torres autorizó le pusieran a su padre un tubo de pecho en el lado derecho.*

110. *El Dr. Ariel Bermúdez colocó una línea central a Modestti Torres.*

111. *Modestti Torres acumuló agua en los pulmones por lo que requirió la colocación de un drenaje pulmonar.*

112. *El paciente tenía efusión pleural.*

113. *La efusión pleural es una acumulación de líquidos en la pleura.*

114. *Lo que está alrededor del pulmón es la pleura.*

115. *El propósito del tubo de pecho era para drenar fluidos y mejorar condición pulmonar del paciente.*

116. *Se colocó el tubo ese mismo día.*

117. *El 22 de marzo de 2019, se hizo referido de placa de pecho.*

118. *El resultado de esa placa fue que el tubo estaba fuera de la cavidad.*

119. *Múltiples estudios de imagen reflejaron que el hoyo de centinela del tubo de pecho se encontraba fuera de sitio.*

120. *En varias ocasiones se le solicitó Dr. Ariel Bermúdez el reposicionamiento del tubo.*

121. *El Dr. Ariel Bermúdez nunca hizo el reposicionamiento del tubo de pecho.*

122. *La efusión pulmonar continuó.*

123. *El 30 de marzo de 2019, se le retiró el tubo, sin embargo, ese mismo día fue entubado nuevamente porque no podía respirar por sí solo.*

124. *El 1 de abril de 2019, se determina que el tubo de pecho no tiene descarga.*

125. *Se programó remover el tubo al día siguiente.*

126. *No se hizo reubicación del tubo porque paciente entró en fase aguda.*

127. *Paciente sufrió un fallo respiratorio crónico por lo que fue puesto en ventilación mecánica.*

128. *La última vez que el Dr. Bermúdez vio al paciente Modestti fue el 30 de abril de 2019.*

129. *Dejó de verlo porque no tenía otros procedimientos.*

130. *El tubo que estaba mal colocado nunca fue removido.*

131. *Durante el periodo que estuvo intubado fue diagnosticado con neumonía.*

132. *Ángel Modestti Torres continuó intubado y deteriorándose hasta su muerte.*

133. *Ángel Modestti Torres falleció el 12 de mayo de 2019.*

**133.** *Ángel Modestti Torres falleció a los 65 años.[246]*

Sobre el testimonio de la **apelada**, señora López Cruz, viuda, el TPI hizo las siguientes **determinaciones de hechos**:

**134.** *Ángel Modestti Torres trabajaba en Telecomunicaciones.*

**135.** *Ángel Modestti Torres falleció por sepsis secundaria a neumonía.*

**136.** *Ángel Modestti Torres era el esposo de la demandante Maritza López y padre de los codemandantes Nathalie y Ángel ambos de apellidos Modestti López.*

**137.** *Maritza López Cruz, reside en calle Padre Mariano, Extensión la Milagrosa, Bayamón, P.R.*

**138.** *Estuvieron casados por 40 años.*

**139.** *Previo al matrimonio convivieron por dos (2) años. Lo que en total suman 42 años de relación.*

**140.** *Como fruto de su relación tuvieron dos hijos: Ángel y Nathalie, ambos de apellido Modestti López.*

**141.** *Quienes también son codemandantes en este caso.*

**142.** *La codemandante López Cruz trabajaba como esteticista y estilista a domicilio con más de 30 años de experiencia.*

**143.** *Desde que falleció su esposo está retirada.*

**144.** *Modestti Torres había acudido antes a Bayamón Medical Center.*

**145.** *López Cruz acompañó todas las noches a su esposo en el hospital (excepto en Unidad de Intensivo) donde lo visitaba dos veces al día.*

**146.** *Modestti Torres le dijo a su esposa "sácame de aquí, me van a matar".*

**147.** *Cuando lo pasaron a la Unidad de Intensivo lo veía con angustia y dolor.*

**148.** *El tiempo que estuvo su esposo en el hospital fue una pesadilla para ella y su familia.*

**149.** *Ángel Modestti falleció el 12 de mayo de 2019 y ese día ella fue a la iglesia. "Estábamos resignados".*

**150.** *El matrimonio lo describe como excelente, "siempre estábamos juntos".*

**151.** *Ángel Modestti era un hombre alegre, cariñoso, responsable y trabajador.*

**152.** *La vida de López Cruz ha cambiado por completo desde que murió su esposo.*

**153.** *Antes salían a cenar en las noches.*

**154.** *Ha sufrido ataques de pánico.*

**155.** *Se siente bien triste.*

**156.** *No puede guiar sola.*

**157.** *Le subió la presión.*

**158.** *Le subió el azúcar, pero ella no es diabética.*

**159.** *Luego de la muerte de su esposo tuvo que cambiar de iglesia. Esa la iglesia a la que iba juntos y le dolía tener que decirle lo mismo a todo el mundo.*

---

[246] Nótese que, por error involuntario, en la Sentencia se repite el núm. 133 en dos ocasiones.

160. *López Cruz nunca vio al Dr. Bermúdez en la Unidad de Intensivo.*

161. *Maritza López Cruz tenía una buena relación con su esposo.*

162. *Esta no padecía de condiciones previas de salud mental.*

163. *A la fecha del Juicio no estaba bajo tratamiento psiquiátrico ni psicológico.*

164. *No requirió ser hospitalizada.*

165. *Esta no utiliza ningún medicamento recetado para problemas asociados con salud mental, como la depresión.*

166. *Sus fuentes de apoyo son sus hijos, nietas e Iglesia.*

167. *Esta ha sufrido la pérdida de su esposo.*

168. *Cercano a la fecha de la muerte de su esposo acudió a un psiquiatra que le recetó medicamentos, pero esta no los tomó.*

169. *Ella prefiere tratamiento natural.*

170. *Maritza López a la fecha del juicio luce llorosa y sensible afectada cuando habla de la muerte de su esposo.*

171. *Su hija se mudó con ella.*

En cuanto a los testimonios de la señora Nathalie Modestti López y el señor Ángel Modestti López, **apelados**, el TPI hizo las siguientes **determinaciones de hechos**:

172. *Nathalie Modestti López, es la hija de Ángel Modestti Torres y Maritza López Cruz.*

173. *Trabaja como asistente médica en una clínica.*

174. *Estudió medicina, pero no tiene licencia.*

175. *Ella visitaba a su papá todos las noches.*

176. *Luego del primer procedimiento que le hicieron a su papá, no vio que le fueron a cambiar el vendaje.*

177. *Describe el olor que salía del vendaje como "abombao".*

178. *Ángel Modestti Torres tenía mucha flema y tos; por lo que estaba recibiendo terapia respiratoria.*

179. *Cuando lo pasaron a intensivo dejó de hablar, solo movía los ojos.*

180. *Su padre siempre la apoyaba, iban a la iglesia y al cine.*

181. *También decidió cambiar de iglesia, luego del fallecimiento de su padre. Ambas eran parte del coro en la iglesia anterior.*

182. *Dejó de hacer cosas que le recordaban a él, como ir al cine.*

183. *El grupo de apoyo de la Iglesia le sirvió de ayuda.*

184. *Se sentía triste. Esta expresó: "la pérdida de un padre no tiene término de duelo".*

185. *Ahora trabaja más para ayudar a otros.*

186. *No ha podido concentrarse en volver a sus estudios para sacar la licencia de medicina.*

187.     Nathalie Modestti López tenía una buena relación con su padre.

188.     Este fue ejemplo e inspiración para ella.

189.     Ella posterior al fallecimiento de su padre no requirió ni recibió ayuda psicológica, ni psiquiátrica.

190.     Ha continuado con su trabajo.

191.     Sus fuentes de apoyo son su trabajo, familia e iglesia.

192.     Al momento del juicio esta lucia triste y hacia un esfuerzo para mantenerse firme.

193.     Ángel Modestti López, es hijo de Ángel Modestti Torres y Maritza López Cruz.

194.     Trabaja como consultor de sistemas y es padre de dos niñas.

195.     Este identifica a su padre como un hombre excepcional: "no conozco a un hombre como él". "Era un buen padre". "Todo lo que soy es gracias a mi padre".

196.      Ángel Modestti López extraña a su padre. "Todos los días extraño a mi padre".

197.     Lo visitaba en intensivo.

198.     Le ponía música cristiana para que se sintiera en paz.

199.     Ángel Modestti López se siente destruido por la muerte de su padre. "Una pérdida de un padre es bien difícil, de un buen padre, no de cualquier padre".

200.     Ángel Modestti López tenía una buena relación con su padre.

201.     Este fue ejemplo e inspiración para él.

202.     Luego del fallecimiento de su papá este no ha requerido ni recibido ningún tipo de tratamiento psicológico o psiquiátrico.

203.     No requirió ser hospitalizado.

204.     Sus fuentes de apoyo son sus hijas, familia e iglesia, en particular su pastor.

205.     A la fecha del juicio y durante su testimonio se percibía angustiado, lloroso y exaltado cuando narraban las condiciones en la que estaba su padre.

206.     Modestti Torres era un buen padre, esposo y abuelo.

En cuanto al Dr. Víctor Lladó, **perito de los apelados**, el TPI realizó las siguientes **determinaciones de hechos**:

207.     El Dr. Víctor Lladó es un psiquiatra con más de 50 años de experiencia, con vasta experiencia como perito en los tribunales.

208.     Fue cualificado como perito psiquiátrico forense de la parte demandante.

209.     Este evaluó a Maritza López Cruz el 9 de septiembre de 2020.

210.     En igual fecha también evaluó a Nathalie y Ángel Modestti López.

211.     Sus tres informes fueron rendidos el 9 de noviembre de 2020.

212.     Para los tres concluye como diagnóstico (como resultado de los eventos ocurridos a Ángel Modestti Torres) que estos padecen un trastorno depresivo

*mayor, moderado, severo en el pasado, de origen postraumático.*

213. *La depresión es una enfermedad reconocida (por el DSM V).*

214. *Los codemandantes han sufrido como consecuencia del fallecimiento de Ángel Modestti Torres.*

215. *Todos han tenido que hacer ajustes en sus vidas para seguir viviendo con el dolor que les embarga.*

216. *Su fe religiosa los ha llevado a buscar alivio de otra forma que no necesariamente son los medicamentos recetados o tratamiento médico.*

217. *Todos han buscado refugio en la iglesia.*

218. *No por eso dejamos de dar credibilidad a que estos hayan tenido depresión. La cual con el tiempo han ido superando. Aunque el dolor por la pérdida de su padre y esposo sigue estando latente. Así lo pudimos apreciar durante el juicio.*

En cuanto al Dr. Raúl López Menéndez, **perito psiquiatra del apelante**, el TPI realizó las siguientes **determinaciones de hechos**:

219. *El Dr. Raúl López, es un psiquiatra forense, que fue cualificado psiquiatra forense como perito de la parte co-demandada Dr. Ariel Bermúdez. Este tiene más de 30 años de experiencia y ha tenido experiencia previa como perito en los tribunales.*

220. *El Dr. Raúl López evaluó a Maritza López (entrevistas) los días 2, 9 y 25 de febrero de 2021. Este rindió informe el 19 de mayo de 2021.*

221. *Evaluó a Ángel Modestti López los días 22 de diciembre de 2020 y 3 de marzo de 2021. Rindió su informe el 6 de mayo de 2021.*

222. *Evaluó a Nathalie Modestti López los días 22 de diciembre de 2021 (pensamos que hay error en el año y debe leer 2020), y 25 de febrero de 2021. Rindió su informe el 6 de mayo de 2021.*

En cuanto al Dr. Gilberto Rodríguez Morales, **perito de BMC**, el TPI realizó las siguientes **determinaciones de hechos**:

223. *El Dr. Gilberto Rodríguez Morales es cirujano general con entrenamiento en traumatología, con más de 40 años de experiencia. También es catedrático en la escuela de medicina de la U.P.R. Este fue cualificado como perito en cirugía del codemandado Bayamón Medical Center.*

224. *Ha servido como perito previamente.*

En cuanto al Dr. Pablo Rodríguez Ortiz, **perito del apelante**, el TPI realizó las siguientes determinaciones de hechos:

225. *El Dr. Pablo Rodríguez Ortiz, es médico cirujano general, número de licencia 9076, con más de 35 años de experiencia. También es profesor del Recinto de Ciencias Médicas. Ha servido como perito en tribunales*

*previamente. Este fue cualificado como perito cirujano del Dr. Ariel Bermúdez.*

En cuanto al Dr. Danniel S. Timmerman, **perito de los apelados**, el TPI realizó las siguientes **determinaciones de hechos**:

> **226.** *El Dr. Daniel Timmerman es cirujano general, con licencia del Estado de New Jersey. Tiene más de 15 años de experiencia. Fue cualificado como perito de la parte demandante en cirugía con certificación en "Wound Management". También es doctor en medicina osteopática (Osteopathic Medicine). Este es cirujano desde el 2008, con licencia del Estado de New Jersey.*[247]

Culminado el desfile de prueba documental y testimonial, el TPI le otorgó entera credibilidad y valor probatorio al testimonio e Informe Pericial del Dr. Timmerman, —por lo que descartó de plano los informes y testimonios de los peritos, Dr. Pablo Rodríguez Ortiz y el Dr. Jesús Rodríguez Morales— y adoptó íntegramente las conclusiones del perito de los demandantes/apelados.[248] Expresó

---

[247] Apéndice V del recurso de apelación, págs. 114-126.
[248] Véase las conclusiones del *Informe Pericial del Dr. Daniel S. Timmerman* (Perito Parte Dte./apelados), a la pág. 10:

### Conclusion
**Dr. Bermudez deviated from the standard of care:**
- *By failing to diagnose the wound etiology of Mr. Modestii, (sic) namely arterial ulcers and in so doing performed a contraindicated surgical intervention on 3/14/2019.*
- *By performing an unnecessary amputation of the 4th right toe of Mr. Modestii (sic) as the patient had dry gangrene as stated by Dr. Bermudez in his operative note for which other treatment options were available.*
- *By failing to provide appropriate post-operative care to Mr. Modestii (sic) in that Dr. Bermudez did not provide wound care orders until post-operative day #5 nor did Dr. Bermudez physically examine Mr. Modestii (sic) during his post-operative course until postoperative day #6;*
- *By failing to recognize the chest tube inserted by Dr. Bermudez into the right thoracic cavity of Mr. Modestii (sic) was improperly placed and left unattended as such for 10 days evidenced on multiple imaging studies over that time resulting in ineffective drainage and thereby contributing to the failed post-operative recovery of Mr. Modestii (sic);*
- *By failing to appreciate the comorbid conditions of Mr. Modestii (sic) prior to the initial surgery and then failing to recognize the declining health of Mr. Modestii (sic) resulting from said initial surgery. Further, in so failing to appreciate the deconditioned state of Mr. Modestii (sic) and evolving pneumonia following the initial surgery, Dr. Bermudez performed a second unnecessary operation on Mr. Modestii (sic) which was the proximate cause of his death.*

*My opinions are based on my review of the full medical records, on my education and training, on my knowledge of the relevant medical literature, my understanding*

que, aunque todos los peritos contaban con experiencia, el Dr. Timmerman le mereció mayor credibilidad, y además, *se mostró menos parcializado a favor del codemandado Dr. Bermúdez Vera*.[249]

A base de esto, el TPI encontró probado que la **causa próxima** a la muerte del señor Modestti Torres fue por la amputación del cuarto dedo del pie derecho. Esto, debido a que el Dr. Bermúdez Vera no tomó los cuidados necesarios para discernir si el paciente estaba apto para someterse a los procedimientos quirúrgicos. Razonó que el Dr. Bermúdez Vera se desvió del estándar de cuidado médico al no realizar un examen físico al señor Modestti Torres antes de iniciar la cirugía, ni tomó en consideración las condiciones médicas preexistentes del paciente durante los procesos pre y post operatorios. También, indicó que el Dr. Bermúdez Vera se desvió del estándar de cuidado médico al colocar erróneamente el tubo de drenaje en la cavidad toráxica. Arguyó que la colocación errónea del tubo de drenaje provocó que el tubo no drenara correctamente, contribuyendo a la muerte del paciente.

Concluyó que el Dr. Bermúdez Vera era responsable por la muerte del señor Modestti Torres. En consecuencia, encontró al BMC incurso en responsabilidad vicaria. Así las cosas, el TPI dictó sentencia condenando al apelante y al Hospital a satisfacer solidariamente la cantidad de $232,000.00 a los apelados por los sufrimientos y angustias mentales que sufriera el señor Modestti Torres.

**El Dr. Bermúdez Vera solicitó reconsideración del dictamen**, lo cual fue declarado *No Ha Lugar* mediante una *Resolución* del 9 de enero de 2024.

---

*of the facts of this particular case, and on my experience and expertise in the field of general surgery, with a special interest in the field of wound care.*
*Daniel S. Timmerman.*
Véase, pág. 10 de la Entrada Núm. 123 de SUMAC, Exhibit 2, pág. 10 de 10.
[249] *Íd.*, pág. 133-134. Énfasis nuestro.

Aún en desacuerdo, el Dr. Bermúdez Vera presentó el recurso de apelación que nos ocupa, imputándole al TPI la comisión de los siguientes errores:

1. *ERRÓ EL TPI AL DECLARAR CON LUGAR LA DEMANDA, ACEPTANDO CIEGAMENTE EL INFORME DEL PERITO DE LA PARTE DEMANDANTE Y SU TESTIMONIO DE QUE LA PRIMERA INTERVENCIÓN QUIRÚRGICA DEL 14 DE MARZO DEL 2019 NO ESTABA INDICADA PORQUE EL PACIENTE LO QUE TENÍA ERA GANGRENA SECA QUE NO SE OPERA. ESTO ES CONTRARIO A LO QUE SURGE DEL RÉCORD MÉDICO CUANDO EL AQUÍ APELANTE DR. ARIEL E. BERMUDEZ VERA, CIRUJANO, LEE Y EXPLICA SUS NOTAS DE INTERVECIÓN CON EL PACIENTE AL EVALUARLO ÚLCERAS EN LOS DEDOS DEL PIE IZQUIERDO Y DERECHO, ALGUNAS CON TEJIDO NECRÓTICO CON DESCARGA LEVE POR LO QUE TENÍA QUE LIMPIARLOS Y DESBRIDARLOS (RETIRAR TEJIDO NECRÓTICO), ASÍ SALVÓ LOS DEDOS CON ÚLCERAS CUANDO LOS DEBRIDÓ. LA PATOLOGÍA ENCONTRÓ QUE ERAN FRAGMENTOS DE PIEL NECRÓTICA, ÁREA INFECTADA CON ÚLCERAS NECRCÓTICAS POR LO QUE LA CIRUGÍA ESTABA INDICADA CONTRARIA AL CRITERIO DEL TPI QUE SE FUE POR ENCIMA DE HECHOS COMPROBADOS CIENTÍFICANENTE Y CONTRARIO A LOS DISPUESTO EN LA REGLA 602 DE LAS REGLAS DE EVIDENCIA Y NO CONSIDERÓ LA PRESUNCIÓN QUE LE COBIJA AL MÉDICO SEGÚN ARTÍCULO 1802 DEL CÓDIGO CIVIL VIGENTE, 32 L.P.R.A. SECCIÓN 5181 Y SU INTERPRETACIÓN EN QUIÑONES VS DUARTE, 112 D.P.R 223 (1982).*

2. *ERRÓ EL TPI AL DARLE CREDIBILIDAD AL PERITO DE LA PARTE DEMANDANTE QUE OPINÓ QUE LA SEGUNDA INTERVENCIÓN QUIRÚRGICA DEL 21 DE MARZO DE 2019 NO ESTABA INDICADA PORQUE EL PACIENTE LO QUE TENÍA ERA GANGRENA SECA QUE NO SE OPERA. ESTO ES CONTRARIO A LO QUE SURGE DEL RÉCORD MÉDICO CUANDO EL NEFRÓLOGO CONSULTA AL DR. ARIEL E. BERMUDEZ VERA, CIRUJANO PARA QUE CONSIDERARA AMPUTACIÓN DEL 4TO DEDO Y DE LA EVALUACIÓN DEL CIRUJANO QUE DESCRIBE GANGRENA SECA EN LA FALANGE DEL CUARTO DEDO DE SU PIE DERECHO CON SECRECIONES EN LA UNIÓN DEL TEJIDO NECRÓTICO MUERTO CON EL TEJIDO DEL VIVO. SE PROCEDE A LA AMPUTACIÓN Y EL INFORME PATOLÓGICO CONCLUYÓ QUE FUE OSTEOMIELITIS, QUE SIGNIFICA UNA GANGRENA INFECTADA, GANGRENA MOJADA, ESTO CONFIRMA QUE TANTO EL DEBRIDAMIENTO DE LOS DEDOS DEL PIE COMO LA AMPUTACIÓN DEL 4TO DEDO DEL PIE DERECHO ESTABAN INDICADOS. ESTOS SON HECHOS CIENTÍFICOS QUE NO DAN MARGEN A ESPECULACIONES. ESTA DECISIÓN ES CONTRARIO A*

*LO DISPUESTO EN LA REGLA 602 DE LAS REGLAS DE EVIDENCIA.*

3. *ERRÓ EL TPI AL DARLE CRIBILIDAD AL PERITO DE LA PARTE DEMANDANTE QUE OPINÓ QUE EL AQUÍ APELANTE DR. ARIEL E. BERMÚDEZ COLOCÓ ERRONEAMENTE EL TUBO DE DRENAJE EN LA CAVIDAD TORAXICA DEL PACIENTE QUE CONTRIBUYÓ A SU MUERTE, ESTO NO ESTÁ SUSTENTADO EN EL CONTENIDO DEL EXPEDIENTE MÉDICO. ESTA DECISIÓN ES Y CONTRARIO A LOS DISPUESTO EN LA REGLAS 702 Y 703 DE LAS REGLAS DE EVIDENCIA.*

4. *ERRÓ EL TPI A NO DARLE CREDIBILIDAD ALGUNA AL PERITO DE APELANTE, DR. PABLO RODRÍGUEZ, CIRUJANO DIRECTOR, MÉDICO DEL HOSPITAL DE TRAUMA DE PR, PORQUE LO ENCONTRÓ PARCIALIZADO HACIA EL APELANTE E IGNORANDO QUE SU TESTIMONIO SE BASÓ EN HECHOS DEL RÉCORD MÉDICO, SU EXPERIENCIA Y EN EL ESTÁNDAR DE CUIDADO APLICABLE A LOS HECHOS DEL CASO. EL TPI DEBE APLICAR LO DISPUESTO EN LA REGLAS 702 Y 703 DE LAS REGLAS DE EVIDENCIA.*

Habiendo comparecido la parte apelada en oposición el 26 de marzo de 2024 y, con el beneficio de la transcripción de la prueba oral, procedemos a resolver.

**-II-**

Resumidos los hechos que originan la presente controversia, examinemos el derecho aplicable.

**-A-**

***Responsabilidad civil extracontractual.***

El Artículo 1802 del Código Civil dispone que *"[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado".*[250] Para que surja una acción al amparo del citado Artículo 1802 resulta fundamental que la parte demandante presente evidencia que establezca: **(1)** la existencia de un **daño real**; **(2)** el **acto u omisión** cual tiene que ser **culposo o negligente**; y, **(3)** el **nexo causal** entre el daño y la acción u omisión del demandado.[251]

---

[250] 31 LPRA sec. 5141. Ley vigente al momento de los hechos ocurridos en el presente caso.
[251] *Cruz Flores et als. v. Hospital Ryder Memorial, Inc.,* 210 DPR 465, 483-484 (2022). Énfasis nuestro.

La **culpa o negligencia** ha sido definida por el Tribunal Supremo de Puerto Rico como *"la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias"*.[252] Sin embargo, este deber de anticipar y prever los daños no se extiende a todo peligro imaginable, sino a aquél que llevaría a una persona prudente a anticiparlo.[253] Pues, la norma es que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades.[254] Es decir, la anticipación y previsibilidad de daños exigible es aquella que se puede esperar del ser humano promedio. No obstante, el daño no hay que prevenirlo de la manera exacta en que ocurrió, es suficiente con que el daño sea una consecuencia natural y probable del acto u omisión negligente.[255]

Por otra parte, **la omisión que genera responsabilidad civil** es aquella conducta que constituye el quebrantamiento de un deber de cuidado impuesto o reconocido por ley, cuando de haberse realizado el acto omitido se hubiera evitado el daño.[256] En otras palabras, *"ante una reclamación fundada en responsabilidad por omisión, la pregunta de umbral es si existía el deber jurídico de actuar de parte del alegado causante del daño".*[257]

Además de la existencia de un daño y la acción u omisión negligente, *es necesario que se presente evidencia que pruebe el **nexo causal** entre el daño y el acto culposo o negligente.* En reiteradas ocasiones, se ha establecido que solo se han de resarcir aquellos agravios que surgen como consecuencia del hecho que los

---

[252] *López v. Porrata Doria*, 169 DPR 135, 151 (2006); *Toro Aponte v. E.L.A.*, 142 DPR 464 (1997); *Ramos v. Carlo*, 85 DPR 353 (1962).
[253] *Elba A.B.M. v. U.P.R.*, 125 DPR 294, 309 (1990).
[254] *Cruz Flores et als. v. Hospital Ryder Memorial, Inc., supra,* págs. 483-484.
[255] *Tormos Arroyo v. Departamento de Instrucción*, 140 DPR 265, 276 (1996).
[256] *Soc. Gananciales v. González Padín*, 117 DPR 94, 106 (1986).
[257] *Arroyo López v. E.L.A.*, 126 DPR 682, 686-87 (1990).

ocasionó.[258] A tales efectos, en nuestro ordenamiento jurídico se acogió la doctrina de la **causa adecuada**. La misma postula que *"[n]o es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general".*[259]

-B-

### *Responsabilidad por impericia médica.*

En una acción de daños y perjuicios por **impericia médica** instada al amparo del citado Artículo 1802 del Código Civil, *supra*, la parte demandante tiene que probar: **(1)** cuáles son las **normas mínimas de conocimiento** y de **cuidado médico** aplicables a los médicos **generalistas** o **especialistas**; **(2)** que el **demandado no cumplió** con esas **normas en el tratamiento del paciente**; y, **(3) que ello fue la causa de la lesión sufrida por este último**.[260]

Lo anterior implica que, para que el demandante prospere en su causa de acción, no está obligado a demostrar una única y exacta causa del daño, sino que basta con demostrar mediante preponderancia de la prueba que la acción negligente del médico fue el **factor** que con **mayor probabilidad** ocasionó el **daño** y establecer, además, el **vínculo causal** requerido por el mencionado Artículo 1802 del Código Civil, *supra.*[261]

En cuanto a la **norma mínima de cuidado exigible**, se requiere que el médico brinde a sus pacientes aquella atención médica que, a la luz de los modernos medios de comunicación y de enseñanza y, conforme al estado de conocimiento de la ciencia y de la práctica prevaleciente en la medicina, satisfaga las exigencias generalmente reconocidas por la profesión médica.[262]

---

[258] *Estremera v. Inmobiliaria Rac. Inc.*, 109 DPR 852, 856 (1980).
[259] *Nieves Díaz v. González Massas,* 178 DPR 820, 844 (2010).
[260] *Arrieta v. De la Vega,* 165 DPR 538, 549 (2005). Énfasis nuestro.
[261] *Blas v. Hosp. Guadalupe,* 146 DPR 267, 322 (1998). Énfasis nuestro.
[262] *Arrieta v. De la Vega, supra,* pág. 549.

El Tribunal Supremo de Puerto Rico ha establecido como norma que en los casos de impericia médica profesional **existe una presunción de corrección en el tratamiento brindado por el médico**.[263] Por tanto, el demandante **debe** derrotar tal presunción mediante preponderancia de prueba, **demostrando que el médico fue negligente y que dicha conducta negligente fue el factor que con mayor probabilidad causó los daños alegados**.[264]

Tengamos en cuenta que **la negligencia del médico no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso**.[265] Tampoco se considera suficiente, alegar una mera posibilidad de que el daño se debió al incumplimiento del médico con su responsabilidad profesional.[266] **La relación de causalidad no se puede establecer a base de una mera especulación o conjetura.[267]**

Además, **al momento de evaluar una acción en daños por alegada impericia médica** debemos recordar que **el médico posee discreción para formular un juicio profesional en cuanto al diagnóstico y tratamiento médico, a tenor con las circunstancias personales del paciente**.[268] De manera que, el médico está exento de responsabilidad civil si el tratamiento brindado a su paciente, aun cuando erróneo, está enmarcado dentro de los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica.[269] **El error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente tampoco constituye fuente de responsabilidad**.[270]

---

[263] *Íd.* Énfasis nuestro.
[264] *López v. Dr. Cañizares,* 163 DPR 119, 134-135 (2004). Énfasis nuestro.
[265] *Rodríguez Crespo v. Hernández,* 121 DPR 639, 650 (1988). Énfasis nuestro.
[266] *López v. Dr. Cañizares, supra*, 135. Énfasis nuestro.
[267] *Íd.* Énfasis nuestro.
[268] *López v. Dr. Cañizares, supra*, pág. 134. Énfasis nuestro.
[269] *Íd.* Énfasis nuestro.
[270] *Íd.* Énfasis nuestro.

**-C-**

***Apreciación y estándar de la prueba en casos civiles.***

Al revisar una determinación de un tribunal de menor jerarquía, los tribunales revisores tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso.[271] La norma general es que los tribunales apelativos aceptamos *"como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala"*.[272] Lo antes dicho, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[273]

Por lo que antes de formular las determinaciones de hechos y conclusiones de derecho, el tribunal de instancia deberá escuchar y evaluar la prueba testifical, pericial o documental presentada.

En cuanto a los testigos, es harto conocido que solo podrán declarar sobre los hechos que les consten de propio y personal conocimiento. Precisamente, este es el rol de la persona testigo. Cónsono con ello, la Regla 602 de Evidencia de Puerto Rico, dispone que:

> *Salvo lo dispuesto en estas Reglas sobre opiniones de peritos, una persona testigo sólo podrá declarar sobre materia de la cual tenga conocimiento personal. Si una parte formula objeción, tal conocimiento personal deberá ser demostrado antes de que la persona testigo pueda declarar sobre el asunto. **El conocimiento personal de la persona testigo sobre la materia o asunto objeto de su declaración podrá ser demostrado por medio de cualquier prueba admisible, incluyendo su propio testimonio**. Si la falta de conocimiento personal surge después de presentado el testimonio, a petición de parte, el Tribunal deberá excluirlo e impartir la instrucción correspondiente al jurado.[274]*

Lo relevante es que, el conocimiento personal puede tener su origen en cualquiera los sentidos, aunque de ordinario se trata de la

---

[271] *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 770 (2013).
[272] *Dávila Nieves v. Meléndez Marín, supra,* pág. 771. Énfasis nuestro.
[273] *Colón v. Lotería,* 167 DPR 625, 659 (2006).
[274] 32 LPRA AP. VI, R. 602. Énfasis nuestro.

vista y el oído. Pero lo que se exige es que el testigo haya percibido los hechos sobre los cuales va a testificar.[275]

Distinto al testigo, el testimonio pericial se permite en forma de opiniones o de otra manera. En lo concerniente, la Regla 702 de Evidencia de Puerto Rico, establece que:

> *Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita -conforme a la Regla 703- podrá testificar en forma de opiniones o de otra manera.*
> ***El valor probatorio del testimonio dependerá, entre otros, de:***
> > **(A)** *si el testimonio está basado en hecho o información suficiente;*
> > **(B)** *si el testimonio es el producto de principios y métodos confiables;*
> > **(C)** *si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;*
> > **(D)** *si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;*
> > **(E)** *las calificaciones o credenciales de la persona testigo, y*
> > **(F)** *la parcialidad de la persona testigo.*[276]

Nótese, que la citada regla establece una serie de factores que inciden sobre el valor probatorio del testimonio pericial, cuyo fin último es ayudar al juzgador a entender determinada prueba o hecho en controversia.[277] De modo, que: *"el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. Por lo tanto, si luego de aquilatar el testimonio pericial, el juzgador concluye que no merece credibilidad, este tiene la facultad de rechazarlo".*[278]

En cuanto a la evaluación y suficiencia de la prueba, la Regla 110 de Evidencia de Puerto Rico establece los principios que el juzgador deberá evaluar a la hora de determinar cuáles hechos quedaron establecidos.[279] En lo que nos concierne, dispone lo

---

[275] E.L. Chiesa Aponte, Reglas de Evidencia Comentadas, Ediciones SITUM, 2016, págs. 178-179.

[276] Véase, la Regla 702, *Testimonio pericial.* 32 LPRA, Ap. VI, R. 702. Énfasis nuestro.

[277] E. Rivera García, *El valor del testimonio pericial en los procesos judiciales,* 47 Rev. Jur. U. Inter. P.R. 87, 99-100 (2013).

[278] *Ídem,* pág. 101.

[279] Véase, la Regla 110. *Evaluación y suficiencia de la prueba.* 32 LPRA, Ap. VI, R. 110.

siguiente:

> **(A)** *El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.*
>
> **(B)** *La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.*
>
> **(C)** *Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.*
>
> **(D)** *La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho[.]*
>
> **(E)** *[…]*
>
> **(F)** *En los casos civiles, la decisión de la juzgadora o el juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad[.]*[280]

En otras palabras, le corresponde al tribunal determinar si la prueba desfilada es suficiente para establecer la veracidad de los hechos alegados.[281] Así las cosas, no basta con formular meras alegaciones o teorías, pues estas no constituyen prueba.[282]

Así pues, finalizado el desfile de prueba, el tribunal juzgador emite una sentencia resolviendo finalmente la cuestión litigiosa y de la cual pueda apelarse.[283]

En cuanto a la revisión de las determinaciones de hechos, en lo pertinente, la Regla 42.2 de Procedimiento Civil de Puerto Rico, apunta que:

> *[l]as determinaciones de hechos basadas en testimonio oral <u>no se dejarán sin efecto a menos que sean **claramente erróneas**, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos</u>.*[284]

En pocas palabras, la deferencia al juzgador de los hechos no es absoluta.[285] De manera que, se tienen como determinaciones de hechos claramente erróneas:

> *[a]unque alguna prueba sostenga las determinaciones de hechos del tribunal, <u>si de un análisis de la totalidad de la</u>*

---

[280] *Ibid.*
[281] *Belk v. Martínez,* 146 DPR 215, 231 (1998).
[282] *U.P.R. v. Hernández,* 184 DPR 1001, 1013 (2012); *Pereira Suárez v. Jta. Dir. Cond.,* 182 DPR 485, 510 (2011).
[283] Véase, la Regla 42.1 de Procedimiento Civil de Puerto Rico, *Sentencia y resolución; qué incluyen.* 32 LPRA Ap. V, R. 42.1.
[284] Véase, la Regla 42.2, *Declaración de hechos probados y conclusiones de derecho.* 32 LPRA Ap. V, R. 42.2. Énfasis nuestro.
[285] *Dávila Nieves v. Meléndez Marín, supra,* pág. 771.

*evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas.*[286]

Por tanto, nuestra intervención con la evaluación de la prueba testifical procede únicamente cuando un análisis integral de la misma ***"nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia"***.[287] De ahí, que nuestro reglamento establece que cuando una parte señale algún error relacionado con la suficiencia de la prueba testifical o la apreciación errónea de la misma, deberá someter una transcripción, exposición estipulada o narrativa de la prueba.[288]

Se añade a lo anterior que es norma firmemente establecida en nuestro ordenamiento jurídico que al evaluar las determinaciones de hechos que un tribunal inferior hiciere sobre causas como la de título centradas en ***negligencia por impericia médica***, fundamentadas, a su vez, en la prueba pericial y documental ofrecida, este tribunal está en igual posición de evaluarlas y hacer sus propias conclusiones.[289]

**-III-**

Examinado los hechos de la prueba oral y documental que obra en el expediente, y esbozada la jurisprudencia aplicable, nos encontramos en posición de disponer del caso.

La parte apelante nos señala cuatro (4) errores que se resumen en que el TPI erró al descartar prueba material testimonial, pericial y documental que demostraban que el apelante no incurrió en impericia médica. Tiene razón. Veamos.

---

[286] *Íd.*, pág. 772.
[287] *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012).
[288] Véase, la Regla 19, *Reproducción de la prueba oral*, inciso (A) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19 (A). Véanse, además, Reglas 19 (B), 20, 76 (A) y (E).
[289] *Rodríguez Cancel vs. A.E.E.*, 116 DPR 443 (1985).

De entrada, y distinto al TPI, en nuestro análisis sobre la **negligencia por impericia médica y el nexo causal con la muerte del paciente**, que la parte apelada debía demostrar, tomamos en consideración los tres (3) informes periciales y testimoniales de los tres (3) peritos,[290] las declaraciones del médico demandado y los dos (2) médicos que sirvieron como testigos del BCM y la documentación presentada a esos fines.[291]

**A.**

**En primer orden**, y conforme surge de los hechos reseñados, el perito de la parte demandante/apelada, Dr. Timmerman declaró que el Dr. Bermúdez Vera incurrió en negligencia y mala práctica médica en las dos (2) intervenciones quirúrgicas que le hizo al paciente. Opinó que la segunda intervención fue innecesaria y la causa más cercana a la muerte del paciente.

**La primera intervención** quirúrgica de <u>desbridación</u> y <u>limpieza</u> **en los dedos 3, 4 y 5 del pie derecho, al igual que en los dedos 1 y 3 del pie izquierdo** efectuada el **14 de marzo de 2019**, el Dr. Timmerman opinó que estaba contraindicado ya que las úlceras que el paciente padecía se debían a una **insuficiencia arterial severa**. [292] Además, en cuanto al **tratamiento preoperatorio** de esa intervención, el Dr. Timmerman opinó que en una *úlcera arterial colonizada con bacteria*, sería suficiente brindar cuidado a la herida de forma local, específicamente aplicando Betadina *(Betadine)* **para secarla y mejorar la carga biológica**. También, en lo concerniente al tratamiento **postoperatorio**, Dr.

---

[290] Como indicamos antes, la *negligencia por impericia médica*, fundamentadas, a su vez, en la prueba pericial y documental ofrecida, nos coloca en igual posición a la del TPI de evaluarlas y hacer nuestras propias conclusiones. *Rodríguez Cancel vs. A.E.E., supra.*

[291] Un análisis integrar de la totalidad de la prueba testifical de *negligencia por impericia médica* presentada ante el TPI, nos obliga a intervenir en la medida en que nos *causa una insatisfacción o intranquilidad de conciencia tal, que estremece nuestro sentido básico de justicia. Rivera Menéndez v. Action Service, supra.*

[292] Véanse, Transcripción de la Prueba Oral Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 169-171; y, el Issue # 1-*Debridement of arterial ulcer*, pág. 7 del Informe Pericial del Dr. Timmerman, Entrada 123 de SUMAC, pág. 7 de 10.

Timmerman opinó que la orden telefónica que dio el Dr. Bermúdez Vera para que le aplicara antibiótico en crema *Silvadene* y solución salina a las úlceras del paciente, <u>contribuye a humedad y puede empeorar una úlcera arterial</u>. Además, ante la falta de visita al paciente por parte del Dr. Bermúdez Vera, opinó que un cirujano, es la persona que está en la mejor posición de determinar qué es lo que necesita el paciente y debería dar seguimiento cada veinticuatro horas.[293]

**En cuanto a la segunda intervención** efectuada el **21 de marzo de 2019** en la que se le amputó el cuarto dedo gangrenado del pie derecho del paciente, el Dr. Timmerman opinó que era **<u>innecesaria</u> y fue la <u>causa más cercana</u> a la muerte del paciente**.[294] Opinó que había una opción preoperatoria consistente en dejar que el cuarto dedo se auto amputara ya que se trataba de una gangrena seca. También, indicó que no se tomaron en cuenta las complicaciones pulmonares y desmejoramiento del paciente que, no lo hacían, un candidato idóneo para esa intervención. Opinó que ello empeoró con la colocación inadecuada del **tubo torácico**, que a su vez, no fue corregido en los diez (10) días posteriores.

**B.**

**En segundo orden**, examinaremos si se demostró que el Dr. Bermúdez Vera fue negligente en las intervenciones que le realizó al paciente, y que dicha conducta negligente, fue el factor que con mayor probabilidad causó la muerte de este. Por lo cual, examinemos los cinco (5) issues de los cuidados provistos al paciente por el Dr. Bermúdez Vera, que según el Dr. Timmerman, fueron aplicados de forma desviada. Veamos.

---

[293] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 171-174. Énfasis y subrayado nuestro.
[294] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 181-185.

**Issue #1**

Abordemos el issue #1: *Debridement of arterial ulcers,* a la pág. 7 del Informe Pericial el Dr. Timmerman, en el que expresó:

> *The primary goal of the treatment of arterial ulcers is to increase circulation to the area, either surgically or medically. If unable to improve circulation, an arterial ulcer should be treated locally.* **It is not appropriate to debride arterial ulcers as this may promote further ischemia and lead to the formation of a larger ulcer.** *In fact,* ***debridement is contraindicated*** *in ulcers when healing is complicated by* ***severe arterial insufficiency***.
>
> *Mr. Modestii [sic] had considerable arterial disease as seen on an angiogram performed on 2/14/2019 indicating a 90 stenosis of his right foot anterior tibial artery. The anterior tibial artery gives rise to the dorsalis pedis artery. The dorsalis pedis artery is the main source of blood supply to the foot. It can be stated with certainty, the patient had severe peripheral arterial disease with resultant arterial ulcers.*
>
> ***As such, the debridement of 3/14/2109 by Dr. Bermudez was not indicated****.* [295]

En opinión del Dr. Timmerman el **desbridamiento y limpieza** realizado por el Dr. Bermúdez Vera el **14 de marzo de 2019** en los dedos 3, 4 y 5 del pie derecho, al igual que en los dedos 1 y 3 del pie izquierdo estaba contraindicado, ya que las úlceras que el paciente padecía se debían a una **insuficiencia arterial severa**. La meta primaria de tratamiento es mejorar la circulación; y de no ser posible, tratar la úlcera localmente. Este issue de las úlceras arteriales y la contraindicación de desbridamiento, el perito lo reitera en el primer punto de la conclusión de su Informe Pericial como un desvió del estándar de cuidado.[296] No tiene razón.

Primeramente, consta en el Reporte de Consulta del **13 de marzo de 2019**, que el nefrólogo y médico primario, Dr. Rodríguez Castro,[297] le alerta, por primera vez, al Dr. Bermúdez Vera porque el *"paciente que tiene el cuarto debo infectado, gangrenado"*, por lo cual le pide una consulta.[298] En esa por primera evaluación, el Dr.

---

[295] Véase, Issue # 1-*Debridement of arterial ulcer*, Informe Pericial del Dr. Danniel S. Timmerman, pág. 7 de la Entrada 123 de SUMAC, pág. 7 de 10.

[296] Véase, *Conclusiones* del Informe Pericial del Dr. Daniel S. Timmerman, pág.10:
> *By failing to diagnose the wound etiology of Mr. Modestii, (sic) namely arterial ulcers and in so doing performed a contraindicated surgical intervention on 3/14/2019.*

[297] Véase, *Reporte de Consulta*, pág. 10 de la Entrada Núm. 128 de SUMAC, págs. 10 de 200.

[298] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 31-33.

Bermúdez Vera encontró que el señor Modestti Torres de 65 años tenía un historial de diabetes mellitus, insuficiencia periferovascular con múltiples dedos con úlceras, razón por la cual fue admitido al hospital para evaluación y manejo.[299] A juicio del Dr. Bermúdez Vera, el paciente tenía úlceras en los dedos 3, 4 y 5 del pie derecho; y en el pie izquierdo tenía úlceras en los dedos 1 y 3, y además, tenía tejido necrótico con descarga *(mild drainage)*.[300] Por lo cual, diagnosticó ulceras de los dedos 3, 4 y 5 del pie derecho y en los dedos 1 y 3 del pie izquierdo.[301] Luego de consultarlo con los familiares y el señor Modestti Torres,[302] recomendó el desbridamiento *(debriding)* y limpieza al próximo día.[303] Por lo tanto el **14 de marzo de 2019**, el paciente fue examinado por el anestesiólogo —previo a la cirugía— y encontró que estaba apto para el procedimiento quirúrgico;[304] así, el desbridamiento se realizó bajo **sedación** (no anestesia), por lo cual, la intervención resultó exitosa y el paciente fue trasladado a *general ward* para su cuidado.[305]

Resulta importante destacar que el resultado patológico reveló fragmentos de tejido de piel necrótica con infección focal y úlceras clínicamente necróticas en los dedos 3, 4 y 5 del pie derecho, al igual que en los dedos 1 y 3 del pie izquierdo,[306] lo que refuerza el juicio evaluativo del Dr. Bermúdez Vera de desbridar y limpiar las úlceras

---

[299] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 33-35; y, *Hallazgos (Findings)* del *Reporte de Consulta que el Dr. Bermúdez Vera documentó*, pág. 10 de la Entrada Núm. 128 de SUMAC, págs. 10 de 200.

[300] Véase, *Hallazgos (Findings)* del *Reporte de Consulta que el Dr. Bermúdez Vera documentó, supra.*

[301] *Ídem.*

[302] Véase, *Autorización y Consentimiento para Procedimiento Quirúrgico y/o Tratamiento*, pág. 2,215 de la Entrada Núm. 128 de SUMAC, págs. 15 de 52.

[303] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 35-42; y, *Recomendaciones (Recomendations) del Reporte de Consulta*, a la pág. 10 de la Entrada Núm. 128 de SUMAC, págs. 10 de 200.

[304] Véanse, *Evaluación Preoperatoria del Departamento de Anestesiología* (*Department of Anesthesiology Pre-Operative/Pain/Anesthesiology Consultation*), Apéndice X del recurso de apelación, pág. 196; (véase el mismo documento, pág. 529 de la Entrada Núm. 128 de SUMAC, pág. 130 de 200); y, *Consentimiento para la Anestesia*, pág. 530 de la Entrada Núm. 128 de SUMAC, págs. 131 de 200.

[305] Véanse, *Reporte Operatorio (Operation Report)*, pág, 534 de la Entrada Núm. 128 de SUMAC, pág. 135 de 200; y, *Órdenes Médicas (Physician's Orders)*, pág, 1,479 de la Entrada Núm. 128 de SUMAC, pág. 79 de 100.

[306] Véase, *Reporte de Examen de Tejidos (Tissue Examination Report)*, pág. 535 de la Entrada Núm. 128 de SUMAC, pág. 136 de 200.

diabéticas que ya estaban infectadas. No cabe duda, que conforme a la observación y evaluación física hecha de las condiciones médicas del señor Modestti Torres, el Dr. Bermúdez Vera ejerció su criterio médico de desbridar y limpiar las úlceras.

De ese modo, las opiniones de los peritos: **Dr. Rodríguez Ortíz** (perito del Dr. Bermúdez Vera) y **Dr. Rodríguez Morales** (perito del BMC) respaldaron el juicio médico del Dr. Bermúdez Vera de realizar el desbridamiento y limpieza el 14 de marzo de 2019.

**El Dr. Rodríguez Ortíz** opinó que el Dr. Bermúdez Vera hizo lo correcto al debridar y limpiar las úlceras del paciente, ya que se trataba de úlceras diabéticas con secreciones y circulación deficiente que la hacían propensa a las infecciones. Por lo que había que ser agresivo (invasivo y rápido) en el desbridamiento y limpieza para evitar que —una infección que pareciera inocua— comprometiera el resto del pie y terminara cortando la pierna.[307] Opinó que el señor Modestti Torres tenía una **úlcera diabética con descarga** y la distinguió de la **úlcera isquémica** que no tiene circulación sanguínea ni descarga (no secreta y usualmente es un dedo negro y nada más). Reiteró que la úlcera diabética con secreciones que padecía el paciente era una de las complicaciones de su enfermedad de diabetes prolongada y eso lo hacía propenso a las amputaciones, por lo que se debía actuar de forma agresiva con los diabéticos, porque la falta agresividad conllevaba amputaciones posteriormente. Explicó que en un paciente diabético se debía sospechar que tenía isquemia por la naturaleza de esa enfermedad, pero con descarga (secreciones), lo que es típico de la úlcera diabética. Es decir, que en este paciente diabético no se está hablando de una úlcera isquémica por falta total de circulación sanguínea.[308] El Dr. Rodríguez Ortíz recalcó la importancia del

---

[307] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 42-44.
[308] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 44-48.

**resultado del laboratorio de patología**,[309] que demostró una **infección focal en los fragmentos de tejidos necróticos de la piel removida** del señor Modestti Torres. Ello, indicaba la **necesidad** de hacer un desbridamiento que eliminara ese foco de infección.[310] Opinó que una vez se debrida y se saca el foco de infección, como lo hizo el Dr. Bermúdez Vera, disminuye el riesgo de que esa infección se vaya hacia el pie o hacia la pierna y termine en una amputación. Por lo que no hacer el desbridamiento de forma agresiva, traería como consecuencia la amputación.[311] Además, sobre este issue #1, el Dr. Rodríguez Ortíz opinó lo siguiente en su Informe Pericial:

> ***Si no puede mejorarse la perfusión de las úlceras que presentan con debris y secreciones por su enfermedad periferovascular severa****, con alguna intervención invasiva para mejorar la perfusión en un caso ocasionado por un proceso de infección, como el caso que nos ocupa,* **esto requiere desbridamiento para controlar el proceso séptico**. *Su desbridamiento no tuvo consecuencias en este paciente que no requirió de intervenciones más agresivas en estos dedos, ni ocasionó la perdida de los dedos o la amputación del pie.* **Así que esta alegación es académica**.[312]

Por otra parte, y contrario a lo que opinó el Dr. Timmerman, el **Dr. Rodríguez Morales** (perito del BMC), opinó que el estándar de cuidado *(standard of care)* para las úlceras del pie diabético es la limpieza, desbridamiento y mejorar la circulación, lo cual se hizo con el señor Modestti Torres. También opinó que, no creía que en este caso en particular, el problema era uno de úlcera arterial como el Dr. Timmerman lo representó en su Informe.[313] Explicó que el estudio de *"duplex arterial"* bilateral de las extremidades inferiores que se le realizó al señor Modestti Torres el **24 de abril de 2019** en

---

[309] Véase, *Reporte de Examen de Tejidos de Piel (Tissue Examination Report)*, pág. 535 de la Entrada Núm. 128 de SUMAC, pág. 136 de 200.

[310] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 56-57.

[311] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 63-64. Énfasis nuestro.

[312] Véase, Issue #1 – *Debridement of arterial ulcers,* Informe Pericial del Dr. Rodríguez Ortíz, a la pág. 8 de la Entrada Núm. 125 de SUMAC, pág. 8 de 11. Énfasis nuestro.

[313] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 34. Énfasis nuestro.

el BMC,[314] demostró que, a pesar de tener una obstrucción parcial en las arterias, el paciente tenía suficiente circulación para mantener vivas sus extremidades. Entre estas, el pie derecho.[315]

En fin, un análisis objetivo de la prueba pericial y documental presentada, nos lleva a concluir que el issue #1: *Debridement of arterial ulcers* del Informe Pericial del Dr. Timmerman, no se sostiene como una desviación del estándar de cuidado *(standard of care)*. A todas luces, el Dr. Bermúdez Vera fue el médico que observó, examinó, diagnóstico y recomendó el desbridamiento y limpieza en las úlceras diabéticas con descarga que el paciente sufría. Nótese, que ambos peritos: Dr. Rodríguez Ortíz y Dr. Rodríguez Morales distinguieron que no se trataba de una úlcera isquémica por falta de sangre; sino que, el señor Modestti Torres padecía de úlceras diabéticas con descarga, por lo que coincidieron con el juicio médico de desbridamiento y limpieza como buena práctica médica.

**Issue #2**

Examinemos el issue #2: *Treatment options for dry gangrene in consideration of the whole patient,* pág. 7 del Informe Pericial del Dr. Timmerman,[316] que está relacionado al diagnóstico de "gangrena seca" que hizo el Dr. Bermúdez Vera,[317] y a la amputación del dedo el 21 de marzo de 2019.

Al respecto, en su Informe Pericial el Dr. Timmerman, opinó:

> *An arterial ulcer may be described as gangrenous. Gangrene is typically described as wet or dry.* **Wet gangrene is present if there is a bacterial infection in the affected tissue. Wet gangrene needs to be treated immediately with empiric antibiotics, local wound care, _and in many cases surgical intervention because it spreads quickly and can be fatal_**. *On the other hand, dry gangrene develops slowly and is typically not acutely infected but rather either colonized or chronically infected.* **Dry gangrene develops**

---

[314] Véase, *Estudio de "duplex arterial" bilateral de las extremidades inferiores del expediente médico del BMC*, pág. 495 de la Entrada Núm. 128 de SUMAC, pág. 95 de 200.

[315] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 42-44.

[316] Véase, Issue # 2 – *Treatment options for dry gangrene in consideration of the whole patient,* Informe Pericial del Dr. Timmerman, pág. 7 de la Entrada Núm. 123 de SUMAC, pág. 7 de 10.

[317] Véase, *Evaluación del Dr. Bermúdez Vera*, pág. 591 de la Entrada Núm. 128 de SUMAC, pág. 193 de 200.

*most commonly in people who have peripheral arterial disease. Dry gangrene should be treated locally by advanced wound care techniques to remove moisture and improve the overall bioburden of the wound in the prevention of acute infection and the treatment chronic infection.*

<u>*Mr. Modestii (sic) had arterial ulcers. His right foot arterial ulcers were present on the admission of 2/13/2019, as well as the admission of 3/12/2019*</u>*. This indicates a slow development as is seen in arterial ulcers developing dry gangrene. In my review of the medical records provided, I found no evidence of a description of wet gangrene in reference to the right foot arterial ulcers.* <u>*In fact, in the operative note of 3/21/2019, Dr. Bermudez describes the presence of dry gangrene, never mentioning the presence of wet gangrene.*</u>

*As such, in consideration of the whole patient and his comorbid conditions, the dry gangrene present on the right foot 4th toe should have been treated locally by advanced wound care rather than by surgical amputation.*[318]

El Dr. Timmerman opinó que la segunda intervención del 21 de marzo de 2019, en la que el Dr. Bermúdez Vera amputó el 4to. dedo del pie derecho del paciente, no estaba indicada. Según el perito, el paciente tenía una "gangrena seca", por lo que una opción de tratamiento para este tipo de gangrena era dejarla que siguiera su curso y aplicarle solución Betadina *(Betadine)* para mantenerla seca y libre de bacterias, hasta que ocurriera una auto amputación. Esto es, dejar que el propio dedo se auto ampute. Indicó que este tratamiento preoperatorio era el indicado para el paciente y sus condiciones médicas comórbidas. Por lo tanto, el Dr. Timmerman opinó que **la segunda cirugía era innecesaria y señaló que la causa más cercana a la muerte del paciente <u>comenzó</u> con la segunda intervención.** En su opinión, esto empeoró debido a la colocación inadecuada del tubo torácico del lado derecho y que no lo hayan corregido en los seis (6) días posteriores a su colocación.[319] Este issue #2 lo reiteró en el segundo y quinto punto de la conclusión de su Informe Pericial.[320] No tiene razón.

---

[318] Énfasis nuestro.

[319] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, pág. 181.

[320] Véase, *Conclusiones* del Informe Pericial del Dr. Daniel S. Timmerman, pág.10:
- *By performing an unnecessary amputation of the 4th right toe of Mr. Modestii (sic) as the patient had dry gangrene as*

El **Dr. Bermúdez Vera** explicó que la "gangrena seca" tiene una parte del cuerpo seca junto a otra parte que está viva. Es decir, una "gangrena seca" tiene una parte negra y muerta, adyacente a una parte viva, que es, según el Dr. Bermúdez Vera, la única forma en que se puede decir que tiene un *"dry gangrene"*. En ese sentido, expresó que una "gangrena seca" es un arma de doble filo porque un paciente puede tener infección en la unión de ese tejido necrótico, y eso, es un problema real. El Dr. Bermúdez Vera indicó que los pacientes que están con secreciones pueden tener infección activa en esa parte del dedo, mano o pie. Por lo tanto, al ver que las úlceras del señor Modestti Torres tenían secreciones, médicamente entendió que se debía hacer un *"debridement"* o hacer una amputación parcial, pues este paciente tenía un foco de infección que podía terminar en una septicemia. Máxime, cuando este caso el señor Modestti Torres tenía insuficiencia periferovascular y eso lo hacía más propicio a una promoción de infecciones. En consecuencia, y a su juicio médico, de no asumir lo antes dicho, **el problema que iba a encarar el paciente era peor**. En otras palabras, el Dr. Bermúdez Vera razonó que el paciente iba a entrar en problemas de infección, y por lo menos, a nivel del pie iba a desarrollarse una gangrena mayor con consecuencias desastrosas, como la muerte del paciente.[321]

A tono con la opinión del **Dr. Rodríguez Ortíz**, el juicio médico del Dr. Bermúdez Vera quedó respaldado por el resultado objetivo

---

*stated by Dr. Bermudez in his operative note for which other treatment options were available.*

- *By failing to appreciate the comorbid conditions of Mr. Modestii (sic) prior to the initial surgery and then failing to recognize the declining health of Mr. Modestii (sic) resulting from said initial surgery. Further, in so failing to appreciate the deconditioned state of Mr. Modestii (sic) and evolving pneumonia following the initial surgery, Dr. Bermudez performed a second unnecessary operation on Mr. Modestii (sic) which was the proximate cause of his death.*

[321] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 61-66. Énfasis nuestro.

de patología que reveló que el dedo amputado tenía una gangrena con osteomielitis focal,[322] razón por la cual la **segunda intervención estaba indicada**. Explicó que la osteomielitis era una inflamación del hueso a causa de una infección por bacteria, que a su vez, constituía un foco de infección, —que de no ser atendida a tiempo— la infección podía destruir el hueso y diseminarse a través de todo el pie. Por lo tanto, opinó que la única forma de erradicar esa infección era con cirugía dado que el hueso estaba infectado.[323] Consecuentemente, en su Informe Pericial el **Dr. Rodríguez Ortíz** difiere del issue #2 al opinar lo que:

> *Las úlceras descritas por el Dr. Bermúdez, que fue el cirujano que se expuso a este desbridamiento, estaban drenando secreciones según él establece. Esto no es "dry gangrene".* **No puede ser que el perito demandante establezca categóricamente un "dry gangrene" cuando el cirujano que interviene contemporáneo a los hechos, establece una ulcera con descarga, que obviamente no puede ser gangrena seca**. *De hecho, la patología habla de un foco de infección. Esto requiere desbridamiento*. **Un tejido necrótico no se infecta porque es un tejido momificado. Este tejido momificado no se puede debridar porque es una "coraza" negra seca y solo con una amputación se podría debridar**. **Y como establecí, el punto es académico cuando no hay resultado negativo en el paciente por su intervención, que estaba indicada. Este paciente mantuvo sus dedos**. *Ambas debridaciones se hicieron con la misma sedación del 14 de marzo, las mismas que no le impusieron una carga al corazón y no ocasionaron la bradicardia que desarrolló el paciente y que se evidencia en la cirugía del 21 de marzo, a los 15 minutos posterior a la intervención del Dr. Bermúdez. En este caso desarrolla de súbito una bradicardia secundaria a su condición cardíaca restringida*. **Pero la intervención no le causó liberación de catecolaminas al observar los vitales (presión sanguínea, pulso, respiración y saturación) una vez estos estaban totalmente normales**.[324]

De otra parte, el juicio médico del Dr. Bermúdez Vera quedó respaldado por el **Dr. Rodríguez Morales**, al opinar que la necrosis del 4to. dedo del pie derecho fue a causa de una infección que afectó la circulación particular de la parte distal del dedo. Opinó que, de

---

[322] Véase, *Reporte de Examen de Tejidos de Piel (Tissue Examination Report)*, pág. 550 de la Entrada Núm. 128 de SUMAC, pág. 151 de 200.

[323] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 86-87. Énfasis nuestro.

[324] Véase, Issue #2*: "Treatment options for dry gangrene in consideration of the whole patient",* Informe Pericial del Dr. Rodríguez Ortíz, págs. 8-9 de la Entrada Núm. 125 de SUMAC, págs. 8-9 de 12. Énfasis nuestro.

no haberse amputado el dedo, la gangrena hubiese progresado ascendente en la extremidad, por lo que el paciente se arriesgaba al desarrollo de una sepsis o, a una amputación a un nivel más alto.[325] Además, en la pág. 3 de su Informe Pericial, el Dr. Rodríguez Morales, en lo pertinente, opinó lo siguiente:

> *[…]*
> *Los estudios radiográficos confirmaban la extensión de la aterosclerosis que el Sr. Modestti padecía, tanto a nivel del tronco de su cuerpo como de las extremidades. Esta enfermedad de estenosis y oclusión de las arterias de sus extremidades (enfermedad perifero-vascular) era la responsable de los problemas de úlceras e infecciones en sus pies. **El tratamiento de esta condición de forma paliativa (no curativa) pudiera ser en algunas ocasiones con procedimientos que aumenten la circulación a la extremidad concernida. En el caso del Sr. Modestti esto se trató por el Dr. Mercado, pero no fue posible hacerlo. En casos como este la alternativa es la amputación.***
> *Cuando lo riñones no funcionan y el corazón apenas puede bombear una fracción de su sangre a los tejidos del cuerpo, es de esperarse que todos los sistemas colapsen y no funcionen adecuadamente. **Esa es la condición y no es negligencia su paliación o tratamiento.***[326]

En fin, un análisis objetivo de la prueba presentada nos lleva a concluir que el issue #2: *Treatment options for dry gangrene in consideration of the whole patient* del Informe Pericial del Dr. Timmerman, no se sostiene como una desviación del estándar de cuidado *(standard of care)*.

De entrada, tenemos dos diagnósticos sobre la misma gangrena del paciente. Por un lado, el Dr. Timmerman opina que se trata de una "gangrena seca", conforme al récord médico revisado. De otra parte, el testimonio del Dr. Bermúdez Vera explica que, aun cuando escribió *dry gangrene* en el récor médico, su observación y evaluación del dedo del paciente lo llevó a concluir que se trataba de un arma de doble filo, ya que las secreciones podían provocar una infección activa en la unión del tejido necrótico del dedo, y de no amputarlo, podía propagarse por todo el pie con consecuencias fatales. Además, tenemos dos opiniones periciales de los doctores:

---

[325] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 58.
[326] Véase, Informe Pericial del Dr. Gilberto Rodríguez Morales, pág. 3 de la Entrada Núm. 129 de SUMAC, pág. 3 de 4. Énfasis nuestro.

Dr. Rodríguez Castro y Dr. Rodríguez Morales que sostienen la opinión médica del Dr. Bermúdez Vera.

Nos resulta de gran peso probatorio el informe patológico que reveló: **clínicamente una gangrena y osteomielitis focal de la falange distal del cuarto dedo del pie derecho** *(gangrene and focal osteomyelitis clinically from right foot, fourth toe distal phalange).*[327] Dicho resultado es objetivo y respalda el juicio médico del Dr. Bermúdez Vera y las opiniones de los peritos: Dr. Rodríguez Castro y Dr. Rodríguez Morales. Tengamos en cuenta que durante la hospitalización del señor Modestti Torres, el internista y médico primario Dr. Amparo Flores, le administró dos tipos de antibióticos —*Vancomicina y Zosyn*— para la infección del tejido necrótico del paciente.[328]

Nótese que en este issue #2 de su Informe, el Dr. Timmerman opinó lo siguiente sobre la gangrena húmeda *(wet gangrene)*:

> *[...] **Wet gangrene is present if there is a bacterial infection in the affected tissue**. **Wet gangrene needs to be treated immediately with empiric antibiotics, local wound care, and in many cases surgical intervention because it spreads quickly and can be fatal**.*

Tal proceder coincide con el juicio médico del Dr. Bermúdez Vera y las opiniones de los peritos: Dr. Rodríguez Castro y Dr. Rodríguez Morales.

Todavía más, el Dr. Timmerman ignora en su Informe Pericial el resultado patológico de **gangrena y osteomielitis** y no explica cómo se trata preoperativamente un dedo con gangrena seca y osteomielitis focal. Ante este cuadro médico, la gangrena había infectado el hueso, por lo que **hacía necesaria la amputación del dedo** para evitar la propagación rápida y las consecuencias fatales. En conclusión, no se sostiene la opinión del Dr. Timmerman de que

---

[327] Véase, *Reporte de Examen de Tejidos de Piel (Tissue Examination Report)*, pág. 550 de la Entrada Núm. 128 de SUMAC, pág. 151 de 200.
[328] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 28, 31-32.

la amputación del dedo gangrenado estaba contraindicada por lo que constituía un desvío del estándar de cuidado *(standard of care).*

### Issue #3

Analicemos el issue #3: *Local wound care treatment of arterial ulcers,* págs. 7-8 del Informe Pericial del Dr. Timmerman, en el que opinó:

> ***<u>Arterial ulcers differ from others in that the treatment goal should be to keep the wound environment as dry as possible to decrease the risk of infection</u>***<u>.</u>
>
> *<u>I can find no evidence that local wound care was administered upon admission. Further, I can find no evidence that wound care was provided to the patient up to and until 3/19/2019 as provided to Dr. Bermudez by telephone order on 3/19/2019 – postoperative day #5.</u>* ***The order was for Silvadene and Normal Saline Solution, neither of which provides for a dry wound environment and in fact moisten the wound environment****.*
>
> *<u>As such, the local wound care provided starting post-operative day #5 was contraindicated given the etiology of the wound</u>*.[329]

Sobre este issue el Dr. Timmerman indicó que luego de las desbridación y limpieza hecha el 14 de marzo de 2019, el Dr. Bermúdez Vera no ofreció cuidado de curación al señor Modestti Torres hasta la orden telefónica del 19 de marzo de 2029 (cinco (5) días después de la intervención) en la que ordenó que se le aplicara antibiótico en crema *Silvadene* y solución normal salina en las úlceras del paciente. Por lo cual, opinó que esa orden era contraindicada como cuidado postoperatorio ya que contribuía a la humedad y podía empeorar la úlcera arterial. Además, el Dr. Timmerman indicó que el Dr. Bermúdez Vera no visitó al paciente hasta el 20 de marzo de 2019, (entiéndase, seis (6) días desde del desbridamiento y limpieza del 14 de marzo de 2019); por lo que opinó que el cirujano está en mejor posición para determinar lo que

---

[329] Véase, Issue # 3- *Local Wound Care Treatment of Arterial Ulcers,* Informe Pericial del Dr. Timmerman, págs. 7-8 de la Entrada 123 de SUMAC, págs. 7-8 de 10. Énfasis nuestro.

el paciente necesita.[330] Este issue lo reiteró en el tercer punto de la conclusión de su Informe Pericial.[331] No tiene razón.

Primeramente, al examinar el issue #3 debemos tener claro el hecho de que durante la hospitalización del señor Modestti Torres, la prueba demostró que el Dr. Amparo Flores era el **internista y médico primario** a cargo del cuidado diario del paciente y le administró dos tipos de antibióticos *(Vancomicina y Zosyn)* para la infección del tejido necrótico que tenía el señor Modestti Torres; además de la insulina, le aplicó antidiuréticos, antiplaquetarios que son medicamentos para la presión y circulación que sirven para controlar la diabetes.[332]

Todavía más, el nefrólogo principal del paciente, Dr. Rodríguez Castro, fungía como **médico primario** y como parte del cuidado médico estaba pendiente de las úlceras del señor Modestti Torres, a tal grado, que fue el primero en solicitarle al Dr. Bermúdez Vera que lo evaluara, ya que el paciente —por su enfermedad vascular— tenía **un dedo necrótico con gangrena**. Esto le preocupaba por que si no se trataba, podía propagarse.[333] Es decir, el rol del Dr. Bermúdez Vera con el paciente era uno de consultor en el cual, como cirujano se le consultaba, entre otros procesos, sobre las úlceras que el señor Modestti Torres padecía por su condición crónica de diabetes.

En cuanto a este issue #3, el Dr. Rodríguez Ortíz opinó lo siguiente, en su Informe Pericial:

> *Aun cuando he sido insistente en este tema, la intervención del Dr. Bermúdez del 14 de marzo y el 21 de marzo fueron toleradas por el paciente.* **Las mismas se hicieron para controlar un proceso de infección en los dedos que requirieron desbridamiento y de una amputación por osteomielitis por lo que estaba**

---

[330] Véase, Transcripción de la Prueba Oral del 2 de mayo de 2023, págs. 171-174.
[331] Véase, *Conclusiones* del Informe Pericial del Dr. Daniel S. Timmerman, pág.10:
> *By failing to provide appropriate post-operative care to Mr. Modestii (sic) in that Dr. Bermudez did not provide wound care orders until post-operative day #5 nor did Dr. Bermudez physically examine Mr. Modestii (sic) during his post-operative course until postoperative day #6.*

[332] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 28, 31-32.
[333] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 54 y 56.

*indicada*. *Ambos fueron identificados por el patólogo como con áreas de infección (3/14/2019) y osteomielitis (3/21/2019)*. **No progresó la infección ni tuvo perdida de los dedos de los pies, que no fuera el amputado por la osteomielitis**. *De manera que es académico los argumentos del perito demandante cuando le achaca la muerte a realizar un desbridamiento en una úlcera infectada y no a la sepsis de origen pulmonar que desarrolló este paciente y que la literatura establece que es alta.*[334]

En fin, un análisis objetivo sobre el issue #3: *Local wound care treatment of arterial ulcers* del Informe Pericial del Dr. Timmerman, nos lleva a la conclusión de que no existe evidencia en el expediente médico o en la prueba presentada por la parte demandante/aquí apelada que indique que la falta de curación en las úlceras los días 15, 16, 17 y 18 de marzo de 2019,[335] o la curación del 19 de marzo de 2019 con antibiótico en crema *Silvadene* y solución normal salina a las úlceras, o la falta de visita al señor Modestti Torres por parte del Dr. Bermúdez Vera desde el 14 de marzo hasta el 20 de marzo de 2019, le hayan empeorado su condición de úlceras o provocado la amputación del dedo gangrenado el 21 de marzo de 2019 o su muerte el 12 de mayo de 2019.

Nótese que una vez el Dr. Bermúdez Vera evaluó por segunda vez al señor Modestti Torres el **20 de marzo de 2019**, ordenó que estuviera bajo el cuidado del "*wound care team*",[336] para evitar complicaciones futuras;[337] lo cual tuvo un resultado exitoso, al no reportarse ningún problema de cuidado o complicaciones con las úlceras del paciente después de la segunda intervención del 21 de marzo de 2019.

---

[334] Véase, Issue #3 - *Local wound care treatment of arterial ulcers,* Informe Pericial, del Dr. Rodríguez Ortíz, pág. 9 de la Entrada 125 de SUMAC, pág. 9 de 12. Énfasis nuestro.

[335] Nótese, que luego de la primera intervención el 14 de marzo de 2019, el Dr. Bermúdez Vera curó las heridas con el antibiótico en crema *Silvadene*. Véase, *Reporte Operatorio (Operation Report)*, pág. 534 de la Entrada Núm. 128 de SUMAC, pág. 135 de 200. Además, el 19 de marzo de 2019 se procedió a curar las heridas por orden del Dr. Bermúdez Vera.

[336] Véase, *Órdenes Médicas (Physician's Orders)*, pág. 1,486 de la Entrada Núm. 128 de SUMAC, pág. 86 de 100.

[337] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 69-70.

**Issue #4**

Evaluemos el issue #4: *Pre-operative Care and Professional Standards*, págs. 8-9 del Informe Pericial del Informe Pericial del Dr. Timmerman, en el que opinó:

> *According to the Statement on Principles Underlying Perioperative Responsibility as adopted by the American College of Surgeons, the surgeon is responsible for but not limited to the following during the preoperative workup of a patient:*
>
> *1. Confirming the diagnosis for which surgical care is proposed. This responsibility should include the surgeon's personal review of all pertinent aspects of the patient's case.*
>
> *2. Presenting to the patient the range of options available for the patient's appropriate management, including the surgeon's recommendations and rationale for a specific approach to treatment.*
>
> *3. Proper preoperative preparation of the patient. Minimizing the risk of operation, while providing maximal opportunity for a satisfactory outcome, requires a full appreciation by the surgeon of the patient's condition. Achieving optimal preoperative preparation of the patient will frequently require consultation with other physicians; however, the responsibility for attaining this goal rests with the surgeon.*
>
> *Mr. Modestii had multiple comorbidities contributing to his arterial ulcers and further exacerbated by his initial surgery of 3/14/2019 contributing to a decline from his baseline to include:*
>
> *• Diabetes mellitus*
>
> *• Severe peripheral arterial disease evidenced on angiogram performed 2/14/2019 by Dr. Mercado who described and underlined in his note "all vessels heavily calcified",*
>
> *• A "severely impaired" left ventricular systolic function with an ejection fraction (EF) of 25-30% as noted by Cardiology on 2/16/2019,*
>
> *• Evidence of bilateral pleural effusions indicating cardiogenic pulmonary edema on 3/13/2019 as well advancing disease seen on a follow-up chest x-ray of 3/17/2019 describing the pleural effusion as "larger on the right side" and including a new finding of "bilateral atelectasis" following his initial surgery,*
>
> *• An exacerbated pulmonary process, developing 2 days after the surgery of 3/14/2019, requiring frequent pharmaceutical respiratory treatments as evidenced in the respiratory therapy treatment notes with breath sounds being described as rhonchi upon all but one treatment visit spanning from 3/16/2019 up and until the night before the surgery of 3/21/2019 indicating no improvement despite medical treatment.*
>
> <u>*I found no evidence in the medical record Dr. Bermudez reviewed the pertinent aspects of the patient's case*</u>*. <u>This is typically indicated by a recorded physical examination of the whole patient</u>.* **I found no evidence in the medical record that the patient was presented with the range of options available for appropriate management nor did I find a rationale for surgical treatment for either operation performed by Dr. Bermudez***.* **This is typically documented in the chart so as to give notice of the cognitive labor provided by the surgeon in the treatment of a patient***.* <u>*Finally, I found no evidence in the medical records that Dr. Bermudez had a full appreciation of the*</u>

*patient's overall medical condition, including but not limited to the presence of severe peripheral arterial disease and the patient's exacerbated pulmonary process, specifically pneumonia. This is typically indicated in a consultative note by the surgeon.*[338]

El Dr. Timmerman hace un breve listado de las condiciones comórbidas del señor Modestti Torres, y a tono con su revisión del récord médico, le imputa al Dr. Bermúdez Vera no examinar ni tomar en cuenta estas condiciones crónicas como parte del cuidado preoperatorio. No tiene razón.

Sobre la opinión del Dr. Timmerman antes dicha, el perito **Dr. Rodríguez Ortiz** difiere, ya que el señor Modestti Torres fue admitido y hospitalizado para la atención de sus múltiples condiciones médicas, incluyendo las úlceras. El paciente estaba recibiendo tratamiento médico de su médico primario y de distintos especialistas como el cardiólogo, el neumólogo, el nefrólogo, entre otros, que son los que tenían el deber de darle seguimiento a sus condiciones médicas. En opinión del perito, el Dr. Bermúdez Vera no faltó al cuidado médico, pues como cirujano se le consultó e hizo las intervenciones que resultaron adecuadas. Concluyó que el señor Modestti Torres no falleció por la desbridación o la amputación del dedo, sino porque tuvo fallo renal, fallo cardiaco congestivo, problema de las coronarias, fallo renal crónico, hipertensión y diabetes que se sumaron una tras otras. El perito indicó que esta secuencia de eventos es conocida en literatura médica al tratar un paciente de mucha comorbilidad.[339]

También, sobre el issue #4, el **Dr. Rodríguez Ortíz** opinó en su Informe Pericial:

> *El paciente era evaluado diariamente por su médico primario (internista) y otros especialistas como cardiólogos, neumólogos, intensivistas, nefrología, etc. Estos deberían atender las condiciones médicas que podrían ser las causas de su deterioro.* **No hay evidencia de que la falta de**

---

[338] Véase, Issue # 4 – *Pre-operative Care and Professional Standards,* Informe Pericial del Dr. Timmerman, págs. 8-9 de la Entrada 123 de SUMAC, págs. 8-9 de 10. Énfasis nuestro.

[339] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 131-132. Énfasis nuestro.

*evaluación del Dr. Bermúdez hubiera causado un deterioro en el paciente. La intervención del 21, estaba justificada una vez el dedo tenía osteomielitis por lo que la amputación estaba indicada. El paciente se interviene con sedación y se observa por la falta de respuesta simpática manifestada por una respuesta intraoperatoria normal sin manifestar taquicardia, hipo o hipertensión, taquicardia o bradipnea y con saturación normal. <u>El anestesiólogo, responsable directo de administrar la anestesia, en casos de duda de la condición del paciente, cancela las intervenciones y las condiciona a un "clearance médico". Esto no ocurrió en este caso. Y esto fue así porque los criterios preoperatorios objetivos del paciente que se documentan en el récord no identifican a un paciente deteriorado. Esto no ocurrió en este caso. Y esto fue así porque los criterios preoperatorios objetivos del paciente que se documentan en el récord no identifican a un paciente deteriorado, ni clínica ni termodinámicamente.</u>*

*Ninguno de estos 4 puntos previos establece negligencia de parte del Dr. Bermúdez una vez el paciente desarrolla un evento cardiaco por su disfunción cardiaca severa ya conocida o por el SSS, en un paciente con indicaciones quirúrgicas. Además de que fue evaluado por múltiples especialistas, tanto preoperatoriamente como intraoperatorio demostrando vitales normales, respiraciones normales (17/minutos) y saturando perfectamente al 100%. <u>La ausencia de dificultad respiratoria y la auscultación por el anestesiólogo, describe unos pulmones claros. Estos hallazgos anteriores apoyaban la ausencia de disfunción pulmonar.</u>*[340]

Por otra parte, en su Informe Pericial el **Dr. Rodríguez Morales**, en lo pertinente, opinó:

<u>*Interesantemente, el Dr. Timmerman no presenta un cuadro clínico real de la seriedad de la condición del Sr. Modestti y solo menciona el servicio de "nefrología" para decir que fueron quienes consultaron al Dr. Bermúdez.*</u> ***No menciona en ningún momento el hecho de que el paciente recibía hemodiálisis tres veces a la semana y tampoco menciona el hecho que había sido operado de corazón abierto. Estas "comorbilidades" tan importantes en el caso del Sr. Modestti ni siquiera el Dr. Timmerman las menciona en el último párrafo de la página 8 de su informe, en donde él nos da un listado de las "múltiples comorbilidades" que contribuían a las ulceras arteriales del paciente y su deterioro.*** <u>*El Dr. Timmerman no hace imputación alguna de negligencia contra el Bayamón Medical Center y su personal. El solo se limita a señalar discrepancias de juicio clínico que él tiene con el tratamiento quirúrgico ofrecido por el Dr. Bermúdez, de acuerdo con su interpretación del expediente médico del paciente Ángel F. Modestti Torres. […].*</u>[341]

Finalmente, el perito no concurrió con la afirmación del Dr.

Timmerman de que la responsabilidad del cirujano no se detiene con

---

[340] Véase, Issue #4 – *"Preoperative Care and Professional Standards,"* Informe Pericial del Dr. Rodríguez Ortíz, págs. 9-10 de la Entrada Núm. 125 de SUMAC, págs. 9-10 de 12. Énfasis nuestro.
[341] Véase, Informe Pericial del Dr. Rodríguez Morales, pág. 4 de la Entrada Núm. 129 de SUMAC, pág. 4 de 4. Énfasis nuestro.

la intervención de otros facultativos.[342] De igual modo, no estuvo de acuerdo de que la bradicardia sufrida por el paciente fue causada porque estaba en la sala de operaciones.[343]

Un análisis objetivo de la prueba presentada, nos lleva a concluir que el issue #4: *Preoperative Care and Professional Standards,* del Informe Pericial del Dr. Timmerman, no se sostiene como una desviación del estándar de cuidado *(standard of care),* ya que surge del récord médico que desde que el señor Modestti Torres fue recibido en la Sala de Emergencia y durante su hospitalización en el BCM, el Dr. Amparo Flores (internista y médico primario) le aplicó una serie de antibióticos, medicamentos y consultó con distintos subespecialistas para tratar las diversas condiciones del paciente.[344] De igual modo, el nefrólogo, Dr. Rodríguez Castro fungió como médico primario del paciente y estuvo a cargo de la hemodiálisis y las enfermedades asociadas a su enfermedad renal,[345] como las úlceras y el dedo necrótico del pie derecho a falta de circulación sanguínea.

Nótese, que además de las enfermedades comórbidas del paciente, los dos médicos primarios tenían claro el problema de las úlceras que padecía el señor Modestti Torres, a tal grado, que para el Dr. Amparo Flores la mayor condición médica *(chief complaint)* que aquejaba al paciente al llegar a la sala de emergencia, eran los dedos necróticos e infectados del pie derecho, debido a la mala circulación.[346] Por su parte, el Dr. Rodríguez Castró le consultó —el 13 de marzo de 2019[347] y 20 de marzo de 2019[348]— al Dr. Bermúdez Vera para que evaluara las úlceras y el dedo necrótico con gangrena

---

[342] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, pág. 65.

[343] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 71-72.

[344] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 27-28, 31-31.

[345] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 52-54.

[346] Véase, Transcripción de la Prueba Oral del 11 de mayo de 2023, págs. 25-27.

[347] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 31-33.

[348] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 56-58; y, *Consulta del Nefrólogo*, pág. 590 de la Entrada Núm. 128 de SUMAC, pág. 191 de 200.

que padecía el señor Modestti Torres. Es decir, el rol del Dr. Bermúdez Vera era de un consultor y no de un médico primario.

También, consta en el Reporte de Consulta del 13 de marzo de 2019, que el Dr. Bermúdez Vera estaba consciente del cuadro médico del señor Modestti Torres al diagnosticarlo como un hombre de 65 años con un historial de diabetes mellitus, insuficiencia periferovascular con múltiples dedos con úlceras, por lo cual fue admitido al hospital para evaluación y manejo.[349]

Todavía más, previó a realizar las cirugías, el señor Modestti Torres fue evaluado por el anestesiólogo y dio el visto bueno en ambas intervenciones paraque fuera intervenido mediante sedación (no anestesia). Además, a pesar de las imágenes de estudios pulmonares,[350] a juicio médico del Dr. Bermúdez Vera las efusiones pleurales se debían a un fallo congestivo causado por su condición cardiaca, [351] por lo que no hubiera variado las cirugías practicadas.[352] Tal apreciación, está respaldada por el perito, Dr. Rodríguez Ortiz al no relacionar ambas intervenciones a las condiciones pulmonares del paciente.[353]

### Issue #5

Por último, escrutemos el issue #5: *Postoperative Care and Professional Standards*, pág. 9 del Informe Pericial del Informe Pericial del Dr. Timmerman, en el que opinó:

> ***According to the Statement on Principles Underlying Perioperative Responsibility as adopted by the American College of Surgeons, the surgeon is responsible for the postoperative care of the patient. This responsibility includes personal participation in***

---

[349] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 33-35; y, *Hallazgos (Findings)* del *Reporte de Consulta que el Dr. Bermúdez Vera documentó,* pág. 10 de la Entrada Núm. 128 de SUMAC, págs. 10 de 200.

[350] Véanse, las págs. 403, 404, 405, 409, 410, 411, 417, 419, 421, 425, 426, 461, 486 de la Entrada Núm. 128 de SUMAC, págs. 3, 4, 5, 9, 10, 11, 17, 19, 21, 25, 26, 61, 86 de 200. Estos estudios van desde el 13 de marzo de 2019 hasta el 27 de abril de 2019. Además, véase la Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 201-206.

[351] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 187-191.

[352] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 206, 211-212. Aunque en la pág. 206 de la TPO se indica que la primera intervención ocurrió el 13 de marzo de 2019, lo correcto es que sucedió el 14 de marzo de 2019.

[353] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 81, 103-104.

> *and direction of postoperative care, including the management of postoperative complications. The best interest of the patient is thus optimally served because of the surgeon's comprehensive knowledge of the patient's disease and surgical management. Even when some aspects of postoperative care may be best delegated to others, the surgeon must maintain an essential coordinating role. Should complications of operation develop, the surgeon is best able to detect them and to provide or coordinate timely and appropriate therapy. This responsibility extends through the period of convalescence until the residual effects of the surgical procedure are minimal, and the risk of complications of the operation is predictably small. The surgeon is responsible for determining when the patient should be discharged from the hospital.*
>
> *I found no evidence in the medical record that Dr. Bermudez examined the patient in the post-operative course from 3/14/2019 up to and until 3/20/2019 when he was asked to see the patient by Nephrology. Nor did I find evidence that Dr. Bermudez provided wound care orders or direction otherwise with respect to the post-operative care of the surgical wounds following the operation of 3/14/2019 until a telephone order for Silvadene and Normal Saline Solution was provided on 3/19/2019 at 5:10 pm – post-operative day #5. Further, following chest tube placement, I found no indication in the chart Dr. Bermudez followed up on chest tube placement or acknowledged the fact the "sentinel hole" of the chest tube was outside the thoracic cavity as dictated in many imaging studies by Radiology.[354]*

La antes citada opinión del Dr. Timmerman, **aborda dos (2) asuntos postoperatorios**; a saber: **(1)** la falta de cuidado médico durante cinco (5) días después de la primera intervención (del 14 de marzo de 2019); y, **(2)** luego de la segunda intervención (del 21 de marzo de 2019), la falta de seguimiento para corregir la colocación del tubo de pecho colocado el 22 de marzo de 2019.

**En cuanto al primer asunto del issue #5**, no tiene razón. Consta en el Reporte Operatorio del expediente médico que, luego de la primera intervención del **14 de marzo de 2019**, el Dr. Bermúdez Vera curó las heridas con antibiótico en crema *Silvadene*.[355] De igual modo, el **19 de marzo de 2019** se procedió a curar las heridas del paciente (con *Sivadene* y normal salina) por orden (telefónica) del Dr. Bermúdez Vera ante el aviso de una

---

[354] Véase, Issue # 5 – *Postoperative Care and Professional Standards,* Informe Pericial del Dr. Timmerman, pág. 9 de la Entrada 123 de SUMAC, pág. 9 de 10. Énfasis nuestro.

[355] Véase, *Reporte Operatorio (Operation Report),* pág. 534 de la Entrada Núm. 128 de SUMAC, pág. 135 de 200.

enfermera de que en los días 15, 16, 17 y 18 el señor Modestti Torres no había recibido curación de sus úlceras.[356] Luego de recibir la llamada del nefrólogo y médico primario, Dr. Rodríguez Castro para que evaluara el 4to. dedo del pie derecho del paciente,[357] el **20 de marzo de 2019** el Dr. Bermúdez Vera lo evaluó y fijó la amputación del dedo para el 21 de marzo de 2019.[358] No obstante, cabe destacar que **ese mismo** día 20 de marzo de 2019, el Dr. Bermúdez Vera solicitó una consulta con el "*wound care team*",[359] para que el paciente recibiera cuidado especializado para las úlceras y se evitara las complicaciones de amputaciones futuras.[360] Ello, tuvo un resultado exitoso al no reportarse ningún problema o complicación con las úlceras del paciente después de la segunda intervención del 21 de marzo de 2019.

**En cuanto al segundo asunto del issue #5**, el Dr. Timmerman opinó que el Dr. Bermúdez Vera se desvió del estándar de cuidado al realizar la segunda intervención (del 21 de marzo de 2019) y no reconocer ni atender (por diez (10) días) que el tubo torácico estaba colocado de forma inadecuada, ello a pesar de los estudios de imágenes radiológicas. Según el perito, esto resultó en un drenaje inefectivo que impidió la recuperación postoperatoria del señor Modestti Torres. Este tema, el Dr. Timmerman lo reitera en el tercer punto de la conclusión de su Informe.[361] No tiene razón.

---

[356] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 55-56; y, *Orden Médica vía teléfono*, pág. 1,484 de la Entrada Núm. 128 de SUMAC, pág. 84 de 100.

[357] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 56-58; y, *Consulta del Nefrólogo*, pág. 590 de la Entrada Núm. 128 de SUMAC, pág. 191 de 200.

[358] Véanse, la Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 59-60; y, *Notas del Cirujano*, pág. 591 de la Entrada Núm. 128 de SUMAC, págs. 192 de 200.

[359] Véase, *Órdenes Médicas (Physician's Orders)*, pág. 1,486 de la Entrada Núm. 128 de SUMAC, pág. 86 de 100.

[360] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 69.

[361] Véase, *Conclusiones* del Informe Pericial del Dr. Daniel S. Timmerman, pág.10:
> *By failing to recognize the chest tube inserted by Dr. Bermudez into the right thoracic cavity of Mr. Modestii (sic) was improperly placed and left unattended as such for 10 days evidenced on multiple imaging studies over that time resulting in ineffective drainage and thereby contributing to the failed post-operative recovery of Mr. Modestii (sic).*

No olvidemos que en la segunda intervención el 21 de marzo de 2019 (amputación del 4to. dedo con osteomielitis), el paciente toleró el proceso,[362] pero cinco (5) minutos después de la operación,[363] sufrió una bradicardia y fue intubado por el anestesista y anestesiólogo, razón por lo cual, el Dr. Bermúdez Vera ordenó a la 1:40 de la tarde el traslado del señor Modestti Torres a la **Unidad de Cuidados Intensivos** junto con una serie de órdenes médicas para el equipo médico que lo atendería allí.[364]

Ello conllevó que, a raíz de una consulta del neumólogo intensivista Dr. Javier Ramos Rossi,[365] el **22 de marzo de 2019** el Dr. Bermúdez Vera le colocara un tubo de pecho en el lado derecho al señor Modestti Torres debido a una efusión pleural.[366] Los resultados de los estudios radiológicos de los días 23, 24, 25 y 27 de marzo de 2019 recomendaban al cirujano a evaluar el reposicionamiento del tubo de pecho;[367] además, entre otras condiciones del paciente, los estudios indicaban que tenía el corazón agrandado, sufría una de edema pulmonar con efusiones pleurales, mayores en el lado derecho que en el izquierdo.

Obra en el expediente médico que el **1 de abril de 2019** a la 1:25 de la tarde, el **Dr. Bermúdez Vera** escribió una nota de cirugía en la que indicó que el tubo de pecho no tenía liqueo de aire y estaba

---

[362] Véanse, *Reporte de Operación (Operation Report)*, pág. 549 de la Entrada Núm. 128 de SUMAC, pág. 150 de la 200; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 70-73.

[363] Véanse, *Notas post Operatoria (Post Op. Note) del Dr. Bermúdez Vera*, pág. 599 de la Entrada Núm. 128 de SUMAC, pág. 200 de 200; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 73-77.

[364] Véanse, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 79-81; y, *Órdenes Médicas (Physician's Orders)*, pág. 1,492 de la Entrada Núm. 128 de SUMAC, pág. 92 de 100.

[365] Véanse, *Reporte de Consulta de Consulta del neumólogo, Dr. Javier Ramos Rossi al Dr. Bermúdez Vera (Report to Consultation)*, pág. 14 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200.

[366] Véase, *Notas del Cirujano Dr. Bermúdez Vera*, pág. 613 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200.

[367] Véase, *Hallazgos/Impresión de placa de pecho del Departamento de Radiología (Findings/Impression, chest view, Radiology Department)*, págs, 409-412, 417 de la Entrada Núm. 128 de SUMAC, págs. 9-12, 17 de 200.

en buena posición, pero que sería removido al próximo día.[368] Consta en la prueba presentada que el Dr. Bermúdez Vera llegó a esa conclusión al revisar personalmente el tubo de pecho y constatar que estaba drenando.[369] Además, en palabras coloquiales, la Juez expresó que el Dr. Bermúdez Vera le explicó que no reposicionó el tubo de pecho porque la grasa del paciente tapa el hueco centinela y lo sella haciendo el trabajo.[370]

Por su parte, el perito **Dr. Rodríguez Ortíz** opinó que el tubo de pecho que el Dr. Bermúdez Vera colocó al paciente no tuvo ninguna relación con el fallecimiento del señor Modestti Torres. El tubo de pecho drenó el líquido —que era consistente con el fallo renal congestivo que sufría el paciente— de forma efectiva.[371] En ese sentido, el Dr. Rodríguez Ortiz opinó no estar de acuerdo con la conclusión que hizo el Dr. Timmerman de que el tubo de pecho colocado por el Dr. Bermúdez Vera no estaba drenando. Reiteró que el tubo de pecho **drenó completamente la efusión**,[372] por lo que luego de ilustrar al tribunal de la función efectiva del tubo,[373] expresó no tener ninguna duda que la efusión se drenó.[374]

Todavía más, el Dr. Rodríguez Ortiz opinó que las condiciones crónicas del señor Modestti Torres, entre ellas, el fallo cardiaco congestivo se manifestaba en el desarrollo de efusiones pleurales; por lo que al no mejorar la disfunción cardiaca, el paciente seguía produciendo más efusiones. El perito opinó que, aun cuando el centinela (último orificio del tubo de pecho) no estaba en el dentro del pecho, estaba ubicado en el espacio entre el pecho y la piel que

---

[368] Véanse, *Notas del Cirujano Dr. Bermúdez Vera del 1 de abril de 2019, para remoción de tubo de pecho*, pág. 781 de la Entrada Núm. 128 de SUMAC, pág. 14 de 200; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, pág. 118.

[369] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 121-123.

[370] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 222-226.

[371] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, pág. 106.

[372] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 133-134. Énfasis nuestro.

[373] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 138-141, 143-144.

[374] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 147-148.

está compuesto por tejido subcutáneo, que cierra el defecto. Apoyó el juicio médico del cirujano de no reposicionar el tubo de pecho, dado que el radiólogo no conoce la dinámica del porqué el tubo está funcionando o deja de funcionar.[375]

Además, en su Informe Pericial, el Dr. Rodríguez Ortíz difirió del issue #5 al opinar que:

> *Múltiples especialistas evaluaron al paciente por su condición crónica. La amputación de una osteomielitis (infección del dedo), en un paciente con pobre perfusión causado por enfermedad arteriosclerótica periferovascular como por diabetes, no lo ayudaron a sanar y se convirtieron sus dedos infectados en un foco infeccioso.*
> ***Si los agujeros de los tubos de pecho están fuera, aun cuando no crean un vacío para drenar la efusión, no contribuyen a su condición de los dedos, ni a su condición pulmonar, ni a su muerte. Son puntos establecidos por el perito demandante, que no contribuyen a la muerte de este paciente.***[376]

A lo antes dicho, cabe destacar que los tratamientos **postoperatorios** no terminaron con la colocación del tubo de pecho, pues el **27 de marzo de 2019** el internista y médico primario, Dr. Amparo Flores consultó al Dr. Bermúdez Vera para que realizara un procedimiento de catéter de la vena subclavia derecha, debido a la deshidratación que sufría el paciente.[377]

El **3 de abril de 2019**,[378] el Dr. Bermúdez Vera le solicitó telefónicamente al radiólogo invasivo, Dr. Salvador Mercado que por medio de los métodos radiológicos le colocara al señor Modestti Torres una línea central de acceso venoso (cánula) para que continuara con el suministro de medicamentos y hemodiálisis, dado los múltiples procedimientos que recibía como paciente ranal.[379]

No obstante, el cuadro médico del paciente se complicó más cuando el **9 de abril de 2019** se reveló que el señor Modestti Torres

---

[375] Véase, Transcripción de la Prueba Oral del 10 de mayo de 2023, págs. 218-220.

[376] Véase, Issue #5: *"Postoperative Care and Professional Standards",* Informe Pericial del Dr. Rodríguez Ortíz, págs. 10-11 de la Entrada Núm. 125 de SUMAC, págs. 10-11 de 12. Énfasis nuestro.

[377] Véase, *Reporte de Consulta (Consultant Report),* pág, 16 de la Entrada Núm. 128 de SUMAC, pág. 16 de 200.

[378] Véase, *Órdenes Médicas (Physician's Orders),* pág. 1,519 de la Entrada Núm. 128 de SUMAC, págs. 19 de 100.

[379] Véase, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 123-124.

(quien se encontraba en la unidad de cuido intensivo) dio positivo a las bacterias: **Acinetobacter baumannii** y **E. coli**, como resultado del cultivo de esputo.[380]

En un intento por promover la desconexión del señor Modestti Torres del ventilador mecánico, el **20 de abril de 2019** el neumólogo intensivista, Dr. Javier Ramos Rossi le consultó al Dr. Bermúdez Vera la posibilidad de un procedimiento de traqueotomía. Sin embargo, ante diagnóstico de fallo respiratorio crónico del paciente, el Dr. Bermudez Vera, entre otras cosas, recomendó por escrito: *"On call to tracheostomy on monday." "Start on vitamin K therapy."*[381] El **21 de abril de 2019** el Dr. Bermudez Vera no llevó a cabo la traqueotomía, dado que el cuadro médico del peciente no mejoraba.[382] El **23 de abril de 2019** el Dr. Bermúdez Vera anotó que el problema respiratorio del paciente era crónico y continuaba con niveles elevados de PT, por lo que recomendó una transfusión de *"fresh frozen plasma"* y vitamina K, para mejorar los niveles de coagulación.[383]

La condición de salud del paciente se torna más complicada cuando el **30 de abril de 2019** el neumólogo intensivista, Dr. Javier Ramos Rossi le consultó nuevamente al Dr. Bermúdez Vera para ver si era posible realizar al señor Modestti Torres una colecistectomía (extirpar la vesícula biliar por causa de piedras). No obstante, y debido a la condición inestable de *colecistitis aguda* y la *coagulopatía*

---

[380] Véase, resultado de cultivo del expediente médico del BMC, la pág. 182 de la Entrada Núm. 128 de SUMAC, págs. 182 de 200.

[381] Véase, *Reporte de Consulta (Consultant Report)*, pág, 21 de la Entrada Núm. 128 de SUMAC, pág. 21 de 200.

[382] Véanse, *Notas del Cirujano, Dr. Bermúdez Vera*, pág. 1,139 de la Entrada Núm. 128 de SUMAC, págs. 140 de 201; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 128-129.

[383] Véanse, *Notas del Cirujano, Dr. Bermúdez Vera*, pág. 1,170 de la Entrada Núm. 128 de SUMAC, págs. 171 de 201; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 129-130.

que sufría el paciente, el Dr. Bermudez Vera no recomendó remover la vesícula en ese momento.[384]

Pese a los intentos de los médicos y especialistas, el cuadro de salud que afectaba al señor Modestti Torres fue deteriorándose a tal extremo que el **12 de mayo de 2019**, el paciente falleció de un *"shock"* por **sepsis** secundaria a neumonía.[385] En ese sentido, el **Dr. Rodríguez Morales** opinó que las bacterias: *Acinetobacter baumannii* y *E. coli,* encontradas en el cultivo de esputo realizado el 6 de abril de 2019,[386] eran agresivas y resistentes a la gran mayoría de los antibióticos, y con **pacientes inmunosuprimidos** como el señor Modestti Torres, fue bien significativo en ese momento, pues la presencia de *"shock"* por sepsis fue el detonante de la muerte del paciente.[387] También, en su Informe Pericial, el Dr. Rodríguez Morales difirió del issue #5, en lo pertinente, opinó:

> *[...] **Con mayor probabilidad el fallo cardiaco, el fallo renal y el fallo respiratorio con infección y sepsis (A. Baumanii) fueron las causas principales del fallecimiento en este paciente y no el manejo de las ulceras de sus pies**.*
> *Con un alto grado de certeza médica soy de la opinión de que no ocurrió una desviación de la mejor práctica de la medicina en la atención del paciente Ángel F. Modestti Torres, por parte del Bayamón Medical Center y su personal durante su atención entre el 13 de febrero y el 12 de mayo de 2019.[388]*

En fin, un análisis objetivo de la prueba presentada sobre el issue #5: *Postoperative Care and Professional Standards*, del Informe Pericial del Dr. Timmerman, nos lleva a concluir que el cuidado postoperatorio brindado por el Dr. Bermúdez Vera y el personal médico del BMC, no fue negligente ni fue el factor que con mayor probabilidad causó la muerte del señor Modestti Torres.[389] Como

---

[384] Véanse, *Notas del Cirujano, Dr. Bermúdez Vera*, pág, 1,258 de la Entrada Núm. 128 de SUMAC, pág. 59 de 101; y, Transcripción de la Prueba Oral del 5 de mayo de 2023, págs. 130-133.
[385] Véase, *Certificado de Defunción*, págs, 2,208-2,209 de la Entrada Núm. 128 de SUMAC, págs. 8-9 de 52.
[386] Véase, resultado de cultivo del expediente médico del BMC, la pág. 182 de la Entrada Núm. 128 de SUMAC, págs. 182 de 200.
[387] Véase, Transcripción de la Prueba Oral del 12 de mayo de 2023, págs. 53, 56-57.
[388] Informe Pericial del Dr. Rodríguez Morales, pág. 4 de la Entrada Núm. 129 de SUMAC, pág. 4 de 4. Énfasis nuestro.
[389] *López v. Dr. Cañizares, supra*, págs. 134-135.

bien indicó el Dr. Rodriguez Morales en su Informe Pericial sobre la enfermedad de la diabetes:

> *La historia natural de la enfermedad conocida como diabetes es devastadora ya que afecta todos los órganos y tejidos del cuerpo humano. Afecta la micro vascularidad de los tejidos, de esta forma dañando los riñones causando fallo renal. Esto a su vez hace que suba la presión arterial causando daño a las arterias coronarias con mayor incidencia de infartos. El endurecimiento de las arterias del cerebro también produce cambios que aumentan la incidencia de derrames cerebrales. Se afectan los nervios periféricos causando neuropatías y múltiples problemas visuales. Una vez comienza ese ciclo de daño a los tejidos, el mismo es progresivo e irreversible, no importa que hagamos. Desgraciadamente solo podemos ofrecer tratamiento de soporte paliativo, en la mayoría de las ocasiones en forma muy limitada. Esta realidad es sumamente frustrante, tanto para los pacientes como para los proveedores de servicios médicos.[390]*

Reconocemos el dolor que la pérdida del señor Modestti Torres ocasionó en sus familiares y amistades. Sin embargo, no consideramos suficiente, alegar una mera posibilidad de que el daño se debió al incumplimiento del médico con su responsabilidad profesional.[391] Nótese que los hechos de este caso nos sitúan en el campo del juicio médico, en el que por una parte, tenemos la opinión del Dr. Timmerman que difiere del diagnóstico y tratamiento médico del Dr. Bermúdez Vera; y de otra parte, tenemos las dos (2) opiniones de los peritos Dr. Rodríguez Ortíz y Dr. Rodríguez Morales que respaldan el proceder médico del Dr. Bermúdez Vera. Tengamos en cuenta que al momento de evaluar una acción en daños por alegada impericia médica debemos recordar que el médico posee discreción para formular un juicio profesional en cuanto al diagnóstico y tratamiento médico, a tenor con las circunstancias personales del paciente,[392] que en este caso, era un hombre de 65 años que padecía de una diabetes prolongada tipo 2 en estadio final de enfermedad renal crónica (ESRD) y con complicaciones relacionadas que fueron agravándose hasta ocasionarle la muerte. Recordemos que la

---

[390] Informe Pericial del Dr. Rodríguez Morales, pág. 3 de la Entrada Núm. 129 de SUMAC, pág. 3 de 4. Énfasis nuestro.
[391] *López v. Dr. Cañizares, supra*, 135.
[392] *López v. Dr. Cañizares, supra*, pág. 134.

negligencia del médico no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso.[393]

**-IV-**

Por las razones expuestas, revocamos la Sentencia apelada que atribuyó negligencia por mala práctica médica contra el Dr. Bermúdez Vera y responsabilidad vicaria contra el BMC.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[393] *Rodríguez Crespo v. Hernández, supra*, pág. 650.